# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

CRAIG REED, *et al.,*

        Plaintiffs,

    vs.

FREEBIRD FILM PRODUCTIONS, INC.,
*et al.,*

        Defendants.

)
)
)
)
)
)
)
)
)
)

CASE NO. 1:08CV1761

JUDGE CHRISTOPHER A. BOYKO

---

**Memorandum In Opposition to RHI Entertainment's
Motion for Summary Judgment; Civil Rule 56(f) Motion Relating to
RHI's "Lack of Profit" and "Contemplation" Defenses**

---

Respectfully submitted,


/s/  H. Alan Rothenbuecher
H. Alan Rothenbuecher (0041883)
  hrothenbuecher@szd.com
T. Earl LeVere  (0063515)
  elevere@szd.com
Schottenstein Zox & Dunn, Co., LPA
US Bank Center at Playhouse Square
1350 Euclid Avenue
Suite 1400
Cleveland, Ohio  44115
Phone: (216) 394-5075
Facsimile: (216) 394-5092

*Attorney for Craig Reed and Survivor Films*

{H1457410.2 }

# Table of Contents

                                                                                   **Page**

INTRODUCTION ...................................................................................................................1

FACTS ....................................................................................................................................1

    1.    Reed's Agreement with Freebird Video and Cabin Fever regarding the Use of His Film Footage. .....................................................................................1

    2.    Cabin Fever and Freebird Video. ...........................................................................3

    3.    RHI Assumes Cabin Fever's Obligations to Reed. ................................................4

    4.    Reed's Complaint against RHI. ..............................................................................4

ARGUMENT ...........................................................................................................................6

    1.    Standard of Review. ...............................................................................................6

    2.    RHI has a Direct Contractual Obligation of Payment to Reed. .............................7

    3.    Reed is also an Intended Third Party Beneficiary of Cabin Fever's Contract with Freebird Video. ...............................................................................9

    4.    The Case Law Relied upon by RHI is Inapplicable. .............................................12

    5.    RHI's Arguments for Disavowing its Obligations are Unavailing. ......................13

    6.    RHI Failed to Provide Admissible Evidence. .......................................................15

    7.    Genuine Issues of Fact Exist over whether Royalties are Owed to Reed. ............17

CONCLUSION ........................................................................................................................20

<u>**Cases**</u>

*2361 State Corp. v. Sealy, Inc.*, 402 F.2d 370 (7th Cir. 1968)........................................................ 6

*Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496 (6th Cir. 2007) ............................ 6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 6

*Aymes v. Gateway Demolition, Inc.*, 817 N.Y.S.2d 233 (N.Y. App. Div. 2006)......................... 13

*Batchelor v. Sears, Roebuck & Co.*, 574 F. Supp. 1480 (E.D. Mich. 1983)................................. 6

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................. 6

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991)........................................................ 6

*Connection Distrib. Co. v. Keisler*, 505 F.3d 545 (6th Cir. 2007).................................................. 6

*Fink v. Ohio Health Corp.*, 2004 WL 3511614 (S.D. Ohio August 25, 2004)............................ 16

*Gettings v. Building Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300
        (6th Cir. 2003)....................................................................................................................... 15

*Hines v. Amole*, 4 Ohio App. 3d 263 (1989)................................................................................ 10

*Johnson v. Jones*, 149 F.3d 494, 506 .......................................................................................... 18

*Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d. 819 (9th Cir. 1985) ........................... 10

*LaSalle Nat'l Bank v. Ernst & Young LLP*, 729 N.Y.S.2d 671 (N.Y. App. Div. 2001).............. 13

*Lumhoo v. Home Depot USA, Inc.*, 229 F.Supp.2d 121 (E.D.N.Y. 2002).................................... 7

*Oursler v. Women's Interart Center, Inc.*, 566 N.Y.S.2d 295 (N.Y. App. Div. 2001)................. 13

*Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409 (N.D. Ohio 1976) ................................. 7

*Septembertide Publishing, B.V. v. Stein and Day, Inc.*, 884 F.2d 675 (2nd Cir. 1989) ................ 10

Stainbrook v. Fox Broadcasting Co., 2006 WL 3757643 (N.D. Ohio 2006) ............................... 19

*Thorworks Industries v. E.I. Dupont de Nemoirs and Co.*, 2008 WL 4966068
        (N.D. Ohio Nov. 17, 2008) ..................................................................................................... 9

*TRINOVA Corp. v. Pilkington Bros., P.L.C.*, 70 Ohio St. 3d 271 (1994)..................................... 10

*U.S. v. Bray*, 139 F. 3d 1104 (6th Cir. 1998) ............................................................... 18

*Varga v. Rockwell International Corp.*, 242 F. 3d 693 (6th Cir. 2000).......................... 19

*Woodruff v. National Life Ins. Co.*, 2006 WL 2792204 (E.D. Tenn., July 24, 2006)................... 18

## **Rules**

Fed. R. Civ. P. 56(e)(1) .......................................................................................... 15, 18

Fed. R. Civ. P. 56(f) ............................................................................................ passim

Fed. R. Civ. P. 56(c) .................................................................................................... 6

Fed. R. Evid. 1006 ..................................................................................................... 18

## STATEMENT OF THE ISSUES TO BE DECIDED

- Whether Defendant RHI Entertainment is liable to Craig Reed for breaching its predecessor Cabin Fever's agreement to pay Reed 2.5% of the profits arising from Freebird…The Movie.

- Whether Craig Reed is an intended third party beneficiary of the agreement between Cabin Fever and Freebird Video Productions.

- Whether RHI can rely upon inadmissible hearsay and unauthenticated documents in support of its motion for summary judgment.

- Whether Civil Rule 56(f) precludes RHI's reliance upon its "lack of profit" and "contemplation" defenses.

## SUMMARY OF ARGUMENT

In 1995, Defendants Cabin Fever Entertainment and Freebird Video Productions jointly agreed to pay Plaintiff Craig Reed $5,000 and 2.5% of the net profits earned from a documentary they were producing about Lynyrd Skynyrd, which was to include Reed's historic film footage of the band. Cabin Fever made the required initial royalty payments to Reed and even acknowledged in writing its agreement with Reed. As a result, RHI Entertainment stepped into Cabin Fever's shoes when it assumed Cabin Fever's obligations arising from the documentary. Those obligations included Cabin Fever's direct agreement to pay Reed and Cabin Fever's additional indirect promise to pay Reed as an intended third party beneficiary of the agreement between Cabin Fever and Freebird Video regarding the documentary. As a result, RHI is liable to Reed for breach of contract and its motion for summary judgment should be denied. This is particularly so because RHI only offers inadmissible evidence in support of its motion and otherwise presents arguments which must be rejected under Civil Rule 56(F).

# INTRODUCTION

In 1995, Defendants Cabin Fever Entertainment and Freebird Video Productions agreed to pay Plaintiff Craig Reed $5,000 and 2.5% of the net profits earned from a documentary they were producing about Lynyrd Skynyrd. The documentary was to include Reed's historic film footage of the band.

Cabin Fever made the required initial royalty payments to Reed. In 1998, however, Hallmark Entertainment Distribution, LLC, acquired the assets and obligations of Cabin Fever associated with the Lynyrd Skynyrd documentary. Those assets and obligations arising from the documentary included both: (1) Cabin Fever's direct obligation to Reed to pay him for the use of his film footage; and (2) Cabin Fever's indirect obligation to pay Reed as an intended third party beneficiary of Cabin Fever's related contract with Freebird Video.

Despite Cabin Fever's partial performance of its promise to pay Reed, RHI Entertainment Distribution, LLC (the successor to Hallmark) now contends there exists no further obligation to pay any monies to Reed because it has no duty to make such further payment and, even if it did, no profits have accrued to trigger the 2.5% profit payment. As to its contention that is has no payment obligation to Reed, RHI is wrong as a matter of law and fact. As to its contention no profits have accrued, Civil Rule 56(f) precludes entry of judgment on that defense.

# FACTS

### 1.  Reed's Agreement with Freebird Video and Cabin Fever regarding the Use of His Film Footage.

From 1974 through most of 1977, Reed worked for the band Lynyrd Skynyrd. In 1976 and 1977, as a personal project and hobby, he used his own camera to shoot approximately 90 minutes of concert and "behind the scenes" film footage containing various members of Lynyrd Skynyrd and its crew. Reed later edited his home movie footage to create two reels of film titled

"Craig Reed – LYNYRD SKYNYRD – 8MM Film Reel – ONE" and "Craig Reed – LYNYRD SKYNYRD – 8MM Film Reel – TWO" (hereinafter "Reel 1" and "Reel 2" individually, and "the Film," collectively). (Reed Dec. ¶2-8, 10-12).

Sometime during early summer of 1995, Judy Van Zant Jenness (the widow of former lead singer Ronnie Van Zant) contacted Reed and asked whether he would be willing to license his summer 1977 film footage for use in a documentary about Lynyrd Skynyrd that Freebird Video and Cabin Fever were producing. He indicated he would and on July 31, 1995, Reed signed a letter he received from Freebird Video regarding Freebird Video's and Cabin Fever's use of his film footage in their Lynyrd Skynyrd documentary. Reed signed the letter with the understanding that Freebird Video and Cabin Fever would be jointly responsible for paying him for the use of his film footage as described in the letter (*i.e.*, $5000.00 plus 2.5% of the net profits of the documentary). (Reed Dec. ¶15-17; Ex.A thereto).

Reed's understanding that Freebird Video and Cabin Fever would be jointly responsible for the payment due him for the use of his film footage was premised on several statements from both of them. First, the letter he signed on Freebird Video's stationary repeatedly used "we," which he understood to encompass both Freebird Video and Cabin Fever. Second, the statements in that same letter indicated that either Freebird Video or Cabin Fever, or both, would be making the promised payments to Reed. Third, in his discussions with Judy Van Zant Jenness (from Freebird Video) and Jeff Waxman (from Cabin Fever) about the use of his film footage, both persons stated that Reed would be paid for the use of the film footage by their respective companies. Reed also understood from the letter he signed and his discussions with Jenness and Waxman that the footage he provided would be used only in the documentary and would not be

used anywhere else without his prior permission and without further compensation to him. (Reed Dec. ¶18; Ex.A thereto).

With the understanding in mind that he had an agreement with Freebird Video and Cabin Fever regarding the use and payment for the inclusion of his footage in the documentary, Reed sent Reel 1 to Cabin Fever. On August 7, 1995, Reed received a letter from Cabin Fever in response to his sending Reel 1 to it. Enclosed with the letter was a check for $2,500.00 from Cabin Fever. Cabin Fever further stated that "***pursuant to our agreement***, upon the initial exhibition of the Film, you will be paid an additional $2,500.00." Reed understood Cabin Fever's reference to "our agreement" to mean the agreement between Cabin Fever and Reed whereby Cabin Fever would pay him $5,000.00 plus 2.5% of the profits it earned from the documentary. The letter was consistent with and confirmed Reed's earlier discussion with Waxman regarding payment, and even acknowledged the next schedule installment payment of $2,500.00. (Reed Dec. ¶19-21; Ex.B thereto)(emphasis in quote added).

Reed did receive that additional $2,500.00 payment from Cabin Fever when the documentary – Freebird…The Movie – was released in August 1996. Reed was listed in the on-screen credits to the documentary. Reed, however, is still waiting for the 2.5% profit payment. (Reed Dec. ¶20, 22-26).

**2. Cabin Fever and Freebird Video.**

Cabin Fever entered into an agreement with Freebird Video regarding the production of the documentary. In its agreement with Freebird Video, Cabin Fever stated that it was assuming payment of certain expenses and royalties as set forth in the budget on Schedule B to the agreement.[1] (Ringler Dec. ¶7; Ex. C: Cabin Fever/Freebird Video Agreement §7.2)[ECF 50-5

---

[1] No defendant has produced a copy of the Schedule B budget despite repeated requests for the schedule. Efforts to secure the schedule from Cabin Fever's...*[footnote continued on next page]*

and 50-8]. Cabin Fever made certain royalty payments (*i.e.*, $5,000.00) directly to Reed for the use of his film footage. (Reed Dec. ¶20). This payment was necessarily an expense for producing the documentary.

### 3. RHI Assumes Cabin Fever's Obligations to Reed.

In 1998, Hallmark Entertainment Distribution (which years later RHI Entertainment Distribution succeeded) acquired the assets of Cabin Fever. Among the assets it acquired was the rights to Freebird...The Movie. Also acquired by Hallmark (and then RHI) was Cabin Fever's accompanying obligations to pay royalties and other similar amounts to unaffiliated parties, licensors, and profit participants of the Lynyrd Skynyrd documentary (*i.e.*, Freebird...The Movie). (Ringler Dec. ¶¶2-5, 8; Hallmark/Cabin Fever Agreement at §1.2(a)(i) and (v))[ECF 50-5 and 50-6].

Reed is an unaffiliated party, licensor, and profit participant of Freebird...The Movie. Cabin Fever even admitted in writing and verbally to Reed that it had an agreement with him to pay him profits associated with Freebird...The Movie. (Reed Dec. ¶18,21). This is an obligation RHI assumed both directly and indirectly, as is explained in greater detail below.

### 4. Reed's Complaint against RHI.

RHI is named a defendant to Plaintiffs' copyright infringement claim. Plaintiffs (hereinafter collectively referred to as "Reed") contend that RHI and the other defendants impermissibly used Reed's copyrighted films in various video projects, including VHS and DVD products, live concert productions, and music videos. (Complaint, Count II). During discovery,

---

*[footnote continued from prior page]* ...prior owner UST were also unavailing, as UST has stated Hallmark (RHI's predecessor) should have that and all other schedules to the Cabin Fever/Freebird Video Agreement. Hallmark (via RHI) has stated it does not have the schedule, nor has Freebird Video produced any schedule to the Cabin Fever/Freebird Video Agreement. (Rothenbuecher Aff. ¶ 9-10).

RHI declared that is was only involved in the marketing, distribution, and sale of Freebird...The Movie, and that it had no involvement in any of the other video projects which incorporate Reed's copyrighted films. Further, as to its involvement with Freebird...The Movie, RHI produced a copy of an agreement showing it purchased the license to market, distribute, and sell that movie. (Ringler Dec. ¶¶2-5, 8; Ex. A: Hallmark/Cabin Fever Agreement §1.2(a)(i) and (v))[ECF 50-5 and 50-6]. As such, it has no apparent liability for copyright infringement relating to the use of Reed's film footage in other media or products.

Despite having no apparent liability for copyright infringement, when RHI (though its predecessor Hallmark Entertainment) purchased Freebird...The Movie, it assumed all liabilities associated therewith. *Id.* This included all contractual liabilities Cabin Fever had arising from that movie. As a result, RHI is liable to Reed for breach of contract because Reed is both a direct promisee and third party beneficiary of Cabin Fever's obligations relating to Freebird...The Movie. Indeed, Reed sued Cabin Fever for breach of Cabin Fever's obligations to him.[2] Because RHI assumed that obligation when it purchased the rights to Freebird...The Movie, it also assumed Cabin Fever's liability to Reed arising from that movie. It stepped into Cabin Fever's shoes as a defendant to Reed's breach of contract claim against Cabin Fever arising from the documentary.[3] Therefore, RHI is liable to Reed for breach of contract, and is properly maintained as a defendant to that claim.

---

[2] Reed alleged that both Cabin Fever and Hallmark, which was distributing the film, failed to pay Reed any portion of the profits due him from the sale and distribution of Freebird...The Movie. (Plaintiffs' Complaint ¶45).

[3] The Court has not set any deadline for amending the complaint. But, as the parties and Court is aware (and as confirmed by this filing), RHI is a professed defendant to Reed's breach of contract claim.

**ARGUMENT**

**1.    Standard of Review.**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together, with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  RHI "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes *demonstrate the absence* of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (emphasis added) (quoting Fed. R. Civ. Proc. 56(c)). Thus, RHI "carries the burden of proving that there is no genuine issue of material fact." *Connection Distrib. Co. v. Keisler*, 505 F.3d 545, 551 (6th Cir. 2007) (emphasis added).

To succeed on a summary judgment motion, "it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  The party "opposing summary judgment does not have the burden of showing that there is a genuine issue for trial *until* the movant has produced evidentiary material showing that there is no genuine issue as to any material fact." *2361 State Corp. v. Sealy, Inc.*, 402 F.2d 370, 375 (7th Cir. 1968) (emphasis added); *see also Batchelor v. Sears, Roebuck & Co.*, 574 F. Supp. 1480, 1483 (E.D. Mich. 1983) (same).  Only if RHI satisfies this initial burden does the burden shift to the Reed to show that there is more than a "scintilla of evidence" in support of his position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Moreover, in considering RHI's motion, the Court must view all of the evidence and the reasonable inferences therefrom in the light most favorable to Reed and must resolve all doubts in the Reed's favor. *See Anderson*, 477 U.S. at 255; *Abdulnour v. Campbell Soup Supply Co., LLC*,

502 F.3d 496, 501 (6th Cir. 2007). If under this standard a "jury *could* return a verdict for the nonmoving party, summary judgment *must be denied*." *Abdulnour*, 502 F.3d at 501 (emphasis added) (citation omitted). This standard mandates that RHI's request for summary judgment be denied.

### 2.     RHI has a Direct Contractual Obligation of Payment to Reed.

In discussions between Cabin Fever and Reed, Cabin Fever offered to review Reed's film footage. If Cabin Fever determined after examining the film footage that it could be utilized in the Lynyrd Skynyrd documentary, Cabin Fever offered to pay Reed $5,000.00 plus 2.5% of the net profits it earned from the documentary. Reed accepted that offer and sent his film footage to Cabin Fever for its review. Cabin Fever ended up using the film footage in the documentary and began paying Reed in accordance with the payment terms of their agreement. This offer, acceptance, and performance by Reed and the accompanying acceptance and performance by Cabin Fever created an enforceable contract between Reed and Cabin Fever under both Ohio and New York law. *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D. Ohio 1976) (reciting essential elements of contract under Ohio law); *Lumhoo v. Home Depot USA, Inc.*, 229 F.Supp.2d 121, 161 (E.D.N.Y. 2002) (reciting essential elements of contract under New York law). Cabin Fever even acknowledged it had a direct agreement with Reed regarding the payment for the use of his film footage: "… pursuant to *our* agreement, upon the initial public exhibition of the [documentary]…". (Reed Dec. ¶20-21; Ex.B)(emphasis and explanation added). Thus, Cabin Fever is an obligor to Reed and the promissor of the installment and profit payments to him.

Equally as significant, Reed understood and believed based upon his discussions with Waxman and Jenness,[4] the July 31, 1995 letter he signed, and the written confirmation and payments he received from Cabin Fever, that that he had an agreement with Cabin Fever regarding the use and payment of his footage. The payment included initial installment payments and subsequent profit participation. (Reed Dec. ¶18-21).

Cabin Fever had a similar understanding. First, Cabin Fever acted upon their agreement by paying him the initial $5,000 required under their agreement, and by acknowledging *its* agreement with Reed. Second, Cabin Fever (through Waxman) and Freebird Video (through Jenness) expressed their agreement to Reed that he would be paid by them for the use of his film footage in the documentary. Thus, there was, at a minimum, a direct agreement between Reed and Cabin Fever that Cabin Fever would pay Reed $5,000.00 and 2.5% of the net profits for the use of Reed's film footage in the documentary. That obligation became RHI's obligation.

In 1998, Hallmark (now RHI) assumed Cabin Fever's obligations to pay royalties and other amounts to unaffiliated parties, licensors, and profit participants to the Lynyrd Skynyrd documentary (*i.e.*, Freebird…The Movie). (Ringler Dec. ¶¶2-5, 8; Ex.A: Hallmark/Cabin Fever Agreement §1.2(a)(i) and (v))[ECF 50-5 and 50-6]. RHI admits the same: "RHI also agreed to assume 'the Company's [Cabin Fever's] obligations to account and pay royalties or other similar amounts to unaffiliated third parties…'." Id. at ¶4. Reed, like Freebird Video, is an unaffiliated party, licensor, and profit participant of Freebird…The Movie. Thus, if RHI assumed Cabin Fever's obligation to pay unaffiliated third party Freebird Video, as it admits it did, then it also assumed Cabin Fever's correlating obligation to Reed, which arose from and relates to the same

---

[4] Judy Van Zant Jenness was the executive producer for Freebird…The Movie. (Reed Dec. ¶56). Jenness also signed the 1995 Cabin Fever/Freebird Video Agreement on behalf of Freebird Video Productions. (Ringler Dec. ¶5 Ex. C pg. 21)[ECF 50-5 and 50-8].

underlying documentary. (Ringler Dec. ¶8). As a result, RHI is liable for the alleged failure of Cabin Fever to pay Reed in accordance with its direct agreement with him, and is properly maintained as a defendant to Reed's breach of contract claim.

### 3. Reed is also an Intended Third Party Beneficiary of Cabin Fever's Contract with Freebird Video.

RHI also has an obligation of payment to Reed because Reed is an intended third party beneficiary of the contract between Cabin Fever and Freebird Video, which Hallmark and RHI assumed. (Ringler Dec. ¶¶2-5, 8; Ex.A: Hallmark/Cabin Fever Agreement §1.2(a)(i) and (v))[ECF 50-5 and 50-6]. An intended beneficiary of a contract has enforceable rights under the contract. In determining whether Reed is an intended beneficiary of the Cabin Fever/Freebird Video Agreement assumed by Hallmark and then RHI, both New York and Ohio apply Section 302 of the Restatement of the Law 2d, Contracts (1981) 439-440. Section 302 states:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
>  (a) the performance of the promise will satisfy an obligation of the promise to pay money to the beneficiary; or
>  (b) the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance.

> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Under this test (also referred to as the "intent to benefit" test), there are two types of recognized intended third party beneficiaries: creditor and donee beneficiaries. *Thorworks Industries v. E.I. Dupont de Nemoirs and Co.*, 2008 WL 4966068 at *3 (N.D. Ohio Nov. 17, 2008).

A party is a creditor beneficiary if the performance of the promise will satisfy an actual, supposed, or asserted duty of the promisee to the beneficiary and is not intended as a gift. *Id.* A party is a donee beneficiary if performance of the promise is intended to bestow some gratuitous benefit rather than satisfy a legal obligation. *Id.* Notably, the intended beneficiary need not be

named in the contract, so long as he is contemplated by the parties to the contract. *Hines v. Amole*, 4 Ohio App. 3d 263, 268 (1989); *Septembertide Publishing, B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 679 (2nd Cir. 1989)(New York law); *Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d. 819, 821-922 (9th Cir. 1985)(if person is a member of a class referred to and identified in the contract, he is an intended third party beneficiary).

In determining the intent of the parties, the court must examine the underlying agreements and surrounding circumstances. *Septembertide*, 884 F.2d. at 679; *Thorworks*, 2008 WL 4966068 at *4; *TRINOVA Corp. v. Pilkington Bros., P.L.C.,* 70 Ohio St. 3d 271, 277 (1994)(two related documents may be read to garner intent of parties). Such an examination results in the finding that Reed is an intended third party beneficiary of the Cabin Fever/Freebird Video Agreement. The Second Circuit found so under New York law when confronted with an analogous scenario in *Septembertide*.

In *Septembertide*, the author of a book entered into an exclusive licensing agreement with Stein and Day to publish a hardcover edition of his work. Under the contract, Stein and Day was to pay certain advances against future royalties. Stein and Day was to also pay a share to the author of any sublicensing income earned from paperback versions of the book.

Stein and Day entered into a sublicense agreement for the paperback version with New Library. The author was not a party to the sublicense agreement. Some time thereafter, the author of the book (after having terminated his relationship with Stein and Day) asked New Library to forward to him all future payments due to Stein and Day under the paperback agreement. New Library refused, resulting in the author suing New Library for the remaining payments under the paperback agreement as a third party beneficiary to that agreement.

The *Septembertide* court determined the author was an intended third party beneficiary of the paperback agreement. The court found it significant that New Library knew of the author and his relationship with Stein and Day, New Library's funds were used to make the initial payments owed by Stein and Day to the author, and the well-known industry practice was to pay authors a royalty for the publication of their work in any media. *Id.* at 680; *see also Thorworks*, 2008 WL 4966-68 at *5 (if promisor under contract made a royalty or other payment to the professed third party beneficiary, then that third party beneficiary is an intended creditor beneficiary).

A similar result is mandated here. First, the performance of Cabin Fever's promise will satisfy Freebird Video's obligation to pay money to Reed. Cabin Fever's *actual conduct* unmistakably establishes its intent to benefit Reed through its promised performance under the Cabin Fever/Freebird Video Agreement. Specifically, Cabin Fever directly paid Reed $5,000.00 to satisfy certain of Freebird Video's obligations to Reed under their July 1995 agreement – the very same agreement which confirms the royalty obligations Reed seeks to enforce.

Second, the circumstances objectively demonstrate that Freebird Video – the promisee under the Cabin Fever/Freebird Video Agreement – intended to give Reed the benefit of the promised promise. Indeed, Freebird Video not only *intended* to give Reed the benefit of the promised promise, it was contractually *obligated* to do so by virtue of its direct agreement with him under the July 1995 letter they signed. Freebird Video's intent to give Reed the benefit of the promised promise is further manifested by the fact that Freebird Video instructed Cabin Fever to pay to Reed monies that Freebird Video was obligated to pay to Reed under their July 31, 1995 letter agreement. Cabin Fever made the requested payments.

Third, Cabin Fever was well aware that Reed was the owner of the footage it was using and incorporating into the documentary. (Reed Dec. ¶20; Ex.B). Cabin Fever even listed Reed in the on-screen credits to the documentary when it released the film. (Reed Dec. ¶56). Fourth, Cabin Fever also knew of (and agreed to) the payment terms for the use of the footage, otherwise it would not have paid him the initial $5,000 referenced in Freebird Video's July 1995 letter to Reed.[5] Indeed, Cabin Fever (through Waxman) expressed its understanding that Reed was the owner of the footage and was to be compensated for the use of the footage in the documentary. Such an arrangement was consistent with the generally known industry practice to pay the creator of a film for use of film footage. (Reed Dec. ¶18).

The preceding reveals that Reed was an intended third party beneficiary of the Cabin Fever/Freebird Video Agreement. Just like in *Septembertide*, Cabin Fever knew of Reed and his relationship with Freebird Video, Cabin Fever's funds were used to make payments owed by Freebird Video (and Cabin Fever itself) to Reed, and under the well known industry practice Reed was to receive a royalty from the recognized publication of his footage in the documentary. As such, he is an intended beneficiary of the Cabin Fever/Freebird Video Agreement, with full rights under that contract (including the right to enforce it for breach) against RHI and Hallmark, who assumed those obligations under Hallmark's agreement with Cabin Fever. *Septembertide*, 884 F.2d. at 680; *Thorworks*, 2008 WL 4966-68 at *5; *see also* Ringler Dec. ¶3-5, 8.

### 4.       The Case Law Relied upon by RHI is Inapplicable.

Despite the parties' objective manifestations of their intent to benefit Reed both under the

---

[5] In early 1995, Cabin Fever, in its agreement with Freebird Video for the production of the documentary, stated that it was assuming payment of certain expenses as set forth in the budget on Schedule B to their agreement. (Ringler Dec. ¶5, Ex. C: Cabin Fever/Freebird Video Agreement §7.2). Although the Cabin Fever/Freebird Video Agreement predated Reed's agreement with Freebird Video (and Cabin Fever), it is evident that the payment obligations owed to Reed became part of the film budget (Schedule B) because Cabin Fever made payments directly to Reed and necessarily incurred this expense as a production cost for the documentary.

Cabin Fever/Freebird Video Agreement and through their actual course of conduct, RHI now

claims that Reed is only an "incidental" beneficiary of the Cabin Fever/Freebird Video

Agreement. In support of its position, RHI cites several cases for the proposition that the parties'

intent to benefit a third party must be apparent from the contract itself. *See, e.g., LaSalle Nat'l*

*Bank v. Ernst & Young LLP*, 729 N.Y.S.2d 671, 676 (N.Y. App. Div. 2001); *Aymes v. Gateway*

*Demolition, Inc.*, 817 N.Y.S.2d 233 (N.Y. App. Div. 2006); *Oursler v. Women's Interart Center,*

*Inc.*, 566 N.Y.S.2d 295 (N.Y. App. Div. 2001). Conspicuously absent from these decisions,

however, is any indication that the parties engaged in the type of conduct present here, which

objectively and unmistakably establishes the parties' intent to benefit the claimed third-party

beneficiary.

The cases relied upon RHI are also inapplicable because Cabin Fever obligated itself

directly to Reed. Cabin Fever promised to pay Reed his 2.5% net profits, and even

acknowledged in writing it had an agreement with him regarding the use of his Film in the

documentary it was producing. (Reed Dec. ¶20, Ex.B). Reed understood their agreement – as

corroborated by Waxman (Cabin Fever) and Jenness (Freebird Video) during their conversations

regarding the use of his footage – was that Cabin Fever and Freebird Video would be jointly

responsible for paying him 2.5% of the profit derived from the documentary. Id. at ¶18-21.

Thus, when RHI (through its predecessor Hallmark) purchased that assets and assumed the

related obligations for profit payments for Freebird…The Movie (which included the 2.5% profit

obligation to Reed), RHI assumed Cabin Fever's joint and several obligation to pay Reed his

promised percentage of the net profits. None of the cases RHI cited take issue with such a

recognized and enforceable obligation.

### 5.  RHI's Arguments for Disavowing its Obligations are Unavailing.

RHI contends that Freebird Video, and not Cabin Fever, was obligated to make the profit

payment to Reed. In support of this contention, it relies upon the absence of the phrase "cause to be paid" in the sentence from the July 31, 1995 letter from Freebird Video to Reed stating "we agree to pay to you 2.5% of our net profits." In drawing that conclusion, however, RHI ignores Cabin Fever's own written admission – dated after the July 31, 1995 letter – acknowledging *its* agreement with Reed. (Reed Dec. ¶20, Ex.B). Reed understood their agreement, as corroborated by Cabin Fever via Jeff Waxman during their conversations regarding the use of his footage, that Cabin Fever would also assume responsibility for paying him 2.5% of the profit derived from the documentary. Thus, RHI's contention that Cabin Fever owed no direct payment obligation to Reed is belied by Cabin Fever's own written and verbal admissions and Reed's understanding of the scope of their agreement, which encompassed an obligation by Cabin Fever to pay him 2.5% of the documentary's profits.

RHI also contends that Reed was not contemplated by the Cabin Fever/Freebird Video Agreement because he was not even asked to provide Reel 1 to Cabin Fever until a few months after the Cabin Fever agreement was entered into (referred to as RHI's "Contemplation" Defense). The schedules to the Cabin Fever/Freebird Video Agreement, however, which could provide insight on this issue, have not been produced by RHI or any other defendant. Schedule A purportedly identifies pre-recorded audiovisual materials used in the documentary. (ECF 50-6 at §1.13 and Schedule A thereto). Reel 1 was such an audiovisual material. Schedule B is Cabin Fever's budget for the documentary. (ECF 50-6 at §7.2). The budget must have included payments for use of Reel 1 since Reed was paid by Cabin Fever for such use. Thus, a reasonable interpretation of the Cabin Fever/Freebird Video Agreement and its schedules is that the payments to Reed and the use of Reel 1 of his Film were covered by the contract and its

schedules.[6] No affirmative evidence has been provided to show Reed and his Film were not

contemplated or covered by the Cabin Fever/Freebird Video Agreement and its schedules. On

the contrary, the uncontroverted evidence shows payments to Reed were contemplated by Cabin

Fever. Not only did Cabin Fever acknowledge such an agreement in writing, it also confirmed

its obligation to pay Reed in conversations with Reed. (Reed Dec. ¶18-21; Ex.B). Thus, RHI

failed to show all facts direct the sole legal conclusion that Cabin Fever did not contemplate

paying Reed for use of his Film.

6.     **RHI Failed to Provide Admissible Evidence.**

RHI makes certain factual statements in its brief, including pronouncing that certain

advances and payments were made. RHI Motion, pg. 4. In support of those statements, RHI

offers the declaration of Jeff Ringler. Ringler's statements, however, are not based upon first

hand knowledge, as required by Civil Rule 56(e)(1). He states certain payments were made

(RHI Motion pg. 4; Ringler Dec. ¶7), yet he was not present when the payments were made and

has not viewed any checks or financial documents showing that the advances and payments were

actually made. Nor does he authenticate or provide the documents stating so. He declares what

the underlying agreements mean or what was intended by them (RHI Motion pg. 4-5; Ringler

Dec. ¶6,7,9), yet he did not participate in the negotiation or drafting of, or communication

---

[6] Alternatively, the absence of the schedules (and discovery thereon) creates a Civil Rule 56(f) issue. RHI contends Reed was not contemplated by either Freebird Video or Cabin Fever in their agreement. Yet, the information and witnesses corroborating or disavowing that contention have not been made available to Reed because the Court stayed further discovery. *See* Court's 12/17/08 Minutes; Rothenbuecher Aff. ¶11-12 (describing the discovery needed, why it is needed, what Reed hopes to uncover with such discovery, and why such information was not previously discovered). Thus, to the extent the Court does not deny this defense outright based on the facts proffered by Reed (which indicate Cabin Fever contemplated Reed), then Reed moves the Court to require RHI to withdraw the defense (because RHI has not provided discovery thereon) or permit Reed to pursue discovery of RHI's "Contemplation Defense" to disavow that defense. *See* Civil Rule 56(f); *Gettings v. Building Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300, 305 (6th Cir. 2003).

relating to the underlying documents. He talks about how the documentary was sold by RHI and its predecessors Cabin Fever and Hallmark (RHI Motion pg. 5), yet he was not part of that decision and does not have any personal knowledge about how Cabin Fever and Hallmark handled and were paid for sales during the time they sold the movie.

Ringler declares advances total about $1 million and remain unrecouped (Ringler Dec. ¶10), but in doing so bases that statement upon hearsay and summaries, none of which have been authenticated or verified (or even produced in support of the motion). He states the royalties earned from Freebird…The Movie are only $88,000.00, but in doing so he ignores the sales and income generated from 1995 through 1998, which – under the very same documents he apparently relies upon as support for the purported costs that Cabin Fever incurred – show sales in excess of $100,000.[7]  (Ringler Dec.¶10; *compare* Rothenbuecher Aff.¶13, H/A 182).

Simply put, Ringler has no first hand knowledge about what was paid under any agreement or what the agreements even mean. His personal knowledge is limited to what RHI knows (which succeeded Hallmark in 2006) and not what its predecessors Hallmark and Cabin Fever knew or did. He declares he reviewed RHI's business records to provide him with first hand knowledge, but he does not identify which documents he reviewed and whether they encompass actual data and records or summaries of such data and records. Moreover, he fails to identify or authenticate the "records" pursuant to Fed. R. Evid. 803(6), rendering those records he relied upon and his statements based thereon inadmissible hearsay. *Fink v. Ohio Health Corp.*, 2004 WL 3511614 at *3 (S.D. Ohio August 25, 2004) (detailing requirements to properly

---

[7]  Ringler also states there "essentially has been no non-device proceeds generated by the Movie." (Ringler Dec. ¶10). Yet, the movie was shown in theaters, earning income. (Reed Dec. ¶57). This lack of personal knowledge renders inadmissible each of his statements and conclusions regarding the costs, income, and other recited "facts" which pre-date RHI's acquisition of Hallmark in 2006 and his apparent "first-hand knowledge."

authenticate a business record to be admissible as an exception under the hearsay rule). As such, all statements made by Ringler about what took place before RHI took over Hallmark, including his pronouncement that Cabin Fever "incurred substantial production costs" (Ringler Dec. ¶6) are inadmissible and cannot be used to support RHI's request for summary judgment, particularly as to its contention that costs – the majority of which were incurred before RHI entered the picture – have exceeded income. (RHI Motion pg.13-14; Ringler Dec. ¶10); *see also Fink v. Ohio Health Corp.*, 2004 WL 3511614 at *3 (S.D. Ohio August 25, 2004) (if the incident in question occurred, or the records were created before the employment of the officer in question, then the authenticating affidavit is inadmissible).

### 7. Genuine Issues of Fact Exist over whether Royalties are Owed to Reed.

RHI and the other defendants contend that summary judgment should be granted in their favor on Reed's breach of contract claim because none of the required royalties and profits to be paid Reed have accrued. (RHI Motion pg.13-14). Specifically, the defendants contend there has been no breach because initial advances have not been recouped – in other words, costs have exceeded income. Civil Rule 56(f) precludes the Court from granting defendants summary judgment premised defendants' "Lack of Profit" defense.

Reed sought via discovery information regarding the costs and advances associated with Freebird…The Movie, which defendants contend have exceeded sales and precluded the payment of any royalty to any party, including Reed. RHI provided a summary of the costs it incurred relating to the movie; it did not provide the actual documents underlying those costs. (Rothenbuecher Aff. ¶4 H/A 440, 866). RHI also produced and relied upon an unauthenticated document regarding the alleged costs Cabin Fever incurred, which purport to total almost $1 million. *Id.* To date, however, no party has substantiated that figure, despite being requested to do so. *Id.* Indeed, RHI admits it has no personal knowledge about those advances. (RHI Motion

pg.13 "…documentation provided to RHI by Cabin Fever [in 1995] *reflects*…"). Yet, RHI and the other defendants continue to argue no profits are due, relying upon third party summaries and recapitulations of income, costs, and advances.[8] Such summaries and recapitulations, however, are not enough when challenged by an opponent – which is what Reed did in raising this very discovery issue with the Court.[9] *Cf., e.g., Johnson v. Jones,* 149 F.3d 494, 506 (not enough for party to present evidence of average profit margin).

RHI and the other defendants cannot defend against (and request summary judgment on) Reed's breach of contract claim by stating there has been no breach because there are no profits due (because costs exceed income), yet preclude full discovery thereon to test that defense. *See* Rothenbuecher Aff. ¶5-6 (describing need, relevance, and likely result of discovery sought from RHI); *Gettings,* 349 F.3d at 305. Civil Rule 56(f) precludes entry of summary judgment under such circumstances. RHI must either withdraw that defense or permit full discovery on the issue

---

[8]   Some of the cost summaries produced (H/A 177-180)[Rothenbuecher Aff. ¶13, Ex. R1] were only recently created as evidenced by the addressee on the document (Mark Avsec, who only started representing Freebird Video when this lawsuit was filed). Those summaries do not identify the underlying data or how the calculations were achieved. They fail altogether to provide the requisite personal knowledge to permit consideration for Rule 56 purposes, as does the affidavit of Mark Avsec [ECF 61] seeking to authenticate them and other documents (such as checks, agreements, financial statements). Because Mr. Avsec has no personal knowledge of their creation, maintenance, or storage, his sworn statements relating thereto must be disregarded. *See* Civil Rule 56(e)(1); *Woodruff v. National Life Ins. Co.,* 2006 WL 2792204 at *1 (E.D. Tenn., July 24, 2006) ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Federal Rule of Civil Procedure 56(e). Documents which do not meet those requirements cannot be considered by the court."); *see also* Fed. R. Evid. 1006; *U.S. v. Bray,* 139 F. 3d 1104, 1109 (6th Cir. 1998) (the requirement to provide the opposing party with documents that underlie a summary or recapitulation is to enable that party to attack the authenticity or accuracy of the summary or the calculations contained therein).

[9] The Court stayed resolution of the discovery issue regarding costs and advances. *See* Court's 12/17/08 Minutes.

of unrecouped costs and advances.[10] *See, e.g., Stainbrook v. Fox Broadcasting Co.*, 2006 WL 3757643 at *5 (N.D. Ohio 2006) (damages information, including ascertaining the full scope of plaintiff's damages, is properly discoverable in a breach of contract context); *see also Varga v. Rockwell International Corp.*, 242 F. 3d 693, 697 (6th Cir. 2000) (party entitled discovery to test accuracy of opponent's contentions and defenses).

Withdrawal of the defense, or additional discovery thereon, is particularly appropriate for two reasons. First, discovery will likely show that the professed expense of approximately $1 million to produce the documentary is much less. Second, discovery will likely show that costs have been recouped. Documents produced by former defendant Artisan (through its successor Lions Gate) appear to reveal that it (or its successor Lions Gate) have not properly allocated and accounted for income from the sales of Freebird...The Movie. This discrepancy directly impacts RHI's contention that costs and advances have not been recouped (*i.e.*, there are no profits).

By way of example, Freebird...The Movie was released in 1996. In 2001, it was combined with the 1986 movie called Lynyrd Skynyrd Tribute Tour, into a repackaged DVD. (Rothenbuecher Aff. ¶14, Ex.R2). Yet, from 2001 forward, Artisan and Lions Gate appear to have allocated sales of that combined DVD as sales of the Tribute Tour movie only. *Id.* at ¶15 and Ex.R3 thereto. As such, questions exist as to why no sales originating from the 2001 DVD have been allocated to Freebird...The Movie when it comprises the majority of the DVD and receives lead billing on the cover and back of the DVD packaging.[11] *Id.* at ¶14, Ex.R2.

---

[10] As referenced in the caption to this filing, Reed alternatively moves the Court to exercise its discretion under Civil Rule 56(f) to dismiss the "lack of profit" defense or permit further discovery thereon.

[11] Based upon this discrepancy alone, it is unreasonable for Ringler to declare that "RHI is satisfied that Lions Gate has properly accounted to it with respect to sales and royalties." (Ringler Dec. ¶13). Having failed to explain that discrepancy, which was raised via letter to RHI's counsel and later in Court, any pronouncement by... *[footnote continued on next page]*

Because an issue exists over the apparent improper allocation and accounting for income from sales of Freebird...the Movie, and given that there is no substantiation for the contention that no royalties or profits are due Reed because costs and advances remain unrecouped, summary judgment in favor of RHI on the basis that Reed cannot show a breach of contract is unwarranted pursuant to Civil Rule 56(f). Too many factual issues (known and unknown) exist as to the purported unrecouped advances and costs which defendants contend precludes any contractual profit payment by them to Reed. As a result, Civil Rule 56(f) requires the Court to permit discovery thereon or dismiss RHI's "Lack of Profit" defense outright.

## CONCLUSION

The admissible evidence – versus the hearsay, speculative factual statements, unverified documents, and unsubstantiated summaries relied upon by RHI – show that either Cabin Fever agreed to pay Reed directly "pursuant to our agreement" or Cabin Fever agreed to pay Reed as an intended third party beneficiary of the Cabin Fever's agreement with Freebird Video. RHI, in turn, assumed Cabin Fever's obligations to pay the profit participants of Freebird...The Movie. As a result, RHI is liable to Reed for breach of contract and its motion for summary judgment should be denied. Any other result would require the Court to ignore the uncontroverted evidence which shows RHI is liable for breach of contract, necessitate accepting RHI's speculative and unverified contentions, and cause a violation of Civil Rule 56(f) because of RHI's prosecution of and reliance upon defenses it (and ultimately the Court) failed to permit discovery on.

---

*[footnote continued from prior page]* ...RHI about the "reasonableness" of the costs and expenses in not credible and also undermines the reliability of Ringler's other "factual" statements.

Respectfully submitted,

_____/s/ H. Alan Rothenbuecher_____
H. Alan Rothenbuecher (0041883)
  hrothenbuecher@szd.com
T. Earl LeVere  (0063515)
  tlevere@szd.com
Schottenstein Zox & Dunn, Co., LPA
US Bank Center at Playhouse Square
1350 Euclid Avenue
Suite 1400
Cleveland, Ohio  44115
Phone: (216) 394-5075
Facsimile: (216) 394-5092

*Attorney for Craig Reed and Survivor
Films*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served upon counsel for each of the defendants via the Court's electronic filing system this 20th day of February, 2009.

_____/s/ H. Alan Rothenbuecher_____
H. Alan Rothenbuecher