IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CRAIG REED, *et al.*, | ) |
| Plaintiffs, | ) CASE NO. 1:08CV1761 |
| vs. | ) JUDGE CHRISTOPHER A. BOYKO |
| FREEBIRD FILM PRODUCTIONS, INC., *et al.*, | ) |
| Defendants. | ) |

**DECLARATION OF CRAIG REED**

I, Craig Reed, declare under penalty of perjury the following:

1. I have personal knowledge of the statements contained herein.

2. For over 30 years, I worked as a professional stage hand throughout the United States and in Europe for musical performing artists. I worked as a stage hand, drum technician, production assistant, audio production manager, guitar technician, and stage manager. I have worked for nationally and internationally known artists such as Foreigner, Journey, The Rossington Collins Band, The Allen Collins Band, The Marshal Tucker Band, and Lynyrd Skynyrd, and numerous others.

3. From January 1, 1974, through October 20, 1977, and from 1987 until 2005, I worked for the band Lynyrd Skynyrd in various capacities including stage hand, drum technician, production assistant, audio production manager, guitar technician, and stage manager. In 1976 and 1977, I served Lynyrd Skynyrd as drum technician and as a guitar technician.

4. In 1976 and 1977, as a personal project and hobby, I shot a total of approximately 90 minutes of concert and "behind the scenes" film footage containing various members of Lynyrd Skynyrd and its crew.

5. I filmed the footage using a personal 8mm movie camera that I purchased with my own personal funds.

6. I did not film the footage at the request, or under the direction, of any employer or any Defendant in this action.

7. I decided when and where to film the various portions of the footage and decided what to include in the footage.

8. I was under no obligation to film any part of the footage.

9. On October 20, 1977, while on tour with Lynyrd Skynyrd, I was a passenger on Lynyrd Skynyrd's famous airplane that crashed in Mississippi, which claimed the lives of the pilot, co-pilot, and four passengers, including Lynyrd Skynyrd's lead singer, Ronnie Van Zant. The crash left me severely injured.

10. Some time after the October 1977 plane crash, I edited my 1976 and 1977 home movie footage to create two reels of film titled "Craig Reed – LYNYRD SKYNYRD – 8MM Film Reel – ONE" and "Craig Reed – LYNYRD SKYNYRD – 8MM Film Reel – TWO," respectively (hereinafter "Reel 1" and "Reel 2" individually, and "the Film," collectively).

11. I was under no obligation to edit any of my film footage to create either Reel 1 or Reel 2.

12. Although I filmed Reel 1 and Reel 2 in 1976 and 1977, I retained sole and exclusive possession of Reel 1 and Reel 2 until 1995.

13. After the October 20, 1977, airplane crash, Lynyrd Skynyrd disbanded until 1987 when the band reformed. Johnny Van Zant, the younger brother of the late Ronnie Van Zant, assumed the role as lead singer.

14. During the period after Lynyrd Skynyrd's reformation in 1987, I continued to work for the band in various capacities.

15. In or around the early summer of 1995, Judy Van Zant Jenness contacted me and asked whether I would be willing to license my summer 1977 film footage for use in a documentary about Lynyrd Skynyrd that Freebird Video Productions and Cabin Fever Entertainment were producing.

16. I stated that I would be willing to license some of my film footage for use in a Lynyrd Skynyrd documentary project.

17. On or about July 31, 1995, I signed a letter on Freebird Video Productions' stationery regarding Freebird Video Productions' and Cabin Fever Entertainment's use of my film footage in their Lynyrd Skynyrd documentary. A true and accurate copy of the letter I signed is attached as Exhibit A.

18. I signed the letter with the understanding that both Freebird Video Productions and Cabin Fever Entertainment would jointly assume responsibility for paying me for the use of my film footage as described in the letter. Specifically, because: (a) of the repeated use of "we," which I understood to be plural and encompass both Freebird Video Productions and Cabin Fever Entertainment; (b) the statements in the letter that either Freebird Video Productions or Cabin Fever Entertainment would be making the referenced payments to me; and (c) my discussions with Judy Van Zant Jenness from Freebird Video Productions and Jeff Waxman from Cabin Fever Entertainment during the summer of 1995 that I would be paid for the use of

my film footage by their companies. Based upon the letter and my discussions with Judy Van Zant Jenness and Jeff Waxman, I understood that Cabin Fever and Freebird Video jointly agreed to pay me and would be jointly responsible for the promised payment to me of $5,000.00 (in two installments of $2,500.00) and 2.5% of the net profits of the documentary. I understood, based upon my years in the entertainment industry, that it was a generally accepted practice to pay the owner and creator of a work, such as a film or song, for the subsequent commercial use of the film or song. I also understood from the letter and my discussions with Judy Van Zant Jenness and Jeff Waxman that the footage I provided would be used only in the documentary and would not be used anywhere else without my prior permission and without further compensation to me if used elsewhere.

19. With the understanding in mind that I had an agreement with Freebird Video Productions and Cabin Fever Entertainment regarding the inclusion of my footage in the documentary being created by them, I sent Reel 1 to Cabin Fever Entertainment.

20. On August 7, 1995, I received a letter from Cabin Fever Entertainment in response to my sending Reel 1 to it. Enclosed with the letter was check for $2,500.00. Cabin Fever Entertainment also indicated it would pay the additional $2,500.00 required as an initial payment under my agreement with it and Freebird Video Productions. I did receive that additional $2,500.00 payment from Cabin Fever Entertainment after the documentary was released. A true and accurate copy of the August 7, 1995 letter and accompanying check is attached as Exhibit B.

21. In its August 7, 1995 letter to me, Cabin Fever Entertainment states that "pursuant to our agreement, upon the initial exhibition of the Film, you will be paid an additional $2,500.00." I understood Cabin Fever Entertainment's reference to "our agreement" as being an

acknowledgement of its agreement to pay me $5,000.00 plus 2.5% of the net profits it earned from the documentary. By that time, I had not received any payment from Freebird Video Productions, and it became clear to me that between the two companies that had jointly agreed to pay me for the use of my film footage, Cabin Fever Entertainment was the company that was going to be making actual payments under my agreement with them. The letter also confirmed for me that Cabin Fever Entertainment understood that the next scheduled payment to me was the $2,500.00 payment due upon public exhibition of the documentary. I did not read that statement to mean Cabin Fever Entertainment was only going to pay $5,000.00, and nothing more.

22. I learned from Cabin Fever Entertainment that the documentary, which was to include Reel 1 of my Film, would be called Freebird...The Movie.

23. Freebird Video Productions and Cabin Fever Entertainment produced a documentary which was to include Reel 1 of my film footage about the original Lynyrd Skynyrd band titled, "Freebird...The Movie." Judy Van Zant Jenness was the Executive Producer of the documentary, as confirmed in the movie credits.

24. "Freebird...The Movie" included portions of my Reel 1 film footage.

25. "Freebird...The Movie" was released in or around August 1996.

26. No one has paid me any portion of the profits from "Freebird...The Movie."

27. On July 15, 1997, Lynyrd Skynyrd was performing a concert in Burgettstown, Pennsylvania. During the set-up for the concert, Joe Boyland, on behalf of the band, asked me whether the band could show some of my footage from Reel 1 for that concert, which was also being broadcast live via Pay Per View. I gave him permission to do so since Freebird...The Movie had just been released and I believed the showing of Reel 1 during the concert would help

with sales of Freebird...The Movie. Prior to that time, none of my footage from my Film had ever been shown at a concert, nor was it used at any other concerts in 1997 or 1998.

28. I later learned that a film of the concert had been made and was released and sold in 1998 under the title Lynyrd Skynyrd – Lyve from Steel Town. The VHS video of that concert included excerpts from Reel 1 of my Film. I never gave permission to anyone to, or received compensation for, the use and display of Reel 1 of my Film in that subsequently produced video. I was only asked for and granted permission to use and show Reel 1 at the Burgettstown concert and the related live Pay Per View.

29. In or around June 2002, Ross Schilling and Vector Management contacted me to inquire about whether I had any film footage of the original Lynyrd Skynyrd band other than the footage contained on Reel 1.

30. I told Ross Schilling that I had Reel 2 and stated that Reel 2 contained "never before seen" footage of the original Lynyrd Skynyrd band.

31. Ross Schilling stated that he and Vector Management, and possibly others, were interested in potentially licensing some or all of Reel 2.

32. Ross Schilling requested an opportunity to review Reel 2 in order to determine whether he or Vector Management would license or some or all of the Reel 2 footage.

33. In or around July 2002, I gave a copy of Reel 2 to Vector Management for the sole purpose of allowing Ross Schilling and Vector Management to preview Reel 2 to determine whether they would be interested in licensing some or all of Reel 2 at an agreed price and under agreed terms.

34. In February, 2003, Ross Schilling called me to ask if VH-1 could use my film in a documentary it was producing. I told him they could so long as I was paid for such usage. VH-1 and I entered into an agreement for its usage of my film footage.

35. I called Ross Schilling early in June 2003 about whether Reel 2 was being run in any other documentary or videos. He told me it was not because it was of poor quality and not worth the price I was asking ($50,000.00) for its use and display. Despite his representation to me, I later learned that Vector Management and the other defendants began using excerpts of Reel 2, as well as excerpts of Reel 1, in various media without my prior permission.

36. On July 11, 2003, when I was arriving for work for a concert in Nashville, Tennessee, Ross Shilling asked me to use the Film during the concert and accompanying Pay Per View showing. Unbeknownst to me at that time, a background video for use at the concert, which incorporated by Film, already had been made. Ross Shilling asked me what I wanted to be paid for the use of my Film during the concert and Pay Per View. I told him $2,500.00, to which he agreed. Ross Shilling only asked for permission to use the Film for the concert and accompanying Pay Per View. I only gave him and Vector Management permission to use my Film during that concert and the simultaneously cast Pay Per View. He agreed to that limited use.

37. After the Nashville, Tennessee concert, Ross Shilling asked if the band could use by Film for the rest of its concerts in 2003. He told me that the showing of my Film during the rest of the 2003 concerts would benefit the band and make the band more successful during its 2003 tour. I told him I would allow usage of the Film at the other concerts in 2003 for a fee of $1,000.00 per concert. After threatening to terminate my employment with the band if I did not lower my usage charge, he forced me to accept a payment of $75.00 per concert at which the

film was shown. The price was later raised to $100.00 per concert. This agreement was for the concerts in 2003, and then was extended for the concerts in 2004 and 2005. I never agreed to nor authorized the use of my Film at any live concerts in 2007. I also never agreed to nor authorized the use of any of my Film in any recording of any concert in 2003, 2004, 2005, or 2007. My Film was not used during the band's 2006 concert tour.

38. Vector Management, Haber Corporation, and the other Lynyrd Skynyrd defendants performed and displayed the Film publicly by showing portions of the Film at live concert events where Lynyrd Skynyrd performed, without paying me for all of the uses of the film at the live concerts. For example, I was not paid for any usage of the Film at the concerts during Lynyrd Skynyrd's 2007 tour. Nor was I ever asked for permission to use the Film during the 2007 tour.

39. When I was asked to use my Film at concerts or for a video product, I was never told by any defendant, band member, or agent of the band that the purpose for the use of my Film at concerts or in other media was so that homage could be paid to deceased band members or that the use or showing of the Film was to educate concert goers and younger people about the historical roots of the band. On the contrary, there were many instances were my Film was used in advertising and marketing of the band for its concert shows, presumably to excite persons to attend the concerts. Otherwise, they would not have found it necessary to use my Film in the advertising for the concerts. I recall at least three instances in 2003 when I was sitting in a hotel or restaurant in Las Vegas, Nevada and Birmingham, Alabama where I saw television ads (which included my Film) advertising the band's concerts in those cities. This showed me that the band and its agents were using my Film to advertise their concerts and promote attendance at their concerts.

40. At no time did anyone ever ask my permission or authorization to use my Film in any DVD or video produced from any concert. Even when Ross Shilling asked to use the Film during the Pay Per View showing in Nashville, Tennessee on July 11, 2003, he only asked for (and I only gave) permission to use the Film for the concert and simulcast Pay Per View. I was never told about nor asked for permission to use the Film in a video or DVD to be made of that 2003 Nashville concert. I never received any compensation for any recording of my Film at any concert at which it was shown, and I never authorized or received any compensation for the use of my Film in any subsequent showing of a recorded concert.

41. With respect to the use of my Film at concerts in 2003, 2004, and 2005, I only was asked for and granted permission to use my Film during live performances and one Pay Per View event, not in any subsequently released film, video, or DVD of such concert. In particular, I did not authorize the use or showing of my Film in the subsequently released DVD of the 2003 Nashville, Tennessee live concert, called Lynyrd Skynyrd Lyve – The Vicious Cycle Tour.

42. Vector Management and the other defendants copied, used, displayed, and distributed excerpts of the Film in the DVD titled Lynyrd Skynyrd Lyve – The Vicious Cycle Tour, without my permission or consent and without compensation to me. I was asked in early July 2003 by Joel from Vector Management to allow the use of my Film solely in the marketing and television advertising of a record or CD to be called "Thyrty – the 30th Anniversary Limited Edition Lynyrd Skynyrd Collection." I allowed such limited use for an agreed to payment of $2,500.00. A true and accurate copy of the document which I was told was sent to me on Vector Management's behalf to confirm the terms discussed and agreed to with Vector Management for the use of my Film in the marketing and advertising of Thyrty is attached as Exhibit C hereto.

43. The CD Thyrty was released in August 2003.

44. I was paid $2,500.00 by Haber Corporation in October 2003.

45. The permission I granted and was paid for to use my Film in the promotion and advertising of Thyrty did not extend to any other DVD or video production. I did allow the usage and showing of my Film during concerts in 2003, 2004, and 2005 for a forced price of $100.00 per concert, but I never agreed to nor authorized (nor was I paid for) the use of any of my Film in any video or DVD produced from any concert in which my Film was shown.

46. The statement on the inside back cover of the Vicious Cycle DVD, released in mid-November 2003, that I licensed the use of my Film footage for the Vicious Cycle DVD is false and a lie. I never gave such license, was never asked for such a license, was never paid for such a license, and never authorized the inclusion of such a statement on the DVD packaging. I did not even know I was listed in the packaging for the DVD until after it was released for sale in late 23003. The contention that Ross Shilling now makes that I gave such permission is very disappointing because during a conversation with Ross Shilling in 2003, I confirmed to him that the permission I gave to Vector Management, Haber Corporation, and the Lynyrd Skynyrd defendants for the use of my Film for upcoming projects by Lynyrd Skynyrd was limited to the advertising and marketing of Thyrty, and not for any other DVD that Vector Management, Haber Corporation, or the other Lynyrd Skynyrd defendants were creating.

47. I authorized one or more of the defendants to use my Film only in the following events and media:

    a. Freebird…The Movie;

    b. 1997 Burgettstown, Pennsylvania live concert and Pay Per View;

    c. 2003 live concerts, including the Nashville, Tennessee Pay Per View;

    d. 2004 live concerts;

e. 2005 live concerts; and

f. Promotion and advertising of the Thyrty CD.

48. Vector Management and the other defendants also copied, used, displayed, and distributed, without my authorization and without payment to me, excerpts of Reel 1 and Reel 2 of my Film in music videos for VH1 and/or MTV for the songs Simple Man, Freebird, and Sweet Home Alabama, even though Ross Schilling from Vector Management had told me Reel 2 was of poor quality and not usable.

49. The music video for Freebird included 3 minutes and 22 seconds of Reel 1 and Reel 2 of my Film. Attached as Exhibit D is a true and accurate summary (bates labeled CR0290) of the time points reflecting the unauthorized usage of my film in the Freebird music video.

50. The music video for Simple Man included 5 minutes and 1 second of Reel 1 and Reel 2 of my Film. Attached as Exhibit E is a true and accurate summary (bates labeled CR0295) of the time points reflecting the unauthorized usage of my film in the Simple Man music video.

51. The music video of Sweet Home Alabama included 1 minute 23 seconds of Reel 1 of my Film. Attached as Exhibit F is a true and accurate summary (bates labeled CR0296) of the time points reflecting the unauthorized usage of my film in the Sweet Home Alabama music video.

52. In July 2005, I was told by Steve Vidoris, the road manager from the band, in front of David Baker, Brian Evers, and Steve Owens that the band wanted me to take a paid medical leave to address certain medical issues I was experiencing. I was told that when I was done with my medical treatments I could come back.

53. At the end of my medical treatments in 2005, I called Ross Shilling to tell him that I was ready to come back and work. Mr. Shilling told me I had been fired. This came as a surprise because I had been promised my job back when my medical treatments were completed.

54. Prior thereto, Gary Haber and the other defendants threatened to terminate my employment with the band several other times, including when I asked for an increase in my wages in 2003 and when I started selling my Film *via* my website in 2000.

55. On or about January 8, 2008, I assigned all rights, title, and interest in Reel 1 and Reel 2 to Survivor Films, Inc. a copy I solely own. Survivor currently holds those rights today.

56. Attached as Exhibit G hereto is a true and accurate copy of the packaging for the DVD Freebird...The Movie, which identifies Judy Van Zant Jenness as an executive producer for the film. I am listed in the credits at the end of the movie as having provided the historic footage.

57. Freebird...The Movie was commercially released and shown in movie theaters. Internet Movie Database (IMD) lists the movie having been shown at least 17 times. I attended what I understood to be the premier showing in Cleveland, Ohio. From what I understood, the movie was ultimately pulled from the movie theaters when the estate of Allen Collins obtained an injunction to stop further showings until such time as a proper accounting was made of the income earned from the showing of the movie.

58. In late 2007, I called Lynyrd Skynyrd's attorney Jonathon Blaufarb about the unauthorized uses of my Film. He said he would investigate the matter, but I never heard back from him. Over the next few months, I made several follow-up inquiries and attempts to resolve my concerns over Lynyrd Skynyrd's misuse of my Film. None of my phone calls were returned. I eventually has to hire a Nashville attorney to pursue the matter further, but her additional

inquiries and attempts to resolve my concerns were also ultimately ignored. At that point, I felt I had no other choice than to file this lawsuit.

The undersigned, being hereby warned that willful false statements in the likes are made punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, declares that he is properly authorized to execute this Declaration, that all statements made of his own knowledge are true, and that all statements made on information and belief are believed to be true.

_____
CRAIG REED
DATE: 2-19-09