IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CRAIG REED, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | CASE NO. 1:08CV1761 |
| ) | |
| vs. ) | JUDGE CHRISTOPHER A. BOYKO |
| ) | |
| FREEBIRD FILM PRODUCTIONS, INC., ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |

## CIVIL RULE 56(F) AFFIDAVIT OF H. ALAN ROTHENBUECHER

I, H. Alan Rothenbuecher, being first duly sworn, depose and state as follows:

1. I am the attorney for the Plaintiff in the above referenced action and have handled this case since its inception. I have personal knowledge of the statements contained herein.

2. In his declaration, Craig Reed declares that on or about July 31, 1995, he signed a letter from Freebird Video Productions regarding Freebird Video's and Cabin Fever Entertainment's use of my film footage in their Lynyrd Skynyrd documentary. As Reed declares, pursuant to the language in that letter and his discussions with Judy Van Zant Jenness from Freebird Video Productions and Jeff Waxman from Cabin Fever, Cabin Fever and Freebird Video jointly agreed to pay him 2.5% of the net profits from that documentary.

3. The Defendants have said no profits have accrued from the sale of the documentary because costs and advances remain unrecouped. Defendants RHI Entertainment (formerly Hallmark Entertainment) and Freebird Video state that, as a result of the costs and

advances being unrecouped, there have been no profits, which means there can be no breach of the agreement to pay Reed 2.5% of the net profits of the documentary.

4. During discovery, Plaintiffs sought information regarding the costs and advances associated with Freebird...The Movie. Defendants only produced cryptic summaries of those purported costs and advances, a couple of which were from the 1990's. Defendants did not provide Plaintiffs with any of the underlying information to test the accuracy of the summaries and recapitulations of the alleged costs and advances.

5. Plaintiffs cannot present facts in opposition to Defendants' contention that costs have exceeded income (thereby precluding any profit payments), because Plaintiffs have not received access to the information to test that contention. Plaintiffs requested the documents and information which underlie the details of the alleged unrecouped costs and advances, but have not been provided them. I brought the issue to the Court's attention, but the Court held in abeyance its decision on whether Plaintiffs should be provided that information and those documents.

6. Plaintiffs need the detailed information and the documents underlying and substantiating the cost summaries and recapitulations to determine if the alleged costs and expenses for the documentary have exceeded the sales of Freebird...The Movie. The information will help determine whether there have been profits earned from the documentary and whether the agreement to pay Reed 2.5% of the profits from the documentary has been breached. To date, no one with first-hand knowledge of the "unrecouped" costs and expenses has offered any evidence as to the specific costs and expenses which have purportedly exceeded revenue.

7. Plaintiffs believe the underlying documents and information will show income has exceeded costs, profits have been earned, and the agreement to pay Reed 2.5% of the net profits has been breached.

8. RHI also contends that Reed is not an intended third party beneficiary to the Cabin Fever-Freebird Video contract because he was not contemplated by the Cabin Fever-Freebird Agreement when it was entered into.

9. In the agreement between Cabin Fever and Freebird Video for the production of the documentary, Cabin Fever stated that it was assuming payment of certain expenses as set forth in the budget on Schedule B to the agreement. *See* 1995 Cabin Fever-Freebird Video Agreement at §7.2. (ECF No. 50-8). The Cabin Fever-Freebird Video Agreement also references Schedule A. Schedule A is supposed to identify tapes of older film footage to be provided for and used in the documentary.

10. To date, no defendant has produced a copy of Schedule A or B despite repeated requests for them. Those requests have been made both formally (via discovery requests) and informally (via email exchanges). In my discussions with counsel for RHI Entertainment, the successor of Hallmark Entertainment (who purchased the assets of Cabin Fever from UST), I was told there are no additional documents available and they have not been able to find Schedule A or B. I made similar inquiries for the documents to Cabin Fever's prior owner UST. Through its counsel, Martha Weiss, it stated that it does not have any additional documents relating to Hallmark's purchase of Cabin Fever's assets, including Freebird...The Movie, and that it does not have the Schedules A and B to the Cabin Fever-Freebird Video Agreement. Ms. Weiss directed me instead to Hallmark Entertainment or RHI Entertainment for the schedules.

11. It is evident that the payment obligations owed to Reed were part of the documentary budget because Cabin Fever made payments directly to him for the documentary. Reed declares that Cabin Fever also told him (through Jeff Waxman) that he would be paid by Cabin Fever for his film's usage in the documentary. Thus, it is very likely that Schedules A and B, at some point (originally or via amendment), included a reference about the use of older film footage of the band, including Reed's film footage. Plaintiffs need discovery on that issue (documents and depositions) to confirm that belief and to disavow RHI's defense identified in Paragraph 8, above.

12. Plaintiff cannot fully defend against the contention that Reed was not contemplated by the Cabin Fever-Freebird Video Agreement without reviewing Schedules A and B, inquiring about the contents of the schedules and costs encompassed in Schedule B, and inquiring of the persons who negotiated the terms of the Cabin Fever-Freebird Video Agreement and its schedules. Discovery on this issue will show that Reed was contemplated by both Cabin Fever and Freebird Video in their agreement, making him an intended third-party beneficiary of that contract.

13. Attached as Exhibit R1 is a true and accurate copy of documents H/A 177-180, 182, 440, and 886, produced by RHI Entertainment in response to Reed's document requests. On behalf of Reed, I asked for the documents and specifics underlying the summary of costs reflected in these documents. To date, neither a detailed explanation about the costs, nor the documents substantiating the referenced costs, have been provided.

14. Attached as Exhibit R2 is a true and accurate copy of the packaging for the 2001 DVD combining Freebird…The Movie and Lynyrd Skynyrd Tribute Tour.

15. Attached as Exhibit R3 is a true and accurate copy of documents H/A 1037 and 1044 provided by RHI Entertainment in response to Reed's document requests.

16. Attached hereto as Exhibit R4 is a true and accurate copy of the exterior back cover of the LYNYRD SKYNYRD VICIOUS CYCLE CD/Bonus DVD referring to "UNRELEASED, HISTORICAL BAND FOOTAGE."

17. Attached hereto as Exhibit R5 is a true and accurate copy of the interior back cover of the LYNYRD SKYNYRD VICIOUS CYCLE CD/Bonus DVD referring to "Historic Band video footage licensed by Craig Reed."

18. Attached hereto as Exhibit R6 are: (1) true and accurate copies of printouts from the Amazon.com Internet website containing customer reviews of LYNYRD SKYNYRD – LIVE – THE VICIOUS CYCLE TOUR (2003) and LYNYRD SKYNYRD – FREEBIRD THE MOVIE TRIBUTE TOUR; and (2) true and accurate copies of printouts from the MP3.com Internet website containing a review of FREEBIRD THE MOVIE that each identify and make mention of Plaintiffs' historical band footage featured in those works offered not for their truth, but to show the state of mind of the reviewers and the appeal of Plaintiffs' footage to them.

FURTHER AFFIANT SAYETH NAUGHT.

STATE OF OHIO        )
                     )   SS:
COUNTY OF SUMMIT     )

_____
H. ALAN ROTHENBUECHER

DATE: 2/20/04

Sworn to before me and subscribed in my presence this 20 day of February, 2009.

_____
NOTARY PUBLIC