# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **CRAIG REED,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CASE NO. 1:08CV1761** |
| **vs.** | ) | |
| | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| **FREEBIRD FILM PRODUCTIONS, INC.,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

---

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO THE LYNYRD SKYNYRD DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT;**

**and**

**CIVIL RULE 56(f) MOTION RELATING TO
DEFENDANTS' "LACK OF PROFIT" DEFENSE.**

---

H. Alan Rothenbuecher, Esq.
  hrothenbuecher@szd.com
T. Earl LeVere, Esq.
  elevere@szd.com
Schottenstein Zox & Dunn, Co., LPA
US Bank Center at Playhouse Square
1350 Euclid Avenue, Suite 1400
Cleveland, Ohio 44115
Phone: (216) 394-5075
Facsimile: (216) 394-5092

*Attorneys for Plaintiffs Craig Reed and
Survivor Films, Inc.*

{H1453052.4 }

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

STATEMENT OF THE ISSUES TO BE DECIDED ...............................................................iv

SUMMARY OF ARGUMENT............................................................................................v

I.     STANDARD OF REVIEW.........................................................................................1

II.    LAW AND ARGUMENT...........................................................................................2

     A.    Defendants Admit that They Failed to Pay for Live Concert Uses. .......................2

     B.    Genuine Issues of Fact Exist Over Whether Defendants Owe Royalties. .............2

     C.    A Jury Could Find that Defendants Infringed Plaintiffs' Copyrights...................6

          1.    The Documentary Agreement Does Not Permit Defendants' Uses...........6

          2.    A Reasonable Jury Could Find that Plaintiffs Did Not License Defendants' Uses of the Reel 2 Footage. ..................................................9

     D.    The Record Supports a Finding that Defendants' Copying of Plaintiffs' Film Were Not Fair Uses. ..................................................................................13

          1.    Defendants' Use of the Film is Commercial and Non-Transformative. ......................................................................................14

          2.    Plaintiffs' Film is an Expressive Work Entitled to Full Protection Under Copyright Law............................................................................16

          3.    Defendants Took the Heart of Plaintiffs' Film. ......................................17

          4.    Defendants' Unauthorized Uses Supplant the Film's Potential Market.................................................................................................18

III.    CONCLUSION......................................................................................................20

CERTIFICATE OF TRACK AND PAGE LIMITATION........................................................21

CERTIFICATE OF SERVICE..............................................................................................21

# TABLE OF AUTHORITIES

## Federal Cases

*2361 State Corp. v. Sealy, Inc.*, 402 F.2d 370, 375 (7th Cir. 1968) .............................................2

*Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 501 (6th Cir. 2007) .....................3

*Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 918 (2d Cir. 1994) ..................................16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ..........................................................3

*Batchelor v. Sears, Roebuck & Co.*, 574 F. Supp. 1480, 1483 (E.D. Mich. 1983) ........................2

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 589-91 (1994) ...........................................16

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) .......................................................................2

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) .................................................2

*Coleman v. ESPN, Inc.*, 764 F. Supp. 290, 294 (S.D.N.Y.1991) .................................................15

*Connection Distrib. Co. v. Keisler*, 505 F.3d 545, 551 (6th Cir. 2007) ..........................................2

*Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) .... 17, 18, 20

*ETW Corporation v. Jireh Publishing, Inc.*, 332 F.3d 915 (6th Cir. 2003) ..................................21

*Gettings v. Building Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300, 305 (6th Cir. 2003) ......................................................................................................................................6

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 561 (1985) .....................15

*Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc.* 621 F.2d 57, 62 (2d Cir. 1980) .........................................................................................21

*Jackson v. Warner Bros. Inc.*, 993 F. Supp. 585, 587 (E.D.Mich.,1997) ....................................15

*Jacob Maxwell, Inc. v. Veeck*, 110 F.3d. 749 (11th Cir. 1997) ....................................................14

*Johnson v. Jones,* 149 F.3d 494, 506 (6th Cir. 1998) .....................................................................5

*Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008) ..................................16

*Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 939 (9th Cir. 2002) ................. 17, 18

*Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, 1389, n. 5 (6th Cir. 1996) ........................................................................................................ 16, 17, 18

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) .............................16

*U.S. v. Bray*, 139 F.3d 1104, 1109 (6th Cir. 1998)......................................................5

*Varga v. Rockwell International Corp.*, 242 F. 3d 693, 697 (6th Cir. 2000)................................6

*Wickham v. Knoxville Intern. Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir. 1984) ........................................................................................................8

*Zomba Enterprises, Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 583 (6th Cir. 2007)............21

**State Cases**

*Folsom v. Marsh*, 9 F. Cas. 342, 345 (C.C.D. Mass. 1841) .........................................18

*Lewis v. Mathes,* 161 Ohio App.3d 1, 829 N.E.2d 318, 323-24 (2005) .......................................10

*Stainbrook v. Fox Broadcasting Co.*, 2006 WL 3757643 at *5 (N.D. Ohio 2006).......................6

*Woodruff v. National Life Ins. Co.*, 2006 WL 2792204 at *1 (E.D. Tenn., July 24, 2006) ............5

**Federal Statutes**

17 U.S.C. § 107 ...........................................................................................15

**Federal Rules**

Fed. R. Civ. Proc. 56(c) ...................................................................................2

Fed. R. Civ. Proc. 56(e) ...................................................................................5

**Rules**

Civil Rule 56(f)...........................................................................................4, 6, 24

**Other Authorities**

3 Nimmer on Copyright § 1305(B) at 13-58...........................................................18

Avsec Dec. Ex. R, CR290-291 .............................................................................20

Avsec Dec. Ex. R, CR293 ..................................................................................20

## STATEMENT OF THE ISSUES TO BE DECIDED

The Motion for Summary Judgment filed by Freebird Film Productions, Inc., Fly On, Inc., Vector Management, Inc., Gary Rossington, Ross Schilling, and Lynyrd Skynyrd, Inc. (hereinafter, the "Lynyrd Skynyrd Defendants") sets forth the following general issues for resolution by the Court:

- Whether the Lynyrd Skynyrd Defendants have satisfied their initial burden under Rule 56 of producing suitable and admissible evidentiary material showing that there is no genuine issue as to any material fact and that they are entitled to a judgment as a matter of law;

- Whether the record would support a finding that the Lynyrd Skynyrd Defendants have breached an agreement with the Plaintiffs or, alternatively, whether Plaintiffs are entitled to discovery on this issue;

- Whether the record would support a finding that the Documentary Agreement does not authorize Defendants' multiple uses of Plaintiffs' copyrighted Reel 1, separate and apart from the Documentary, "Freebird...The Movie";

- Whether the record would support a finding that Plaintiffs did not expressly or impliedly license Defendants' copying of Reel 1 and/or Reel 2 in some or all of Defendants' various video products, commercials, music videos, and/or live concert events; and

- Whether the record would support a finding that Defendants' copying of Plaintiffs' copyrighted works was not a fair use.

## SUMMARY OF ARGUMENT

The Lynyrd Skynyrd Defendants have moved for summary judgment on Plaintiffs' claims for breach of contract and copyright infringement [Doc. # 60] ("Defendants' Motion"). Defendants, however, fail to satisfy their burden on either of Plaintiffs' claims. First and foremost, in the status conference before this Court on December 17, 2008, counsel for the Lynyrd Skynyrd Defendants *admitted* that Defendants owe Plaintiff Reed money under an agreement related to the use of Plaintiffs' film. Defendants further concede this point in their own motion. Moreover, although Defendants contend that no royalties are yet due under the parties' Documentary Agreement, this is a disputed question of fact and is properly resolved only after all parties have exchanged full and fair discovery, which has not occurred in this case given its preliminary posture.

Likewise, genuine issues of material fact exist on Plaintiffs' copyright infringement claim (Count II). For example, although Defendants suggest that the parties' Documentary Agreement allows them to exploit Plaintiffs' copyrighted Reel 1 footage in any manner and for all times, both the language of the agreement and the parties' course of dealings allow a reasonable jury to conclude otherwise. Additionally, Plaintiff Reed's declaration testimony allows a reasonable jury to conclude that Plaintiff never agreed—expressly or impliedly—to allow Defendants' uses of Plaintiffs' copyrighted Film including the Reel 2 footage.

Finally, the evidence would allow a finding that some or all of Defendants' copying was not a fair use. Defendants' unauthorized uses were commercial in nature and non-transformative. The material that Defendants' copied was creative and expressive in nature and the record would allow a finding that Defendants misappropriated the most significant portions, i.e., the "heart," of Plaintiffs' works and supplanted at least some of the market for the Film.

# I.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together, with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Throughout their motion, the Lynyrd Skynyrd Defendants ignore the mandate that a Rule 56 movant first "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes *demonstrate the absence* of a genuine issue of material fact."[1] Thus, a defendant moving for summary judgment "first carries the burden of <u>proving</u> that there is no genuine issue of material fact."[2]

To succeed on a summary judgment motion, "it is never enough simply to state that the non-moving party cannot meet its burden at trial."[3] The party "opposing summary judgment does not have the burden of showing that there is a genuine issue for trial *until* the movant has produced evidentiary material showing that there is no genuine issue as to any material fact."[4] Accordingly, only if the Lynyrd Skynyrd Defendants satisfy this initial requirement does the burden shift to Plaintiffs to show that there is evidence in support of their position.[5] Moreover, in considering the Lynyrd Skynyrd Defendants' motion, the Court must view all of the evidence—and the reasonable inferences therefrom—in the light most favorable to Plaintiffs and must resolve all doubts in the Plaintiffs' favor.[6] If under this standard a "jury *could* return a

---

[1] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (emphasis added) (quoting Fed. R. Civ. Proc. 56(c)).
[2] *Connection Distrib. Co. v. Keisler*, 505 F.3d 545, 551 (6th Cir. 2007) (emphasis added).
[3] *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).
[4] *2361 State Corp. v. Sealy, Inc.*, 402 F.2d 370, 375 (7th Cir. 1968) (emphasis added); *see also Batchelor v. Sears, Roebuck & Co.*, 574 F. Supp. 1480, 1483 (E.D. Mich. 1983) (same).
[5] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).
[6] *See Anderson*, 477 U.S. at 255; *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 501 (6th Cir. 2007).

verdict for the nonmoving party, summary judgment *must* be denied."[7] Defendants have failed to satisfy their burden and the Court should deny their motion.

## II.   LAW AND ARGUMENT

### A.   Defendants Admit that They Failed to Pay for Live Concert Uses.

The Lynyrd Skynyrd Defendants are not entitled to summary judgment because Defendants' counsel, Mark Avsec, <u>admitted</u> to the Court during the December 17, 2008, status conference that Defendants failed to pay Plaintiff Reed for their uses of Plaintiffs' Film at certain Lynyrd Skynyrd concerts.  Mr. Avsec made a similar representation to Plaintiffs' counsel by letter and also asserted it in Defendants' motion for summary judgment.  (Avsec Dec. ¶ 8, Ex. H at 3-4; Defendants' Motion, pg. 12).  Defendants' admission, in and of itself, precludes a summary judgment in Defendants' favor.  Specifically, if Defendants' public performances of the Film were, in fact, pursuant to an agreement between the parties,[8] Mr. Avsec's admission concedes a breach of contract.  Alternatively, if any of Defendants' uses of the Film are not pursuant to an agreement, it was not authorized by Plaintiffs and Mr. Avsec's statement admits copyright infringement under 17 U.S.C. § 106(4).

### B.   Genuine Issues of Fact Exist Over Whether Defendants Owe Royalties.

Count I of Plaintiffs' Complaint asserts that Defendants breached an agreement with Plaintiff Reed relating to their use of portions of Plaintiff Reed's film in Defendants' documentary, "Freebird...The Movie."  The Lynyrd Skynyrd Defendants urge this Court to grant summary judgment in their favor on Count I based solely on their disputed factual allegation that "Freebird...the Movie" has not generated any profits.  Defendants therefore argue that royalties

---

[7] *Abdulnour*, 502 F.3d at 501 (emphasis added) (citation omitted).
[8] Plaintiff Reed testifies in his declaration that had an agreement with the Defendants concerning their use of his Film at certain live concerts in 2003, 2004, and 2005.  Plaintiff Reed also testifies that Defendants have not paid for all of those uses under the parties' agreement.  (Reed Dec. ¶ 37).  Plaintiff Reed testified, however, that he never authorized Defendants to use his Film at <u>any</u> live concerts in 2007.  (Reed Dec. ¶ 37).

under the Documentary Agreement are not yet due or owed to Plaintiff Reed. (Defendants' Motion pg. 9-10). This, however, is purely a disputed question of fact and is properly resolved only after all parties have had a full and fair opportunity to conduct discovery on the issue, which has not occurred in this case given its preliminary posture. Accordingly, Civil Rule 56(f) precludes the Court from granting Defendants' Motion for Summary Judgment.

Even though the case is still in its early stages,[9] as the Court is aware, Plaintiffs have already requested financial information from the Defendants regarding with "Freebird...The Movie." Defendants contend these expenses have exceeded the sales proceeds related to "Freebird...the Movie," and therefore preclude the payment of any royalty to any party, including Plaintiff Reed. (Rothenbuecher Aff. ¶ 3). Although Defendant RHI Entertainment, Inc. provided a summary of the costs it incurred relating to the movie, it did not provide the actual documents underlying those costs as required by the rules. (Rothenbuecher Aff. ¶ 5, H/A 177-180, 182, 440, 866). In support of its contention that costs have exceeded income, RHI also produced and relied upon an unauthenticated document regarding the alleged costs Cabin Fever incurred, which purport to total almost $1 million. (*Id.* at H/A 182). To date, however, no party has substantiated that figure, despite being requested to do so. (*Id.*). Indeed, RHI admits it has no personal knowledge about those advances. (RHI Motion [Doc.# 50] pg.13 "documentation provided to RHI by Cabin Fever [in 1995] *reflects*...."). Yet, the Lynyrd Skynyrd Defendants continue to argue that no reasonable jury could possibly find that any profits are due, relying upon third-party summaries and recapitulations of income, costs, and advances. These and other documents offered by Defendants, however, are hearsay, and unauthenticated.[10] Defendants

---

[9] Indeed, one defendant just appeared for the first time in the action on February 13, 2009 [Doc.# 74].
[10] Despite referring to a "multitude" of documents that "unequivocally" establish their position, Defendants have offered only five (5) pages of financial summaries in support of their motion. (Defendants' Motion, pg. 9-10; LSP00008-00012). Defendants purport to authenticate these documents through the Declaration of Mark Avsec,

offer no exception to the hearsay rules and fail to satisfy the additional requirements of Fed. R. Evid. 1006. Therefore, the Court should not consider these documents when ruling on Defendants' motions. Moreover, such summaries and recapitulations are not enough when challenged by an opponent—which Plaintiffs did by raising this discovery issue with the Court.[11]

The Lynyrd Skynyrd Defendants cannot defend against (and request summary judgment on) Plaintiffs' breach of contract claim by stating in conclusory fashion that there have been no profits, and therefore no breach, yet obfuscate full discovery thereon to test that defense. (*See* Rothenbuecher Aff. at ¶¶ 1-7 (describing need, relevance, and likely result of discovery sought from RHI));[12] Civil Rule 56(f) precludes the entry of summary judgment under such circumstances. The Lynyrd Skynyrd Defendants must either withdraw this defense or permit full discovery thereon.[13]

Withdrawal of the defense, or additional discovery, is particularly appropriate here because documents produced by former Defendant Artisan (through its successor Lions Gate) reveal that Artisan (or its successor Lions Gate) have not properly allocated and accounted for

---

their counsel. (See Avsec Dec. ¶ 12 and Ex. L). Mr. Avsec—who only began representing Freebird Video when this lawsuit was filed—lacks the requisite personal knowledge to authenticate such documents, and therefore, his declaration does not comply with Civil Rule 56(e). *Woodruff v. National Life Ins. Co.*, 2006 WL 2792204 at *1 (E.D. Tenn., July 24, 2006) ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Federal Rule of Civil Procedure 56(e). Documents which do not meet those requirements cannot be considered by the court." (emphasis added)). Additionally, Defendants' summaries do not identify the underlying data or how the calculations were achieved. Thus, Defendants have also failed to satisfy Federal Evidence Rule 1006, which limits the admissibility of summary documents, and with which Defendants must comply for purposes of Rule 56. *See also, U.S. v. Bray*, 139 F.3d 1104, 1109 (6th Cir. 1998) (explaining that the requirement to provide the opposing party with documents that underlie a summary or recapitulation is to enable that party to attack the authenticity or accuracy of the summary or the calculations contained therein).

[11] *See, e.g., Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998) (concluding that a party may not solely present evidence of average profit margin). The Court addressed this dispute briefly at its December 17, 2008, conference.

[12] *Gettings v. Building Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300, 305 (6th Cir. 2003).

[13] *See, e.g., Stainbrook v. Fox Broadcasting Co.*, 2006 WL 3757643 at *5 (N.D. Ohio 2006) (holding that damages information, including information necessary to ascertain the full scope of plaintiff's damages, is properly discoverable in a breach of contract context); *see also Varga v. Rockwell International Corp.*, 242 F. 3d 693, 697 (6th Cir. 2000) (stating that a party is entitled discovery to test accuracy of opponent's contentions and defenses). As referenced in the caption to this filing, Reed alternatively moves the Court to exercise its discretion under Civil Rule 56(f) to dismiss the "lack of profit" defense or permit further discovery thereon.

income from the sales of the rights to "Freebird...The Movie."  This discrepancy directly impacts The Lynyrd Skynyrd Defendants' contention that costs and advances have not been recouped and would allow a reasonable jury to find that The Lynyrd Skynyrd Defendants owe Plaintiff Reed 2.5% of the profits received upon the sale of the rights in "Freebird...The Movie."

By way of example, Defendants released "Freebird...The Movie" in 1996.  (Reed Dec. ¶ 25).  In 2001, Defendants repackaged "Freebird...The Movie" and sold it as a double-DVD set with a video of the 1986 Lynyrd Skynyrd Tribute Tour.  (Rothenbuecher Aff. ¶ 14, Ex. R2). From 2001 forward, however, the evidence shows that Artisan and Lions Gate allocated sales of the combined double-DVD as sales of the 1986 Lynyrd Skynyrd Tribute Tour movie only— entirely ignoring the related sale of "Freebird...The Movie."  (*Id.* at. ¶ 15, Ex. R3). "Freebird...The Movie" comprises the majority of content offered in the double-DVD package and even receives lead billing on the cover and back of the packaging.[14]  (*Id.* at. ¶ 14, Ex. R2). As such, a genuine issue of material fact exists as to why Defendants failed to allocate any portion of these sales to the expenses related to "Freebird...The Movie" and whether, if properly accounted for and allocated, such proceeds would have generated a profit on "Freebird...The Movie" thereby necessitating a payment to Plaintiff Reed.[15]

Because a genuine issue of material fact exists over the apparent improper allocation and accounting for income from sales of "Freebird...the Movie," and given that Defendants have failed to adduce affirmative factual evidence of the types listed in Rule 56(c) showing that there is no genuine issue that royalties or profits are due to Plaintiff Reed, summary judgment in favor

---

[14] Based upon this discrepancy alone, it is unreasonable for Ringler to declare that "RHI is satisfied that Lions Gate has properly accounted to it with respect to sales and royalties."  (Ringler Dec. ¶13 [Doc.#50, Ex. 4]).  Having failed to explain that discrepancy, which was raised via letter to RHI's counsel and later in Court, any pronouncement by RHI about the "reasonableness" of the costs and expenses is, at best, a question of fact for resolution by the jury.

[15] Defendants have not disputed that the agreement requires them to distribute a portion of the profits to Plaintiff Reed.  Defendants have only asserted that they are not in breach because "Freebird...The Movie" remains unrecouped and has not generated a profit.

of the Lynyrd Skynyrd Defendants is inappropriate under both Rules 56(b) and 56(f). Too many factual issues exist as to the purported unrecouped advances and costs which Defendants contend preclude any contractual profit payment by them.

    **C.    A Jury Could Find that Defendants Infringed Plaintiffs' Copyrights.**

        **1.    The Documentary Agreement Does Not Permit Defendants' Uses.**

    The Sixth Circuit "recognizes that granting summary judgment, particularly in favor of a defendant, is a practice to be used sparingly in copyright infringement cases."[16] Count II of Plaintiffs' Complaint alleges that the Defendants infringed Planitiffs' copyrights in two separate works of film, which the parties refer to a "Reel 1" and "Reel 2." Pursuant to the Documentary Agreement, Plaintiff Reed licensed Defendants to use portions of Reel 1 in "Freebird...The Movie." (Reed Dec. ¶¶17, 24). Plaintiffs also agreed to allow Defendants, for a fee, to display portions of Reel 1 and Reel 2 at live Lynyrd Skynyrd concerts. (Reed Dec. ¶ 37). Plaintiffs never licensed any portion of Reel 2 to any of the Defendants either expressly or impliedly for use for any DVD or video produced from any concert. (Reed Dec. ¶40). Rather, Plaintiff Reed only authorized Defendants to "preview" Reel 2 so that the parties could negotiate a fair and equitable licensing arrangement for Reel 2, which never occurred for DVD or video products. (Reed Dec. ¶40). Accordingly, based upon the evidence in the record—even at this early stage in the case—summary judgment is inappropriate.

    The Lynyrd Skynyrd Defendants contend the Documentary Agreement allows their infringement of Reel 1. (Defendants' Motion, pg. 7-9). Specifically, the Lynyrd Skynyrd Defendants contend that the Documentary Agreement entitles them to use Plaintiffs' Footage for any and all conceivable purposes and for no consideration, "including, without limitation, the 97 minute video product called LYNYRD SKYNYRD – LYVE FROM STEEL TOWN, in the

---

[16] *Wickham v. Knoxville Intern. Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir. 1984).

Sweet Home Alabama music video, in the Free Bird and Simple Man music videos, in the 120 minute Vicious Cycle DVD, at or in conjunction with all or any Lynyrd Skynyrd live concerts, and/or in any other manner or media without restriction." (Defendants' Motion, pg. 8-9). Both the Lynyrd Skynyrd Defendants' actions and the language of the Documentary Agreement itself flatly contradict Defendants' interpretation of the Documentary Agreement. Properly construed, the Documentary Agreement precludes a summary judgment in Defendants' favor.

First, the plain language of the Documentary Agreement negates the Lynyrd Skynyrd Defendants' claim as a matter of law:

> You [Reed] agree that we shall have the right to utilize and include the Footage, or any portion or portions thereof, **within the documentary** film project we are producing which comprises concert footage of the original Lynyrd Skynyrd band (the "**Documentary**") [Freebird…the Movie]. We shall also have the right to exploit **the Documentary**, including the Footage, in any manner or media throughout the universe in perpetuity without restriction and without obligation, financial or otherwise to you, except as set forth herein. Our rights hereunder shall be assignable without restriction...we agree to pay you 2.5% of our net profits derived from exploitation of the Documentary itself in any manner or media. We shall pay you your percentage of net profits as and when we receive monies, it being understood that there is no guarantee of any profits being generated.

(Avsec Dec., Ex. A) (emphasis added). Defendants contend that the Documentary Agreement permits them to exploit the Documentary, i.e., "Freebird…the Movie," in any manner or media in perpetuity. (Defendants' Motion, pg. 8-9). Defendants further contend that the Documentary Agreement permits them to exploit the Footage *independently as a separate and distinct work*, with no relationship to the Documentary "Freebird…the Movie." (Defendants' Motion, pg. 8-9).

Defendants' contention, however, contradicts the plain language of the Documentary Agreement, which explicitly grants Defendants only "the right to exploit *the Documentary*...." Defendants take the dependent clause, "including the Footage," entirely out of context and seek to apply it to uses that have absolutely nothing to do with the Documentary. The purpose of the language was only to allow Defendants to commercialize the Documentary (*i.e.*, "Freebird...The

Movie") in various media without having to seek separate permissions from Plaintiff Reed for each and every medium. This was Plaintiff Reed's understanding and how Defendants represented the agreement to him. (Reed Dec. ¶ 18). It was not—nor was it intended to be—a blanket license to the Defendants to use the Footage in perpetuity, in any media, for any purpose. Thus, as a matter of law, the Documentary Agreement does not justify Defendants' subsequent uses of the Footage separate and apart from the "Freebird...The Movie."[17]

Under Ohio law, "[c]ontractual terms are ambiguous if the meaning of the terms cannot be deciphered from reading the entire contract or if the terms are reasonably susceptible to more than one interpretation."[18] Where there is an ambiguity, the interpretation of the parties' intent is a question of fact.[19] Here, at a minimum, the language of the Documentary Agreement is susceptible to more than one interpretation (assuming it is even susceptible to the Lynyrd Skynyrd Defendants' specious interpretation, which Plaintiffs dispute). Thus, summary judgment is inappropriate because a reasonable jury could find that the Documentary Agreement, upon which Defendants rely, does not allow the uses of Plaintiffs' film referenced in Plaintiffs' Complaint. Absent a license to use the Film, a reasonable jury could conclude that Defendants' uses constitute copyright infringement.[20]

---

[17] Conversely, however, if Defendants' construction is correct, then the Defendants are also obligated to pay Plaintiff Reed 2.5% of all net profits received from all media and products that include any of Plaintiffs' Footage. The Documentary Agreement requires Defendants to pay Plaintiff Reed "2.5% of our net profits derived from exploitation of the Documentary." There is no dispute that Defendants have not paid Plaintiff Reed 2.5% of the net profits from their music videos, DVD projects, and live concerts. *The Lynyrd Skynyrd—Lyve From Steel Town* and *Lynyrd Skynyrd Lyve—The Vicious Cycle Tour* videos each went Gold and concert revenues for Lynyrd Skynyrd in 2007 alone, where they used Plaintiffs' footage, exceeded $9 million. Avsec Dec. ¶ 17 and Ex. Q (LSP 157-158). Defendants cannot conveniently construe identical terms in the agreement in different fashions in order to have their cake and eat it too.
[18] *Lewis v. Mathes,* 161 Ohio App.3d 1, 829 N.E.2d 318, 323-24 (2005).
[19] *Id.* at 324.
[20] Even under Defendants' strained construction of the Agreement, the license would apply only to those portions of Reel 1 that are actually *in* the Documentary, for which Defendants have offered no evidence. Rather, they simply concede that they have used undisclosed portions of the Footage separate and apart from the Documentary.

Tellingly, Defendants' own course of conduct belies Defendants' argument. Despite their current contention that the Documentary Agreement allows any and all uses of the Footage, the Lynyrd Skynyrd Defendants entered into multiple *separate agreements* with Plaintiff Reed, and paid Plaintiff Reed additional consideration on numerous occasions, for Defendants' subsequent uses of Reel 1 Footage. (Reed Dec. ¶¶ 36-37, 42-44). Indeed, as noted above, Defendants' **admitted,** through counsel, that Defendants owe Plaintiff Reed certain amounts for their use of Reel 1 at live concert events. If, as Defendants now contend, the Documentary Agreement covers any and all uses of the Reel 1 Footage, Defendants would not have entered into separate agreements and paid Plaintiff Reed additional monies for their uses of the Reel 1 Footage apart from the Documentary. These additional agreements alone, which are undisputed, preclude a summary judgment because they are sufficient evidence to allow a jury to find that the parties did not intend for the Documentary Agreement to cover uses of the Footage separate and apart from "Freebird...The Movie."

### 2. A Reasonable Jury Could Find that Plaintiffs Did Not License Defendants' Uses of the Reel 2 Footage.

Conceding that the Documentary Agreement applies, at best, only to Reel 1, the Lynyrd Skynyrd Defendants contend that Plaintiff Reed orally expressly and/or impliedly licensed Defendants' use of the Reel 2 footage, therefore precluding a finding of copyright infringement. (Defendants' Motion, pg. 10-13). Defendants have failed to satisfy even their initial burden under Rule 56 by failing to produce evidence of licenses for each and every use of the Reel 2 footage. Moreover, there is suitable Rule 56 evidence that contravenes their contention. (See Reed Dec. ¶¶ 40-42, 46-48). Likewise, there are numerous issues of material fact as to whether Reed granted Defendants <u>any</u> license to use the Reel 2 footage, let alone a license for <u>each and every</u> use of the Reel 2 footage by the Lynyrd Skynyrd Defendants.

For example, Defendants contend that when Plaintiff Reed provided the Reel 2 footage to Defendant Schilling in 2002, "Schilling understood that Reed intended for the band to start using it, so the band did." (Defendants' Motion, pg. 10). Contrary to Defendants' contention, however, Plaintiff Reed provided the Reel 2 footage to Defendant Schilling for the sole purpose of allowing Defendants Schilling and Vector Management to preview Reel 2 to determine whether they would be interested in licensing some or all of Reel 2 at an agreed price and under agreed terms. (Reed Dec. ¶¶ 31-33). Under Rules 56(c) and (e), Plaintiff Reed's declaration alone creates a genuine issue of fact as to whether he licensed Reel 2 to the Defendants.

Later, while employed as part of the Lynyrd Skynyrd touring organization, Plaintiff Reed discovered that the Lynyrd Skynyrd Defendants had begun using the Reel 2 footage in various media without his prior permission. (Reed Dec. ¶ 35). When approached by the Lynyrd Skynyrd Defendants with a request to use the Film in certain live concerts in 2003, Plaintiff Reed offered a one-year deal allowing Defendants to use the footage for $1,000 per concert in 2003. (Reed Dec. ¶ 37). Rather than accept the offer, Defendant Schilling threatened to terminate Plaintiff's employment with the band and forced Plaintiff instead to accept $75 for each concert (later raised to $100 per concert). (Reed Dec. ¶ 37). The parties' agreement was later extended beyond 2003 to include concerts in 2004 and 2005, although Plaintiff Reed was not paid all concerts where Defendants showed the Film in 2005. (Reed Dec. ¶ 37).

Even accepting, *arguendo*, Defendants' contention that Plaintiff Reed entered into an oral agreement in an August 2003 conference with Defendant Schilling concerning the Lynyrd Skynyrd organizations use of the Film "for touring and for pay-per-view and DVD usage," there are questions of fact sufficient for a jury to find that any original contract did not cover subsequent uses of the Film.

For example, the Lynyrd Skynyrd Defendants contend that on September 30, 2003, Reed was paid $2,500 for the use of certain footage in the Vicious Cycle DVD. (Defendants' Motion, p. 11). Contrary to Defendants' contention, however, Plaintiff Reed declares that Defendants never sought permission nor advised him that they intended to use his Film in a video or DVD. (Reed Dec. ¶¶ 40-41). Plaintiff Reed did not authorize the use or showing of his Film in the DVD of the 2003 Nashville, Tennessee, live concert, called Lynyrd Skynyrd Lyve – The Vicious Cycle Tour (Reed Dec. ¶¶ 40-41, 46), nor was Reed compensated for Defendants' use of his Film in The Vicious Cycle Tour DVD (Reed Dec. ¶¶ 42, 46). In addition to their unauthorized use of Plaintiff Reed's Film in the Vicious Cycle DVD, a reasonable jury could also find that Vector Management and other Lynyrd Skynyrd Defendants also copied, used, displayed, and distributed excerpts of Reed's Film without Reed's authorization in music videos for the songs Simple Man, Freebird, and Sweet Home Alabama. (Reed Dec. ¶ 48).

Again, perhaps most striking is the Lynyrd Skynyrd Defendants' own admission that they used Reed's Film for concerts in 2007 without compensating Plaintiff Reed (see Defendants' Motion, pg. 12). This admission indisputably precludes a summary judgment in Defendants' favor, especially because Plaintiffs never authorized such uses. (Reed Dec. ¶ 38).

The Lynyrd Skynyrd Defendants attempt to excuse their unauthorized uses of Reed's Film by suggesting that Plaintiff Reed knew about and consented to Defendants' uses because he worked at live concerts where Defendants showed the Film. (Defendants' Motion, pg. 11). Defendants suggest that Plaintiff Reed somehow must have known about each and every additional use of the Film by the Lynyrd Skynyrd Defendants and must have given an implied license. (Defendants' Motion, pg. 12).

The cases that Defendants cite in support of their position, however, are inapplicable here. The cases Defendants cite that found the existence of an implied license involved factual scenarios where the copyright owner made some objective manifestation to grant permission for the specific use of the copyrighted work that the plaintiffs were claiming to be infringements. For example, in *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d. 749 (11th Cir. 1997), the copyright owner explicitly approved the specific use of the copyrighted work by the defendant, observed that specific use of the copyrighted work by defendant, and even wrote a letter to defendant *encouraging* the specific use of the copyrighted work.

Here, in contrast, there is, at worst, a genuine issue of material fact as to whether Plaintiff Reed approved of the accused infringements at issue. Lynyrd Skynyrd Defendants have not shown that Reed approved of each and every discrete and specific use of his Film by the Lynyrd Skynyrd Defendants—nor even that Plaintiff Reed was aware of each and every discrete and specific use of his Film. Likewise, Defendants have not given any indication that Plaintiff Reed encouraged any of the discrete and specific uses of his Film by Defendants. While Plaintiff Reed did grant permission for certain uses of his Film (Reed Dec. ¶ 47), he did not grant permission for other uses of his Film or for unspecified uses of his Film generally (Reed Dec. ¶¶ 37, 40-42, 45, 48). The fact that Reed worked as a stagehand/roadie/production assistant at live concerts at which his Film was shown establishes, at most, that he was aware of this specific use (certain of which uses, he admittedly approved and for which Defendants partially paid). Reed, however, did not approve other uses of his Film and Plaintiff Reed even had discussions with Defendants about the limited use of his film. Reed Dec. ¶ 46. Moreover, the fact that the parties negotiated and entered into multiple agreements with respect to different uses of Plaintiff Reed's Film by the Lynyrd Skynyrd Defendants supports the conclusion that the parties recognized that each

specific and discrete use of the Film required a separate agreement, rather than the blanket "implied license" that the Lynyrd Skynyrd Defendants argue already existed. At a minimum, based upon the evidence and affidavits in the record, there are genuine issues of material fact that would allow a reasonable jury to conclude that Plaintiffs granted no implied or explicit blanket license to Defendants to use the Reel 2 Footage and that preclude a grant of summary judgment in Defendants' favor.

     **D.    The Record Supports a Finding that Defendants' Copying of Plaintiffs' Film Were Not Fair Uses.**

The Lynyrd Skynyrd Defendants have repeatedly sought permission from, negotiated with, and paid Plaintiffs for, certain uses of the Film. (Reed Dec. ¶¶ 15-34, 36-37, 42, 44, 47). During the "negotiations" of these agreements, Defendants even threatened Reed with termination if he refused to agree to their terms. (Reed Dec. ¶ 37). Despite their repeated and objective manifestations of their belief that they needed Plaintiffs' permission to use the Film, Defendants now contend that each and every use they made of the Film is not only a "fair use" under the Copyright Act but is also so indisputable as to justify a summary judgment in their favor on Count II of Plaintiffs' Complaint. Defendants are wrong.

Although a court may decide the issue of fair use on a motion for summary judgment, courts should be wary of doing so.[21] To determine whether a given use of a copyrighted work is a fair use, Courts must consider four factors:[22]

- the purpose and character of the use, including whether such use is of a commercial nature, or is for nonprofit or educational purposes;
- the nature of the copyrighted work;

---

[21] *Jackson v. Warner Bros. Inc.*, 993 F. Supp. 585, 587 (E.D.Mich.,1997) ("due to the fact-driven nature of a fair use determination, the district court should be cautious in granting a Rule 56 motion in this area"); *Coleman v. ESPN, Inc.*, 764 F. Supp. 290, 294 (S.D.N.Y.1991) ("Fair use…requires a fact-intensive inquiry ill-suited for summary judgment.").

[22] 17 U.S.C. § 107. Fair use is a mixed question of fact and law. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 561 (1985).

- the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
- the effect of the use on the potential market for, or value of, the copyrighted work.

Defendants bear the burden of proof for these factors.[23]  On summary judgment, Defendants must show that the record could <u>only</u> support a finding that Defendants' copies were fair uses.

### 1. Defendants' Use of the Film is Commercial and Non-Transformative.

The first factor of the fair use analysis considers the purpose and character of the defendant's use of the copyrighted work.  "[E]very commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright...."[24]  A "transformative" use of a work, even if commercial, may receive somewhat greater latitude.[25]  Defendants' uses here were both commercial and non-transformative.

There can be no genuine dispute that Defendants' uses are commercial.  Defendants attempt to argue that their uses of Plaintiffs' Film were not commercial because "the Film...was never advertised to promote the sale of any of these products or to promote any of the concerts." (Defendants' Motion, p. 16; Schilling Dec. ¶ 12).  This is simply not true.  Rather, the Lynyrd Skynyrd Defendants used Plaintiffs' Film in television commercials specifically to promote attendance at their concerts.  (Reed Dec. ¶ 39).  Similarly, the Lynyrd Skynyrd Defendants used Plaintiffs' Film to promote the sale of their music and videos/DVD's, even touting the presence of Plaintiffs' Film on the cover of Defendants' DVDs.[26]  (Rothenbuecher Aff. ¶¶14, 16-17, Exs.

---

[23] *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, 1389, n. 5 (6th Cir. 1996) ("Fair use serves as an affirmative defense to a claim of copyright infringement, and thus the party claiming that its secondary use of the original copyrighted work constitutes a fair use typically carries the burden of proof as to all issues in the dispute." citing *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 918 (2d Cir. 1994)); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 589-91 (1994).

[24] *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) (emphasis added); *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008) ("commercial use of copyrighted material is 'presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright.'" citing *Sony*).

[25] S*ee e.g.*, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994).

[26] *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (finding that use was "clearly commercial" where excerpts of the copyrighted material were "simply rebroadcast for entertainment purposes" and where the defendant "advertise[d] as much on its external packaging.").

R2, R4, R5).[27]  Finally, it is undisputed that Defendants played the Film as part of their for-profit entertainment concerts.  Thus, the record supports a finding of commercial use.

The record also supports a finding that Defendants' some or all of uses were not transformative.  Without providing any meaningful analysis, the Lynyrd Skynyrd Defendants lump together their many uses of Plaintiffs' Film into "various videos, in the Lynyrd Skynyrd concert DVD products…and in live concerts."  Defendants then summarily conclude that each of these uses was "transformative" of Plaintiffs' Film.  (Defendants' Motion, pg. 14-15).[28]  The effect of finding that a use is "transformative"—even if it is commercial—is only that market substitution of the second work for the original work is less certain, and market harm may not be presumed.[29]  In order to qualify as a transformative use, there must be some "creative metamorphosis" from the original to the secondary work—it is not enough to make a mere mechanical transformation of the original work.[30]

The objective facts indicate that Defendants' uses of the Film are <u>not</u> transformative, and "serve[] the same intrinsic entertainment value that is protected by Plaintiffs' copyrights."[31]  Here, Defendants have directly copied portions of Plaintiffs' Reel 1 and Reel 2 and included

---

[27] *See also* Reed Dec. ¶ 42 and Ex. C (stating that Defendant Vector Management asked Plaintiff Reed to allow use of the Film in the marketing and advertising of the CD "Thyrty").

[28] Defendants argue that the purpose of their use of Plaintiffs' Film was to create a "biography" about the band, or "educate" its fans (for obviously self-serving reasons given that educational biographies frequently garner fair-use protection).  Never in their dealings with Plaintiffs, however, did the Defendants indicate that their purpose for using the Film was to educate the audience or to identify the historical roots of the band.  (Reed Dec. ¶ 39).

[29] *Campbell* 510 U.S. at 591.  Defendants go too far and mistakenly argue that *Campbell* eliminated the *Sony* presumption that commercial uses are unfair.  (Defendants' Motion, pg. 15-16).  Since *Campbell*, however, the Sixth Circuit has made clear that the *Sony* presumption of an unfair use survives in full force where the challenged use is not transformative.  *Princeton University Press*, 99 F.3d at 1386.

[30] *Princeton University Press*, 99 F.3d at 1389 (analyzing the transformative use found in *Campbell*); see also, *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 939 (9th Cir. 2002) "'There must be real, substantial condensation of the materials ... and <u>not merely the facile use of scissors; or extracts of the essential parts, constituting the chief value of the original work</u>.'" (quoting *Folsom v. Marsh*, 9 F. Cas. 342, 345 (C.C.D. Mass. 1841) (emphasis added).

[31] *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003); *see, also,* 3 Nimmer on Copyright § 1305(B) at 13-58 ("[W]here the two works in issue fulfill the same function [the] scope of fair use is…constricted").  Defendants disingenuously assert that the purpose of Plaintiffs' Film "was to create 'home movies.'"  While "home movies" may identify the <u>category or genre</u> of the Film, it does not identify Plaintiffs' <u>purpose</u> of creating the Film, i.e., entertainment.

those excerpts in various audiovisual entertainment works. (*See, e.g.*, Reed Dec. ¶¶ 39, 42, 48-51). With approximately ninety minutes of footage at their disposal, Defendants simply identified and extracted the portions that they liked the best and used them however they wanted, without permission from, or compensation to, Plaintiffs. The Lynyrd Skynyrd Defendants have produced no evidence that any of their uses of the Film was anything other than a non-transformative mere "mechanical transformation"[32]—an "extract[ion] of the essential parts, constituting the chief value of the original [Film]."[33]

Having failed to present affirmative factual evidence that would preclude a finding that Defendants' uses were commercial and non-transformative, the first factor would support a finding that Defendants' copies were not fair uses. At a minimum, genuine issues of material fact exist as to whether the Lynyrd Skynyrd Defendants' many uses of the Film, considered separately in their respective contexts, are transformative or, instead, are presumptively unfair. Both in light of the *Sony* presumption and otherwise, Defendants' motion for a summary judgment of fair use must fail.

### 2. Plaintiffs' Film is an Expressive Work Entitled to Full Protection Under Copyright Law.

Under the second fair-use factor, courts are to evaluate the nature of the copyrighted work. "[S]ome works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."[34] When evaluating this factor, courts make two distinctions regarding the nature of the copyrighted work, including: "(1) whether the work is expressive or creative, such as a work of fiction, or

---

[32] *Princeton University Press*, 99 F.3d at 1386
[33] *Los Angeles News Serv.*, 305 F.3d at 939 (9th Cir.2002); *See, e.g.*, *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, 1389 (6th Cir. 1996) ("If you make verbatim copies of 95 pages of a 316-page book, you have not transformed the 95 pages very much—even if you juxtapose them to excerpts from other works and package everything conveniently.").
[34] *Campbell*, 510 U.S. at 586.

more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower."[35]

Here, Reels 1 and 2 are expressive and creative. Plaintiff Reed exclusively determined the scope and content of the copyrighted works: He selected when, where, and how he wished to shoot the scenes and what to include; he selected the medium (i.e., film); and he compiled, organized, and edited the footage into the two separate works that ultimately became Reels 1 and 2. Reels 1 and 2 were also unpublished. (Reed Dec. ¶¶ 4-12). The exercise of creative authorship throughout the process of selecting, recording, and editing the Film resulted in two expressive works that are neither merely informational nor primarily factual, which places Reels 1 and 2 squarely within the "core of intended copyright protection."[36] Thus, like the first factor, the second factor weighs in Plaintiffs' favor and against a summary judgment of fair use.

### 3. Defendants Took the Heart of Plaintiffs' Film.

A jury could also find that Defendants took the heart of Plaintiffs' works. The Lynyrd Skynyrd Defendants argue that they used only a few minutes from Plaintiffs' Film. The inquiry regarding the "amount and substantiality" factor, however, is qualitative as well as quantitative.[37] When examining the qualitative nature of the portion copied, courts frequently look to see whether the defendant took "the heart" of the copyrighted work—*i.e.*, whether the portion taken is the "most likely to be newsworthy and important in licensing serialization."[38] Here, even though the Lynyrd Skynyrd Defendants selected and used only certain portions of the

---

[35] *Gaylord v. U.S.*, 85 Fed. Cl. 59 (Fed. Cl. 2008) (citations omitted).
[36] *Campbell*, 510 U.S. at 586.
[37] *Campbell*, 510 U.S. at 586.
[38] *Elvis Presley Enterprises, Inc.*, 349 F.3d at 630 (quoting *Campbell*, 510 U.S. at 586).

copyrighted work, a reasonable jury could find that they extracted the most valuable part—the heart—of Plaintiffs' Film:

> [A]lthough the clips are relatively short when compared to the entire shows that are copyrighted, they are in many instances the heart of the work…Taking key portions extracts the most valuable part of Plaintiffs' copyrighted works.[39]

Such a conclusion is further supported by the Lynyrd Skynyrd Defendants' marketing and advertising the presence of the Film on its DVD products.[40] (Rothenbuecher Aff. ¶¶ 14, 16-17, Exs. R2, R4, R5). Accordingly, this factor weighs in Plaintiffs' favor and, at a minimum, creates a genuine issue of fact on the question of fair use.[41]

### 4. Defendants' Unauthorized Uses Supplant the Film's Potential Market.

The final factor, market effect, weighs in Plaintiffs' favor as well. "[W]hen the copying at issue is commercial in nature, the alleged infringer bears the burden of proving the 'market effect' factor."[42] Defendants urge that their use of the Film has no effect on the market for the copyrighted work because "any commercial use of the Film by Reed would require [certain individuals'] consent…because their likenesses are embodied in it." (Defendants' Motion, p. 18). Not only is the legal soundness of this proposition far from clear (and not at issue or even

---

[39] *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 630 (9th Cir. 2003) (considering excerpts that represented as little as 5% of the copyrighted work).

[40] Reviewers likewise recognize Defendants' selection, advertising, and use of Plaintiffs' footage as a significant positive feature of Defendants' entertainment products. *See, e.g.*, Rothenbuecher Aff. ¶ 18, Ex. R6 ("…the most unforgettable thing about Freebird: The Movie…is the haunting, grainy home-movie footage shot on an airplane."; "In it, you get to see lots of archival footage of the original group with lots of full-length, uninterrupted scenes from them playing songs"; "…this release contains probably the best video…from 1976"; "What you get is some incredible video tape of the band in various concerts from dates in 1976 to 1977…there are some parts in black and white, believe it or not that does not really detract from this film…" (emphasis added)).

[41] Defendants' argue that "appreciably less than five percent of the 90-minute Film was used in almost every instance." (Defendants' Motion, pg. 18.) A review of the logs that Defendants' reference, however, reveals the misleading nature of this statement. While many of the individual clips that Defendants stole *separately* amount to less than 5% of Plaintiffs' *total* film footage, Plaintiffs have two copyrighted works at issue and each of Defendants' infringing products includes multiple excerpts from Plaintiffs' films. For example, Plaintiffs' logs show that Defendants use *seventy-eight* clips of Plaintiffs' Footage (twenty-three from Reel 1) in the 17-minute music video for Freebird alone. See Avsec Dec. Ex. R, CR290-291. The Reel 1 excerpts represent roughly 7% of the Reel 1 footage and, more tellingly, 18% of Defendants' video. Similarly, Plaintiffs' footage represents over 29% of Defendants' "Live Concert Video" referenced in Avsec Dec. Ex. R, CR293, with 8 minutes and 50 seconds coming from Reel 1 (representing roughly 20% of Reel 1).

[42] *Zomba Enterprises, Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 583 (6th Cir. 2007).

briefed by Defendants with any analysis of consequence), Defendants' sweeping contention presupposes that <u>every</u> potential commercial use of the Film by Plaintiffs would be "illegal" as violative of the band members' right of publicity. (Defendants' Motion, pg. 14). Under this rationale, the Lynyrd Skynyrd Defendants effectively demand that the Court issue a blanket determination on a potentially infinite array of hypothetical facts for which there is no present evidence, case, or controversy.

Contrary to Defendants' suggestion, Plaintiffs' ability to exploit their Film, at a minimum, remains an open question.[43] Indeed, law in this Circuit demonstrates that Plaintiffs do not need Defendants' consent to make a commercial use of creative works that incorporate their likenesses.[44] Accordingly, the evidence supports a finding that there is a market for Plaintiffs' works, which Defendants' copying has, or could if widespread, supplant. Defendants have not shown that a reasonable jury could only find in their favor on this factor, thereby compelling a denial of Defendants' motion.

In summary, the facts and evidenced adduced would allow a reasonable jury to find in Plaintiffs' favor on each of the four fair use factors. Defendants' use of Plaintiffs' copyrighted works is commercial and non-transformative. Plaintiffs' works are creative and enjoy the full scope of protection afforded under copyright. Defendants took multiple, and significant, portions of Plaintiffs' works and have damaged the market therefor. Based upon the foregoing, this Court should deny Defendants' motion for summary judgment of fair use.

---

[43] Even accepting Defendants' argument that they are the exclusive commercial market for the Film, by taking the heart of Plaintiffs' Film and refusing to pay the customary royalty for their uses, Defendants effectively supplant the <u>entire</u> market for Plaintiffs' work; Defendants' decision to make unauthorized uses of Plaintiffs' copyrighted Film does not (as their circular argument demands) qualify such uses as fair where they otherwise are not. *See Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc.* 621 F.2d 57, 62 (2d Cir. 1980) (holding that copyright owner was "**entitled to exploit the commercial market [exclusively] controlled by ABC, and, if it could not, to withhold permission to use the film in that market.**")

[44] *See, e.g., ETW Corporation v. Jireh Publishing, Inc.*, 332 F.3d 915 (6th Cir. 2003) (granting summary judgment for the defendant, finding that the defendant's use of Tiger Woods' likeness in artwork that the defendant sold commercially did not violate Tiger Woods' right of publicity).

# III.    <u>CONCLUSION.</u>

As set forth above, genuine issues of fact remain as to whether compensation is due to Plainitffs under the Documentary Agreement or under other agreements between the parties. Further, the language of the Documentary Agreement, at a minimum, is susceptible to multiple interpretations, which would allow a reasonable jury to find that the Lynyrd Skynyrd Defendants' unauthorized use of the Reel 1 footage constitutes copyright infringement. There is also evidence that would allow a jury to find that Plaintiff Reed did not grant an express or an implied license for one or more of Defendants' uses of the Reel 2 footage by the Lynyrd Skynyrd Defendants. Likewise, the law and evidence would allow a finding that some or all of Defendants' uses of Plaintiffs' film were not fair uses under the Copyright Act. A question on licensing or fair use on just one accused copying or performance forces Defendants' motion to fail. As such, the Lynyrd Skynyrd Defendants have failed to satisfy their burden, and their motion for summary judgment must be denied in its entirety.

Respectfully submitted,

s/ T. Earl LeVere
H. Alan Rothenbuecher, Esq.
  hrothenbuecher@szd.com
T. Earl LeVere, Esq.
  elevere@szd.com
Schottenstein Zox & Dunn, Co., LPA
US Bank Center at Playhouse Square
1350 Euclid Avenue, Suite 1400
Cleveland, Ohio 44115
Phone: (216) 394-5075
Facsimile: (216) 394-5092

*Attorneys for Plaintiffs Craig Reed and
Survivor Films, Inc.*

## CERTIFICATE OF TRACK AND PAGE LIMITATION

Pursuant to Local Rule 7.1(f), the undersigned hereby certifies that this matter has not been assigned to any track and that the foregoing *Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment and Civil Rule 56(f) Motion Relating to Defendants' "Lack of Profit" Defense* adheres to the page limitations for unassigned cases set forth in Local Rule 7.1(f).

s/ T. Earl LeVere
T. Earl LeVere

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2009, a copy of the foregoing "*Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment and Civil Rule 56(f) Motion Relating to Defendants' "Lack of Profit" Defense* was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

s/ T. Earl LeVere
T. Earl LeVere