**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| REED, et al., ) | |
| ) | CASE NO. 1:08-CV-1761 |
| Plaintiffs, ) | |
| ) | JUDGE CHRISTOPHER A. BOYKO |
| vs. ) | |
| ) | |
| FREEBIRD FILM PRODUCTIONS, INC., ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**REPLY IN SUPPORT OF LYNYRD SKYNYRD DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF ARGUMENT ...............................................1

II. LAW AND ARGUMENT......................................................................................................2

    A. PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT FAILS AS A MATTER OF LAW ...............................................................................................................2

    B. PLAINTIFFS' CLAIMS FOR COPYRIGHT INFRINGEMENT FAIL AS A MATTER OF LAW BECAUSE THE USE OF THE FILM BY THE LYNYRD SKYNYRD DEFENDANTS IS A FAIR USE ....................................5

        1. Factor One: Purpose And Character Of The Use, Including Whether Such Use Is Of A Commercial Nature Or Is For Nonprofit Educational Purposes ...............................................................................................................7

            a. *Purpose And Character Of The Use* ................................................7

            b. *Commercial Use*............................................................................10

        2. Factor Two: Nature Of The Copyrighted Work .......................................12

        3. Factor Three: Amount And Substantiality Of The Portion Used In Relation To The Copyrighted Work As A Whol*e* .....................................12

        4. Factor Four: Effect Of The Use Upon The Potential Market For Or Value Of The Copyrighted Work ..............................................................13

III. CONCLUSION ................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994) ............................................................................... 5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................... 5

*Black v. Parke*, 4 F.3d 442 (6th Cir. 1993) ..................................................................................... 5

*Campbell v. Acuff-Rose*, 510 U.S. 569 (1994) ........................................................... 6, 9, 10, 12, 13

*Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831 (6th Cir. 1983) ............................. 7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................... 4, 6, 7

*Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 21 P.3d 797 (Cal. 2001) ............................. 8

*ETW Corporation v. Jireh Publishing, Inc.*, 332 F.3d 915 (6th Cir. 2003) ................................ 7, 8

*Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986) ................................................................................. 6

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ............................... 10, 13

*Hilton v. Persa*, No. 07-cv-00667 (C.D. Cal. Feb. 20, 2007) ......................................................... 7

*Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc.*,
   621 F.2d 57 (2d Cir. 1980) ..................................................................................................... 13, 14

*Michaels v. Internet Entm't Group*, 5 F. Supp. 2d 823 (C.D. Cal. 1998) ....................................... 7

*Nat'l Rifle Ass'n of Am. v. Handgun Control Fed'n of Ohio*, 15 F.3d 559 (6th Cir. 1994) ............ 6

*Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381 (6th Cir. 1996) ....... 6, 10

*Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303 (2d Cir. 1966) .............................. 12

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ................................ 9

*Wright v. Warner Books, Inc.*, 953 F.2d 731 (2d Cir. 1991) .......................................................... 7

**Statutes**

17 U.S.C. § 107 .............................................................................................................................. 13

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................................ 4, 6

**Treatises**

M. Nimmer and D. Nimmer, 4 NIMMER ON COPYRIGHT § 13.05[A][1][c] (2008) ........ 10, 11

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants Freebird Film Productions, Inc., Fly On, Inc., Vector Management, Inc., Gary Rossington, Ross Schilling, and Lynyrd Skynyrd Productions, Inc. (collectively, the "Lynyrd Skynyrd Defendants") have moved for summary judgment on all the claims in the Complaint asserted by Plaintiffs Craig Reed ("Reed") and Survivor Films, Inc. ("Survivor" and, together with Reed, "Plaintiffs").[1]

As to the breach of contract claim, the Lynyrd Skynyrd Defendants have demonstrated that no genuine dispute exists concerning any material fact and that none of the Lynyrd Skynyrd Defendants have breached the Documentary Agreement. Plaintiffs have the burden to prove at trial that Defendants have breached the Documentary Agreement. If a reasonable jury could not find that the Documentary Agreement has been breached, then summary judgment must be awarded to the Lynyrd Skynyrd Defendants.

As to the copyright infringement claim, the Lynyrd Skynyrd Defendants have demonstrated that no genuine dispute exists concerning any material fact and that none of the Lynyrd Skynyrd Defendants are liable for copyright infringement. Plaintiffs' copyright infringement claim should be dismissed because the use of any of Plaintiffs' film footage by all or any of the Lynyrd Skynyrd Defendants is a fair use.[2]

The Lynyrd Skynyrd Defendants thus respectfully move this Court to enter summary judgment in their favor on all of Plaintiffs' claims.

---

[1] Capitalized terms not otherwise defined herein will have the meanings ascribed to them in the Lynyrd Skynyrd Defendants' Motion for Summary Judgment ("MSJ") and Memorandum in Support of the Lynyrd Skynyrd Defendants' Motion for Summary Judgment ("MSJ Brief").

[2] Although not briefed herein, the Lynyrd Skynyrd Defendants continue to assert and rely on the arguments presented, and authorities cited, in Section V.B of their MSJ Brief (as to why Plaintiffs' claim for copyright infringement of Reel 1 fails as a matter of law because any and all uses of Reel 1 are permitted by the Documentary Agreement) and Section V.D of their MSJ Brief (as to why Plaintiffs' claim for Copyright Infringement of Reel 2 fails as a matter of law because Reed expressly and/or impliedly licensed the use of Reel 2).

## II. LAW AND ARGUMENT

### A. Plaintiffs' Claim For Breach Of Contract Fails As A Matter Of Law

The Lynyrd Skynyrd Defendants are entitled to summary judgment on Plaintiffs' breach of contract claim.

As Plaintiffs state in their Memorandum in Opposition to the Lynyrd Skynyrd Defendants' Motion for Summary Judgment, "Count I of Plaintiffs' Complaint asserts that Defendants breached an agreement with Plaintiff Reed relating to their use of portions of Plaintiff Reed's film in Defendants' documentary, "Freebird . . . The Movie."[3] Specifically, Paragraphs 91-96 of the Complaint assert a claim for breach of a Documentary Agreement entered into between "Plaintiff Reed and Defendants Freebird Video and Cabin Fever."[4]

It is undisputed that Defendants Fly On, Inc., Vector Management, Inc., Gary Rossington, Ross Schilling, and Lynyrd Skynyrd Productions, Inc. were not parties to the Documentary Agreement. Accordingly, the Court should, at a minimum, grant summary judgment to these Defendants as to Plaintiffs' breach of contract claim because Plaintiffs' have failed to assert any theories under which these Defendants could be held liable for breach of the Documentary Agreement.

With respect to the remaining Lynyrd Skynyrd Defendant, Freebird Film Productions, this Court should likewise grant summary judgment against Plaintiffs. It is undisputed that under the terms of the Documentary Agreement, Freebird Film Productions had an obligation to pay

---

[3] Pls.' Mem. in Opp'n to Lynyrd Skynyrd Defs.' MSJ (hereinafter, "Pls.' Opp'n Mem.") 2. Plaintiffs make much in their Complaint of the purported admission by the Lynyrd Skynyrd Defendants' counsel that Defendants owe Plaintiff Reed money under an agreement related to the use of Reed's Film at 57 live Lynyrd Skynyrd concerts in 2007. Plaintiffs' Complaint, however, contains allegations of breach of contract only as to the Documentary Agreement, and does not allege the existence of any other contracts between the parties, much less a breach of any of those other contracts.

[4] *See* Compl. ¶ 92. The Documentary Agreement is a simple letter agreement between Reed and Freebird Video Productions, Inc., which is now known as Freebird Film Productions. *See* Avsec Decl. to Lynyrd Skynyrd Defs.' MSJ (hereinafter, "Avsec MSJ Decl.") Ex. A. Although mentioned in the Documentary Agreement, Defendant Cabin Fever was not a party to the agreement itself. *See id.*

Reed a total of $5,000, $2,500 being due following Cabin Fever's examination of the Footage and $2,500 being due upon the initial public exhibition of the Documentary. Freebird Film Productions also has the obligation to pay Reed "2.5% of [Freebird Film Productions'] net profits" derived from the Documentary itself "as and when" Freebird Film Productions receives the monies, "it being understood that there is no guarantee of any profits being generated."[5] Plaintiffs do not dispute that Reed was paid $5,000.[6]

Plaintiffs contend that Lynyrd Skynyrd Productions has breached the Documentary Agreement by failing to pay Reed his portion of the net profits derived from the Documentary itself. Plaintiffs assert that there is a genuine issue of material fact regarding the "apparent improper allocation and accounting for income from sales of 'Freebird . . . The Movie.'"[7] However, these matters are out of the Lynyrd Skynyrd Defendants' hands. Indeed, Plaintiffs admit as much by contending that "documents produced by former Defendant Artisan (through its successor Lions Gate) reveal that Artisan (or its successor Lions Gate) have not properly allocated and accounted for income from the sales of the rights to 'Freebird . . . The Movie.'"[8] Even if this unsubstantiated claim were true, Freebird Film Productions would not be liable for breach of the Documentary Agreement because there is no dispute that, to date, it has not yet received any net profits from the Documentary.[9] In short, viewing the facts in the light most favorable to Plaintiffs, Freebird Film Productions' obligation to pay Reed 2.5% of its net profits derived from the exploitation of the Documentary itself has never been triggered and,

---

[5] *See* Avsec MSJ Decl. Ex. A.
[6] *See* Reed Decl. to Pls.' Opp'n Mem. (hereinafter, "Reed Decl.") ¶ 20 (emphasis added).
[7] Pls.' Opp'n Mem. 5.
[8] *Id.* at 4 (emphasis added).
[9] Defendant RHI Entertainment Distribution, LLC, successor-in-interest to Hallmark/Cabin Fever, has admitted that it never paid any profits to Freebird Film Productions. *See* RHI Mot. for Summ. J. 2, 5, 8-9. *See also* Avsec MSJ Decl. Ex. L (Financial Statements), filed under seal. In addition, Gary Haber and Judy Jenness, both officers of Freebird Film Productions, testify that Freebird Film Productions has never received any net profits from "Freebird . . . The Movie." Haber Supp. Decl. ¶¶ 2-4; Jenness Decl. ¶¶ 3-4. The Supplemental Declaration of Ross Schilling and the Declaration of Judy Jenness are attached hereto.

accordingly, no reasonable jury could find that Freebird Film Productions has breached the Documentary Agreement.

It is well-settled that when a motion for summary judgment is made and supported as provided by Rule 56(e), the non-moving party cannot rest on the pleadings, but rather must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial."[10] Plaintiffs' assertion that Rule 56(f) precludes the Court from granting the Lynyrd Skynyrd Defendants' Motion for Summary Judgment on this issue is specious. When a party opposing a motion for summary judgment shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, Rule 56(f) permits a court to deny the motion for summary judgment; order a continuance to enable evidence to be obtained; or issue any other just order. In this case, Plaintiffs argue that given the preliminary posture of the case, the parties have not had a full and fair opportunity to conduct discovery on the issue. However, no amount of discovery is going to change the following facts: (1) Defendants Fly On, Inc., Vector Management, Inc., Gary Rossington, Ross Schilling, and Lynyrd Skynyrd Productions, Inc. were not parties to the Documentary Agreement[11] and Plaintiffs have asserted no theories under which any of these parties can be held liable for a breach of that Agreement;[12] (2) Lynyrd Skynyrd Productions has not received any net profits related to "Freebird . . . The Movie"[13] and, accordingly, it has not breached its obligation to Reed to pay Reed 2.5% of its net profits derived from the Documentary.[14] Indeed, Plaintiffs have not pointed to any specific provision in the Documentary Agreement breached by Freebird Film Productions (or any of the other Lynyrd

---

[10] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).
[11] *See* Avsec MSJ Decl. Ex. A (Documentary Agreement).
[12] *See* Complaint; Pls.' Opp'n Mem. 1-5.
[13] *See* RHI Mot. for Summ. J. 2, 5, 8-9. *See also* Avsec MSJ Decl. Ex. L (Financial Statements), filed under seal. Haber Supp. Decl. ¶¶ 2-4; Jenness Decl. ¶¶ 3-4.
[14] *See* Avsec MSJ Decl. Ex. A ¶ 4.

4

Skynyrd Defendants), because they cannot. In fact, in response to the Lynyrd Skynyrd Defendants' Motion for Summary Judgment, Plaintiffs have not presented any specific fact showing that there is a genuine issue that Freebird Film Productions or any other Lynyrd Skynyrd Defendants breached the Documentary Agreement that would necessitate a trial.

In light of the foregoing, Reed's claims for breach of contract fail and must be dismissed as to all of the Lynyrd Skynyrd Defendants.

**B.      Plaintiffs' Claims For Copyright Infringement Fail As A Matter Of Law Because The Use Of The Film By The Lynyrd Skynyrd Defendants Is A Fair Use**

Other than the Documentary Agreement, Plaintiffs have not alleged the existence of any contracts governing the Lynyrd Skynyrd Defendants' various alleged uses of Reed's Film. The Lynyrd Skynyrd Defendants submit that any of its uses of Reed's footage that fall outside the scope of the Documentary Agreement do not constitute copyright infringement because those uses were either pursuant to implied licenses from Reed or constituted fair use.

Plaintiffs have not raised any issue of fact that would prevent this Court from granting summary judgment in favor of the Lynyrd Skynyrd Defendants on their fair use defense.[15] On one hand, the parties agree that portions of Reed's home movie footage were displayed during Lynyrd Skynyrd concerts.[16] Plaintiffs provided logs indicating the amount of so-called Reel 1 and Reel 2 footage used in each allegedly infringing work in the case.[17] The Court has copies of the video products.[18] On the other hand, the parties disagree as to whether the Lynyrd Skynyrd

---

[15] The Court is not required "to search the entire record to establish that it is bereft of a genuine issue of material fact." *Black v. Parke*, 4 F.3d 442, 448 (6th Cir. 1993). Rather, the burden falls upon the plaintiff at this stage of the litigation to designate specific facts or evidence in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).
[16] *See* Lynyrd Skynyrd Defs.' MSJ Brief 3-4.
[17] *See* Avsec MSJ Decl. Ex R (Plaintiffs' Logs).
[18] Specifically, the Court has a copy of the LYNYRD SKYNYRD – LYVE FROM STEEL TOWN DVD (a 97 minute concert containing 2 minutes 54 seconds of Reel 1), *see* Avsec MSJ Decl. Ex. O, and a copy of the VICIOUS CYCLE DVD (a 120 minute concert containing 2 minutes 53 seconds in the aggregate of sections of both Reel 1

Defendants' use of Reed's footage was transformative and ultimately fair. However, inasmuch as no material historical facts are at issue and the parties dispute only the ultimate legal conclusions to be drawn from the admitted facts, the fair use issue is ripe for resolution on summary judgment.[19]

Several important decisions exhort judges to use summary judgment to make rulings as a matter of law.[20] Moreover, the Lynyrd Skynyrd Defendants have cited numerous examples in which judges used summary judgment to make rulings in fair use cases.[21] In fact, at least two notable fair use cases decided on summary judgment have come from courts in this Circuit.[22] Thus, there is a solid foundation for this Court to resolve the fair use issue at the summary

---

and Reel 2), *see* Avsec MSJ Decl. Ex. P. Both concerts embodied in these DVDs (filmed six years apart) evidence how Reed's footage was used in Lynyrd Skynyrd's live concerts.

[19] *Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir. 1986) (holding that fair use issue was properly resolved on summary judgment because "[n]o material historical facts [were] at issue in th[e] case [and t]he parties dispute[d] only the ultimate conclusions to be drawn from the admitted facts").

[20] *See, e.g.*, *Celotex*, 477 U.S. at 327 ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules . . . designed 'to secure the just, speedy and inexpensive determination of every action.'"). Indeed, Rule 56(c) itself provides that summary judgment is required when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

[21] *See, e.g.*, Lynyrd Skynyrd Defs.' MSJ Brief 13 n.73. *See also Nat'l Rifle Ass'n of Am. v. Handgun Control Fed'n of Ohio*, 15 F.3d 559 (6th Cir. 1994) (affirming the district court's grant of summary judgment in favor of defendant in copyright infringement case, holding that use of the material at issue was a "fair use" and therefore the defendant could not be held liable).

[22] *See Campbell v. Acuff-Rose*, 510 U.S. 569 (1994) (district court granted summary judgment for 2 Live Crew, holding that its song was a parody that made use of the original song; Sixth Circuit reversed and remanded, holding that the commercial nature of the parody rendered it presumptively unfair; the Supreme Court found that the Sixth Circuit was in error when it concluded that the commercial nature of 2 Live Crew's use rendered it presumptively unfair and was also in error when it held that 2 Live Crew had necessarily copied excessively from the original song, considering the parodic purpose of the use); *Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381 (6th Cir. 1996) (*en banc*) (district court granted summary judgment in favor of Princeton University Press, holding that the actions of Michigan Document Services ("MDS"), a commercial copyshop, did not constitute fair use when it reproduced substantial segments of copyrighted works of scholarship, bound the copies into coursepacks, and sold the coursepacks for a profit to college students for use in fulfilling reading assignments; Sixth Circuit, sitting *en banc*, affirmed the district court's grant of summary judgment on the fair use issue, holding that the systematic and premeditated character, the magnitude, the anthological content, and the commercial motivation of the copying done by MDS rendered it unfair).

judgment stage,[23] and the Court should do so in this case to secure the just, speedy, and most efficient determination of this action.[24]

1. Factor One: Purpose And Character Of The Use, Including Whether Such Use Is Of A Commercial Nature Or Is For Nonprofit Educational Purposes

a. *Purpose And Character Of The Use*

Despite their efforts to distance themselves from the facts, Plaintiffs cannot escape the reality that there is no commercial market for Reed's home movies because the movies contain the identities of the band members. Plaintiffs advance a kind of Wizard of Oz "pay no attention to the man behind the curtain" argument when they suggest that misappropriation of the band members' likenesses by Reed is "not at issue or even briefed by Defendants with any analysis of consequence."[25] Of course Reed wants to distance himself from this issue inasmuch as he admitted he commenced selling the Film through his website in 2000.[26] Highly relevant to the Lynyrd Skynyrd Defendants' fair use argument, however, is basic black-letter law that "a celebrity's legal right of publicity is invaded whenever his identity is intentionally appropriated for commercial purposes."[27] Decisions in cases with similar facts make this clear.[28]

Plaintiffs ask the Court to read the Sixth Circuit Court of Appeals' decision in *ETW Corporation v. Jireh Publishing, Inc.*, 332 F.3d 915 (6th Cir. 2003), as excusing Plaintiffs from

---

[23] *See, e.g.*, *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991) (explaining that although fair use is a mixed question of law and fact, the court may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues).

[24] *See Celotex*, 477 U.S. at 327 ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'").

[25] Lynyrd Skynyrd Defs.' MSJ Brief 18-19.

[26] Reed Decl. ¶ 54. *See also* Avsec MSJ Decl. Ex. S (Dec. 21, 2000 Warning Letter to Reed).

[27] *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 837 (6th Cir. 1983).

[28] One court held that a website operator violated Bret Michaels' and Pamela Anderson's rights of publicity by providing website users access to an illicit Michaels-Anderson video in return for a subscription fee. *See Michaels v. Internet Entm't Group*, 5 F. Supp. 2d 823 (C.D. Cal. 1998). In another example, a court issued an injunction prohibiting a website operator from violating Paris Hilton's right of publicity by selling subscriptions to a website providing access to photographs of her and other private materials belonging to her. *See Hilton v. Persa*, No. 07-cv-00667 (C.D. Cal. Feb. 20, 2007).

7

needing "Defendants' consent to make a commercial use of creative works that incorporate [Defendants'] likenesses."[29] This is incorrect. In *ETW*, the majority and the dissent disagreed on the application of the *Saderup* test, a test first articulated in *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 21 P.3d 797 (Cal. 2001).[30] In *Saderup*, the court favored an inquiry that asks whether an artwork "adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation."[31] Saderup's charcoal drawings, the court determined, did not have the necessary artistic extra element; his talent was "manifestly subordinated to the overall goal of creating literal, conventional depictions of the Three Stooges so as to exploit their fame."[32]

Here, in contrast, Reed merely pointed and shot a Super 8 camera and sold the unadulterated footage to the public. His home movies do not pass the *Saderup* test. They are literal movies of the band "behind the scenes," backstage, on trains, in planes, and in hotel rooms.[33] Had he not been on the plane that crashed in 1977 and a friend to the organization, Lynyrd Skynyrd would have terminated Reed prior to 2005 and pursued him like a common T-Shirt bootlegger long ago.[34] The simple fact is that there is no legitimate commercial market for Reed's footage. Plaintiffs' inability to identify even one ready market impacted by the Lynyrd Skynyrd Defendants' use of the footage confirms that fact.

---

[29] Pls.' Opp'n Mem. 19.
[30] *ETW* involved a portrait of Tiger Woods at the Masters Tournament. The majority in *ETW* found that the defendant's painting had "significant transformative elements" because it "consist[ed] of a collage of images [of caddies, the Augusta clubhouse, and six other golf greats] in addition to Woods's image[,] which are combined to describe, in artistic form, a historic event in sports history and to convey a message about the significance of Woods's achievement in that event." *Id.* at 938. Recognizing that its decision had potentially significant consequences for artists who create representations of famous figures, the California Supreme Court adapted the *Saderup* test, a transformative use test from *Campbell*, to create a standard that would preserve the right of publicity without violating the First Amendment. *Id.* at 807-810.
[31] *Id.* at 799.
[32] *Id.* at 811.
[33] Schilling Supp. Decl. ¶ 1. The Supplemental Declaration of Ross Schilling is attached hereto.
[34] *Id.* at ¶ 2.

The transformative element is somewhat less important to the question of fair use when the allegedly infringing work has had zero commercial impact on the plaintiff.[35] Plaintiffs correctly cite *Campbell* for the premise that "[t]he effect of finding that a use is 'transformative'—even if it is commercial—is only that market substitution of the second work for the original work is less certain, and market harm may not be presumed."[36] Of course, applying *Campbell*'s premise to the facts of this case, because there is absolutely no danger of market substitution of a live Lynyrd Skynyrd concert or one of the video products at issue in this case for Reed's home movies, it means that the effect of finding that the use was transformative here is not critical, if it matters at all.

Yet, the Lynyrd Skynyrd Defendants' use of the Film was transformative.[37]

Despite Plaintiffs' effort in their Brief to distance themselves from it now, they have acknowledged in their Complaint that Reed's Film is only "home movie footage."[38] The Lynyrd Skynyrd Defendants injected it "with a further purpose or different character, altering [it] with new expression, meaning, or message."[39] Plaintiffs assert that the Lynyrd Skynyrd Defendants' use of the Film serves the same intrinsic entertainment value that is protected by Plaintiffs' copyrights.[40] For the sake of argument, however, even if that were true,[41] Reed's Film can only be used by Reed to entertain himself in his home or among a private circle of his family and friends.

---

[35] *See generally Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) (concluding fair use even though the use was commercial, not transformative, and involved creative television programs, for the most part, that were copied in their entirety because consumers watched the broadcasts later, which resulted in zero commercial impact).

[36] *See* Pls.' Opp'n Mem. 15 (citing *Campbell*, 510 U.S. at 591).

[37] Plaintiffs promote a limited interpretation of transformative use in their Brief that is not supported by the relevant case law. *See* Lynyrd Skynyrd Defs.' MSJ Br. at 14-15 (and authorities cited therein).

[38] Compl. ¶ 24.

[39] *Campbell*, 510 U.S. at 579 (internal citations and quotation marks omitted) (alteration in original).

[40] Pls.' Opp'n Mem. 15.

[41] It is difficult to equate, on the one hand, the entertainment value of a multi-media production consisting of an entire band, an orchestra, visual effects, lighting, and various films with, on the other hand, the entertainment value of a 30 year old, jumpy, silent Super 8 home movie.

The allegedly infringing works in this case are multi-media events incorporating small sections of Reed's Film, together with other media that together tie the band's founders to the current lineup.[38] Reed's Film is not that. Therefore, the Court should accord a strong presumption in favor of the fairness of the Lynyrd Skynyrd Defendants' use of it.

In light of the foregoing, the first sub-part of the first factor favors a finding of fair use.

      b.      *Commercial Use*

Plaintiffs ask the Court to read *Sony* and *Princeton University Press* for the proposition that "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright."[42] This is not the law.[43] Plaintiffs also assert that the Lynyrd Skynyrd Defendants went too far in arguing that *Campbell* eliminated the *Sony* presumption that any commercial use is unfair. To the contrary, it is Plaintiffs that did not go far enough. In fact, "*Campbell* derides the 'presumption ostensibly culled from *Sony*.'"[44]

> The district court [in *Campbell*] ruled the parody fair, notwithstanding its commercial nature. The Sixth Circuit reversed, holding that, even conceding the defendant's work to be a parody, *Sony* and *Nation*[45] "require that we start from the position that the use is unfair." The Supreme Court cited that conclusion, "giving virtually dispositive weight to the commercial nature of that parody," as the basis for its reversal of the Sixth Circuit's decision. Emphasizing that the fair use analysis cannot be short-circuited via bright-line rules, the Court confirmed that that one sentence from *Sony* means that commerciality merely inclines against fair use, without giving rise to presumptive significance. Moreover,

---

[38] The band used third party footage as part of the concerts and video products in addition to Reed's footage. For example, the footage shown in a portion of each concert where the deceased Ronnie Van Zant appears on a screen above the stage and appears to sing a duet with his brother, Johnny Van Zant, is "Pepsi" footage owned by the Lynyrd Skynyrd organization. Schilling Supp. Decl. ¶ 3.

[42] Pls.' Opp'n Mem. 14, n.24.

[43] In *Princeton*, what the Sixth Circuit stated was that the proponent of the fair use defense typically bears the burden of proving all issues in dispute. *See Princeton*, 99 F.3d at 1390 n.5. Citing *Sony*, the Sixth Circuit also stated, however, that the burden of proof as to *market harm* presumptively rests with the copyright holder if the challenged use is of a "noncommercial" nature, whereas the alleged infringer has the burden of proving market harm only if the challenged use is "commercial" in nature. *Id.* at 1385-86.

[44] M. Nimmer and D. Nimmer, 4 NIMMER ON COPYRIGHT § 13.05[A][1][c], at 13-174 n.101 (2008) (quoting *Campbell*, 510 U.S. at 583-84).

[45] *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985).

warned the Court, "even the force of that tendency will vary with the . . . context."[46]

The Lynyrd Skynyrd Defendants deny that Reed's footage was used in television ads to promote their concerts.[47] They also deny that Reed was threatened with termination if he refused to agree to their terms.[48] Despite Plaintiffs' assertion in their Brief, the only product packaging that contained a reference to behind-the-scenes footage was the packaging for "Freebird . . . The Movie," and Reed consented to that use through the Documentary Agreement.[49] Furthermore, reviews cited by Plaintiffs to highlight the importance of Reed's footage in the concerts and products are misunderstood by Plaintiffs. For example, the portion of the concert where "lead singer Johnny Van Zant alternates singing with his brother, the late Ronnie Van Zant, by means of having a screen placed above the group on stage with Ronnie shown singing (from one of the group's 70s concert footage)"[50] did not incorporate Reed's footage at all; it was footage owned by the Lynyrd Skynyrd organization.[51]

But these disagreements are, if not completely irrelevant, merely quibbling at the edges. The Lynyrd Skynyrd Defendants have already acknowledged that all of the DVD products at issue are sold commercially and that people purchased tickets to see Lynyrd Skynyrd perform in concert when portions of Reed's Film were shown.[52] However, in light of the fact that this

---

[46] 4 NIMMER ON COPYRIGHT § 13.05[A][1][c], at 13-174 (footnotes omitted).
[47] *See* Pls.' Opp'n Mem. 14; Reed Decl. 9. Schilling Supp. Decl. ¶ 4.
[48] *See* Reed Decl. ¶ 37. *See* Schilling Supp. Decl. ¶ 5.
[49] The only video product packaging that even mentioned the presence of Plaintiffs' film was the packaging for "Freebird . . . The Movie," and even that was an indirect reference—"Go back in time and experience the band's true spirit, raw power and three-guitar attack in blistering live performances, revealing interviews, rare photos, and home movies." Regardless, the Documentary Agreement expressly contemplated and granted Freebird Film Productions "the right to exploit the Documentary, including the Footage . . . ." Neither the LYNYRD SKYNYRD – LYVE FROM STEEL TOWN video packaging nor the VICIOUS CYCLE DVD packaging contains any express or implied reference to Reed's footage. *See* Avsec MSJ Decl. Exs. C and N.
[50] This "review" was included as part of Exhibit R6 to the Civil Rule 56(f) Affidavit of H. Alan Rothenbuecher.
[51] Schilling Supp. Decl. ¶ 3.
[52] Lynyrd Skynyrd Defs.' MSJ Br. 16.

commercial use had zero commercial impact on Reed's original work, the Court should give little weight to it, if any.

The Lynyrd Skynyrd Defendants used a reasonable amount of Reed's footage to achieve a transformative purpose and Plaintiffs suffered no commercial impact as a result. Moreover, since there is no danger of market substitution of a live Lynyrd Skynyrd concert or one of the video products for Reed's original work, the first factor favors fair use even if the Court finds that the Lynyrd Skynyrd Defendants' use was not abundantly transformative. Therefore, this Court should find that the first factor weighs in favor of fair use.

2. <u>Factor Two: Nature Of The Copyrighted Work</u>

Though pointing out that the degree of protection afforded historical film clips is arguably somewhat less than fanciful works,[53] the Lynyrd Skynyrd Defendants acknowledged in their Brief that Reed's Film is a semi-creative work subject to copyright protection. For the sake of argument, even if the Film is an expressive work, as Plaintiffs contend in their Opposition, this fact is not much help to them. Expressive works are at issue in almost every fair use case. In other words, this factor is hardly "ever likely to help much in separating the fair use sheep from the infringing goats[.]"[54] Accordingly, it should be given limited weight.

3. <u>Factor Three: Amount And Substantiality Of The Portion Used In Relation To The Copyrighted Work As A Whole</u>

Because Plaintiffs themselves provided the calculations,[55] they cannot escape the fact that the Lynyrd Skynyrd Defendants used only a small portion of Reed's Film in each allegedly infringing work, heavily favoring fair use. Doomed as to quantity, Plaintiffs unconvincingly assert in their brief that the "heart" of Reed's Film was taken.

---

[53] *See, e.g., Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966).
[54] *Campbell*, 510 U.S. at 586.
[55] *See* Avsec MSJ Decl. Ex R (Plaintiffs' Logs).

Not surprisingly, Plaintiffs never identify what the "heart" is. Only two Supreme Court cases have mentioned the "heart" of a work in a fair use context: in one, it was the memorable hook of a song;[56] in the other, it was a portion of Ford's memoirs recounting his pardon of Richard Nixon that was so juicy that its purported fair use caused Time Magazine to cancel an agreement to pay $25,000.00 for the right to print pre-publication excerpts.[57] Looking to these examples, the "heart" of Reed's Film, if it exists, should be extraordinary. At the very least, it should be describable. But it is not. Considering the small amount of the Film used in each work, the Court should find that factor three heavily favors fair use.

    4.    <u>Factor Four: Effect Of The Use Upon The Potential Market For Or Value Of The Copyrighted Work</u>

The Lynyrd Skynyrd Defendants have demonstrated that there is no legitimate market for the Film other than Lynyrd Skynyrd's sanctioned use of it. Therefore, because the Lynyrd Skynyrd organization's use of the Film had zero effect upon the potential market for or value of the Film, factor four heavily favors a finding of fair use. However, Plaintiffs ask the Court to read an old and irrelevant case, *Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc.*, 621 F.2d 57 (2d Cir. 1980), for the proposition that if a plaintiff's copyright entitled the plaintiff to exploit a significant potential market controlled by the defendant but the plaintiff could not do so, then the plaintiff should be able to withhold permission to use the film in that market.[58]

The Court should note, however, that the statute to be interpreted in the instant case, 17 U.S.C. § 107, did not govern the *Iowa State* case since the plaintiff's copyright was secured

---

[56] *See Campbell*, 510 U.S. at 587-89.
[57] *Harper & Row*, 471 U.S. at 542-43.
[58] *See* Pls.' Opp'n Mem. 19 n.43.

13

before the 1976 Act took effect.[59] Moreover, in the 29 years since *Iowa State* was decided by the Second Circuit, there has been a litany of relevant fair use decisions interpreting the actual law at issue, and many of these cases have already been cited in the Briefs.

Most importantly, in *Iowa State*, ABC refused to compensate the plaintiff even nominally, addressed the plaintiff's overtures to amicably resolve the matter by falsely denying it ever used the film, and was guilty of bad faith. Both the district court and the Second Circuit recognized this: "Bearing in mind, as we must, that the fair use doctrine 'is entirely equitable,' we agree with Judge Lombard that ABC's conduct in the instant case is not irrelevant to the fairness of its use."[60] Conversely, in the present case, beginning in 1995, the Lynyrd Skynyrd Defendants entered into agreements with Reed for the use of his home movie footage and, to date, he has been paid more than $22,000.00. To be sure, if the Documentary ever earns profits, he will be paid more. Further, the Lynyrd Skynyrd Defendants have offered to compensate Reed for the 57 concerts in 2007 at which portions of the Film were shown.

Finally, there is a world of difference between, on the one hand, the *Iowa State* plaintiff having a potential worldwide market for its film about an Olympic wrestler but for the ABC television company suddenly seizing the market by securing an exclusive deal to broadcast the 1972 Olympic games and, on the other hand, Reed's commercial market, which was doomed before he even shot a single role of film. If Reed expected to profit from his movies of Lynyrd Skynyrd band members right from the start, then he was misguided because he was, and is still, not allowed to do that without their consent. The Lynyrd Skynyrd band members and their organization did not *seize* the market for the commercial use of their persona. The market already *belonged* to them.

---

[59] *Iowa State*, 621 F.2d at 60 n.5.
[60] *Id.* at 62.

In short, Plaintiffs have shown no evidence of any harm or adverse impact. In the absence of any evidence about effects on Plaintiffs' business, this Court cannot find any market harm to Plaintiffs. The Lynyrd Skynyrd Defendants have met their burden of proof by offering evidence showing a lack of market harm, and Plaintiffs have not refuted that evidence. Therefore, this Court should find the fourth factor weighs in favor of fair use.

In summary, three of the four fair use factors, including the important fourth factor, heavily favor the Lynyrd Skynyrd Defendants. The second factor, at worst, does not cut against them. Accordingly, this Court should find that the Lynyrd Skynyrd Defendants uses of the Film were fair uses. Therefore, this Court must dismiss Plaintiffs' copyright infringement claim in its entirety.

### III.  CONCLUSION

For the foregoing reasons, the Lynyrd Skynyrd Defendants respectfully request that this Court grant their Motion for Summary Judgment, dismissing Plaintiffs' claims in their entirety.[61]

Respectfully submitted,

DATED: March 4, 2009

*/s/ Mark E. Avsec*
Mark E. Avsec (0064472)
mavsec@beneschlaw.com
Bryan A. Schwartz (0078527)
bschwartz@beneschlaw.com
Angela R. Gott (0082198)
agott@beneschlaw.com
**BENESCH, FRIEDLANDER,
 COPLAN & ARONOFF LLP**

---

[61] In the alternative, to the extent the Court finds there no genuine issues of material fact with respect to less than all of Plaintiffs' claims, the Lynyrd Skynyrd Defendants respectfully request that this Court partially grant their Motion for Summary Judgment as to any such claim or portion of Plaintiffs' claims for which summary judgment is proper. Likewise, to the extent the Court finds there are no genuine issues of material fact as concerns fewer than all of the Lynyrd Skynyrd Defendants, the Lynyrd Skynyrd Defendants respectfully request that this Court partially grant their Motion for Summary Judgment as to those individual Lynyrd Skynyrd Defendants for whom summary judgment is proper.

200 Public Square, Suite 2300
Cleveland, Ohio 44114-2378
Telephone: (216) 363-4500
Facsimile: (216) 363-4588

*Attorneys for Defendants Freebird Film Productions, Inc., Fly On, Inc., Vector Management, Inc., Gary Rossington, Ross Schilling, and Lynyrd Skynyrd Productions, Inc.*