IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CRAIG REED, et al., | ) CASE NO. 1:08-CV-01761 |
| Plaintiffs | ) |
| | ) JUDGE CHRISTOPHER A. BOYKO |
| vs. | ) |
| FREEBIRD FILM PRODUCTIONS, INC., et al., Defendants. | ) |

**REPLY BRIEF IN SUPPORT OF MOTION OF DEFENDANT RHI ENTERTAINMENT DISTRIBUTION, LLC (SUCCESSOR IN INTEREST TO NAMED DEFENDANT HALLMARK ENTERTAINMENT DIST., LLC) FOR SUMMARY JUDGMENT**

Louis A. Colombo (0025711)
Brandt W. Gebhardt (0079823)
BAKER & HOSTETLER LLP
3200 National City Center
1900 East Ninth Street
Cleveland, Ohio 44114
(216) 621-0200 (telephone)
(216) 696-0740 (facsimile)
lcolombo@bakerlaw.com
bgebhardt@bakerlaw.com

*Attorneys for Defendant RHI Entertainment Distribution, LLC*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

I. PLAINTIFFS CONCEDE THAT RHI IS ENTITLED TO SUMMARY JUDGMENT. ... 2

II. SHOULD THE COURT CHOOSE TO ADDRESS PLAINTIFFS' UNPLED DIRECT CONTRACT CLAIM, RHI IS ENTITLED TO SUMMARY JUDGMENT ON THAT CLAIM ALSO. ................................................................................................................. 2

    A. The Only Agreement Establishing Reed's Right To Any Payment Is The Unambiguous Written Agreement Between Reed And Freebird To Which Cabin Fever Is Not A Party. ................................................................................................. 3

    B. The Parol Evidence Rule Bars Extrinsic Evidence That Cabin Fever Was A Party To The Reed-Freebird Agreement. .......................................................................... 5

    C. Even If Plaintiffs' Parol Evidence Were Admissible, It Does Not Show That Cabin Fever Contracted To Pay Reed A Percentage Of Its Profits Through The Reed-Freebird Agreement. ........................................................................................ 6

        1. The Cabin Fever Letter shows only that Cabin Fever was to make a second fixed payment to Reed of $2,500. ................................................... 6

        2. Plaintiffs' construction of the Reed-Freebird Agreement is incoherent because Cabin Fever's and Freebird's net profits from the Movie will not be the same. ............................................................................................... 6

    D. Plaintiffs Cannot Establish An Independent Contract For Royalties Between Cabin Fever And Reed. ............................................................................................. 7

        1. There is no consideration for an independent net profits obligation on the part of Cabin Fever. ............................................................................... 8

        2. The Cabin Fever Letter does not promise to pay net profits to Reed. ........ 8

        3. Jeff Waxman is an independent film producer whose oral promises to Reed, if any, did not bind Cabin Fever. ...................................................... 9

III. SHOULD THE COURT CHOOSE TO ADDRESS PLAINTIFFS' UNPLED INTENDED BENEFICIARY CLAIM, RHI IS ENTITLED TO SUMMARY JUDGMENT ON THAT CLAIM ALSO. ............................................................................ 9

    A. Plaintiffs Have Not Shown That Freebird Had Any Preexisting Obligation To Pay Reed; Therefore, Restatement Section 302(1)(A) Is Inapplicable. ......................... 9

    B. There Is No Class Of Intended Beneficiaries Referred To And Identified In The Freebird-Cabin Fever Agreement, Let Alone Any Such Class Of Which Plaintiffs Are Members. ........................................................................................................... 9

    C. Cabin Fever's Conduct Subsequent To The Freebird-Cabin Fever Agreement Does Not Prove Its Intent Upon Entering Into That Agreement. ......................... 10

    D.    *Septembertide* And The Other Cases Cited By Plaintiffs Are Inapposite. ............ 11

IV.    EVEN IF THE COURT FINDS THAT PLAINTIFFS HAVE A VIABLE CONTRACT CLAIM, RHI IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PRODUCTION COSTS FOR THE MOVIE ARE STILL UNRECOUPED............................................. 12

CONCLUSION............................................................................................................... 14

CERTIFICATE OF SERVICE ..................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Bank v. Cook*, 38 Ohio St. 442 (Ohio 1882) ................................................................. 5

*Big H, Inc. v. Watson*, 2006 Ohio 4031 (Ohio Ct. App. 2006) ..................................... 5

*Bowman v. Tax Com.*, 20 N.E.2d 916 (Ohio 1939) ...................................................... 5

*Carlisle v. T & R Excavating*, 704 N.E.2d 39 (Ohio Ct. App 1997) ............................ 8

*Citicasters Co. v. Bricker & Eckler, LLP*, 778 N.E.2d 663 (Ohio Ct. App. 2002) ....... 5

*Dalton v. Belden & Blake Corp.*, No. 97CA0073, 1999 Ohio App. LEXIS 373 (Ohio Ct. App. 1999) ................................................................................................. 5

*Dalton v. FDIC*, 987 F.2d 1216 (5th Cir. 1993) ........................................................... 13

*FDIC v. Schreiner*, 892 F. Supp. 869 (W.D. Tex. 1995) ............................................. 13

*Hines v. Amole*, 448 N.E.2d 473 (Ohio Ct. App. 1982) .............................................. 11

*Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819 (9th Cir. 1985) ....... 9, 11

*Marino v. Dwyer-Berry Construction Corp.*, 597 N.Y.S.2d 466 (N.Y. App. Div. 1993) ............ 10

*Porter v. Board of Indus. Rels.*, 675 N.E.2d 1329 (Ohio Ct. App. 1996) ...................... 6

*Preston v. First Bank of Marietta*, 473 N.E.2d 1210 (Ohio Ct. App. 1983) ................. 8

*Resolution Trust Corp. v. Camp*, 965 F.2d 25 (5th Cir. 1992) ................................... 13

*Septembertide Publishing, B.V. v. Stein & Day, Inc.*, 884 F.2d 675 (2d Cir. 1989) ... 11

*Stocker & Sitler, Inc. v. Metzger*, 250 N.E.2d 269 (Ohio Ct. App. 1969) ..................... 5

*ThorWorks Industries v. E.T. DuPont De Nemours and Co.*, No. 3:08CV948, 2008 WL 4966068 (N.D. Ohio 2008) ..................................................................................... 11

*TRINOVA Corp. v. Pilkington Bros., P.L.C.*, 70 Ohio St. 3d 271 (1994) .................. 11

*Vulcan Corp. v. Freeland*, 2006 Ohio 4033 (Ohio Ct. App. 2006) ........................... 3, 5

*Zelber v. Lewoc*, 776 N.Y.S.2d 134 (N.Y. App. Div. 2004) ....................................... 10

## PRELIMINARY STATEMENT

Plaintiffs sued defendant RHI Entertainment Distribution, LLC ("RHI") for copyright infringement and nothing else. That claim was specious when filed. Plaintiffs do not even attempt to avoid summary judgment on the claim, sneaking in a concession that they have no evidence of infringement on page 5 of their brief. Plaintiffs' theory of liability has become a moving target, having morphed from a copyright claim to a third party beneficiary contract claim to a direct contract claim. In the latest iteration of their theory, plaintiffs argue that an unambiguous written agreement between Plaintiff Craig Reed ("Reed") and Defendant Freebird Film Productions, Inc. ("Freebird") is also somehow a direct agreement between Reed and Defendant Cabin Fever Entertainment, Inc. ("Cabin Fever"), a company whose assets were acquired by RHI. Plaintiffs alternatively reprise their theory that Reed is somehow an intended beneficiary of an agreement that was entered into between Freebird and Cabin Fever months before Reed was even approached about using his film footage. Plaintiffs' evolving theories all fail, and RHI is entitled to summary judgment in its favor.

## STATEMENT OF FACTS

The relevant facts are set forth in the Brief in Support of Motion of Defendant RHI Entertainment Distribution, LLC (Successor in Interest to Named Defendant Hallmark Entertainment Dist., LLC) for Summary Judgment (the "RHI Brief") (ECF 50-2). Any additional facts germane to the argument herein are included within the discussion.

# ARGUMENT

## I. PLAINTIFFS CONCEDE THAT RHI IS ENTITLED TO SUMMARY JUDGMENT.

The only claim that plaintiffs asserted in their Complaint against RHI is for copyright infringement. (Compl. ¶¶ 75, 86, 97-110, ECF 1-1.) Plaintiffs now admit that they have no proof of copyright infringement by RHI: "[RHI] has no apparent liability for copyright infringement relating to the use of Reed's film footage in other media or products." (Pltfs' Brief at 5, ECF 75.) Plaintiffs admit that RHI's marketing, distribution, and sale of the Movie was pursuant to license, and RHI was not involved in other allegedly infringing uses of Reed's film footage referenced in the Complaint. (*Id.*) Accordingly, for these reasons and those set forth in RHI's Brief, RHI is entitled to summary judgment.

## II. SHOULD THE COURT CHOOSE TO ADDRESS PLAINTIFFS' UNPLED DIRECT CONTRACT CLAIM, RHI IS ENTITLED TO SUMMARY JUDGMENT ON THAT CLAIM ALSO.

Plaintiffs take the position for the first time in their brief opposing summary judgment that RHI is liable to pay Reed a share of the "net profits" from "Freebird . . . The Movie" (the "Movie") by virtue of RHI's assumption of an alleged contract between Cabin Fever and Reed. (Pltfs' Brief at 7-8.) But there is no evidence of any contract between Cabin Fever and Reed; the only contract that promises any payment to Reed in connection with the Movie is the unambiguous written agreement entered into between Reed and Freebird—not among Reed, Freebird, and Cabin Fever. (*See* RHI Brief, Ex. 1, ECF 50-3.) The parol evidence rule bars plaintiffs from introducing extrinsic evidence purportedly showing that Cabin Fever was a party to the Reed-Freebird Agreement. Even if parol evidence were not barred, plaintiffs' purported evidence does not support their assertion that Cabin Fever agreed to make payments to Reed

through the Reed-Freebird Agreement, nor can plaintiffs establish a separate contract for payment between Cabin Fever and Reed.

### A. The Only Agreement Establishing Reed's Right To Any Payment Is The Unambiguous Written Agreement Between Reed And Freebird To Which Cabin Fever Is Not A Party.

Plaintiffs assert that Cabin Fever agreed to pay them 2.5% of Cabin Fever's net profits from the Movie for use of Reed's film. (Pltfs' Brief at 7.) But the document that governs the right to use Reed's film is the unambiguous, written agreement between only Reed and Freebird. That agreement did not bind Cabin Fever and does not bind RHI.

The signatures and accompanying text on a written agreement generally are dispositive in establishing the parties thereto.[1] The Reed-Freebird Agreement, by which Reed licensed the right to use his film footage, includes only two signature lines: one for Freebird and one for Reed. There is no signature line for Cabin Fever. If Cabin Fever was also a party to the Agreement, the writing necessarily would have included a signature line for Cabin Fever.

Plaintiffs seek to circumvent this clear and unambiguous document by fabricating ambiguity in connection with use of the pronoun "we" in the Reed-Freebird Agreement. (Pltfs' Brief at 2.) But reading the entire document shows that the agreement is perfectly clear and consistent in its use of pronouns. The agreement is written in the form of a letter from Freebird to Reed. Freebird appears in the letterhead and signature. Reed is identified in the inside address and salutation. There is a signature line after "AGREED" for Reed to sign. It is plain that "your and our agreement" in the first line of body text refers to Reed and Freebird, respectively, and that "we" thereafter refers to Freebird. The use of the first person plural

---

[1] *E.g., Vulcan Corp. v. Freeland*, 2006 Ohio 4033 at ¶ 15 (Ohio Ct. App. 2006). (When a contract included lines for the defendant's signature both as president of a corporation and individually, "Freeland's signing the documents two times indicated that he was signing in two different capacities. Freeland signed once for Sportcell, Inc., and then once for himself as an individual. This is basic agency law.")

3

pronoun was apparently a stylistic choice by Freebird, and reflects the fact that Freebird is a company, not that the agreement binds anyone other than Freebird and Reed.

That the pronoun "we" cannot be read to include Cabin Fever is obvious from the use of the pronoun "them" in the same letter. Whenever the Reed-Freebird Agreement discusses the role Cabin Fever may play, the language clearly and consistently differentiates Cabin Fever from Freebird, using the pronoun "them" to refer to Cabin Fever. Item 2 provides: "shortly following **Cabin Fever's** examination of the Footage, **we** shall pay or cause **them** to pay to you the sum of Two Thousand Five Hundred ($2500) Dollars" (emphasis added). Obviously, "we" is Freebird, the party with which Reed is contracting; and "them" is Cabin Fever, the outsider to the deal. If "we" included Cabin Fever, then "them" has no antecedent. In addition, Freebird's use of the third person plural pronoun "them" to refer to Cabin Fever, another company, is consistent with its use of the first person plural pronoun "we" to refer to itself.

Plaintiffs also trumpet the fact that Cabin Fever made two $2,500 fixed fee payments to Reed as evidence that Cabin Fever was a party to the contract. (Pltfs' Brief at 3, 8.) The Reed-Freebird Agreement, however, does not require Cabin Fever to make these payments; rather, the agreement requires either that Freebird make the payments or arrange for Cabin Fever—or, with respect to the second $2,500 payment, an unnamed third party—to make the payments: "shortly following Cabin Fever's examination of the Footage, **we shall pay or cause them to pay** to you the sum of Two Thousand Five Hundred ($2500) Dollars. . . . Provided any of the Footage is included in the Documentary, **we shall pay or cause to be paid** to you the sum of Two Thousand Five Hundred ($2500) Dollars upon the initial public exhibition of the Documentary." (Reed-Freebird Agreement ¶¶ 2, 4.) The obligation to pay was solely Freebird's; the mechanism for paying was left to Freebird's discretion. Had Cabin Fever not made a payment, Reed's sole

remedy under the Reed-Freebird Agreement was against Freebird, the entity that agreed to pay or arrange the payment for the use of Reed's film footage.

### B. The Parol Evidence Rule Bars Extrinsic Evidence That Cabin Fever Was A Party To The Reed-Freebird Agreement.

Because Freebird's agreement to pay Reed is embodied in an unambiguous writing, its terms cannot be expanded to cover Cabin Fever by evidence extrinsic to that writing. The law is well settled that parol evidence cannot be used to vary the parties to an unambiguous written contract: "Parol evidence is not admissible to add a party to the instrument who does not appear upon its face." *Bank v. Cook*, 38 Ohio St. 442, 444 (Ohio 1882); *see also Vulcan Corp.*, 2006 Ohio 4033 at ¶ 11 (applying rule to exclude evidence extrinsic to written agreement); *Big H, Inc. v. Watson*, 2006 Ohio 4031 at ¶ 11 (Ohio Ct. App. 2006) (excluding evidence extrinsic to lease).[2]

By virtue of the parol evidence rule, Reed's claimed discussions regarding the Reed-Freebird Agreement (Reed Decl. ¶ 18, ECF 77-1), the Cabin Fever Letter (Reed Decl. Ex. B, ECF 77-3), and anything else beyond the four corners of the document are inadmissible to show that Cabin Fever is a party to the Reed-Freebird Agreement. In particular, Reed's self-serving testimony as to his subjective understanding of the Reed-Freebird Agreement (Reed Decl. ¶¶ 18-21) is inadmissible: "Parole subjective testimony as to the intent of the parties could not be used to vary the terms of a written contract." *Stocker & Sitler, Inc. v. Metzger*, 250 N.E.2d 269, 271 (Ohio Ct. App. 1969); *see also Porter v. Board of Indus. Rels.*, 675 N.E.2d 1329, 1331 (Ohio Ct.

---

[2] Although historically a non-party to a contract was barred from invoking the parol evidence rule in litigation against a party to the contract, *see, e.g., Bowman v. Tax Com.*, 20 N.E.2d 916, 919 (Ohio 1939) (stating rule), modern cases permit strangers to a contract to exclude parol evidence so long as their rights stem from or depend on the contract, *see Dalton v. Belden & Blake Corp.*, No. 97CA0073, 1999 Ohio App. LEXIS 373, at *5-6 (Ohio Ct. App. 1999) (reversing trial court that applied the *Bowman* rule). In any event, since it is plaintiffs' position that Cabin Fever was a party to the Reed-Freebird Agreement, they may not treat Cabin Fever's successor, RHI, as a stranger for the purpose of admitting parol evidence in support of their position. *See Citicasters Co. v. Bricker & Eckler, LLP*, 778 N.E.2d 663, 668 (Ohio Ct. App. 2002) ("Bricker & Eckler was not a stranger to the contract under the very theory of recovery asserted by Citicasters. . . . In view of its own theory of liability, Citicasters cannot simultaneously be heard to assert that Bricker & Eckler was a 'stranger' to the contract.")

App. 1996) (presuming that the intent of the parties is manifest from their written agreement and declining to rewrite the contract based on parol evidence). The Reed-Freebird Agreement is clear that only Freebird was bound contractually to pay Reed for the use of his film. Plaintiffs cannot vary the terms of that agreement based on either their claimed understanding or ambiguous conversations.

### C. Even If Plaintiffs' Parol Evidence Were Admissible, It Does Not Show That Cabin Fever Contracted To Pay Reed A Percentage Of Its Profits Through The Reed-Freebird Agreement.

#### 1. The Cabin Fever Letter shows only that Cabin Fever was to make a second fixed payment to Reed of $2,500.

Plaintiffs assert that the Cabin Fever Letter, which accompanied the first fixed fee payment discussed above, evidences Cabin Fever's contractual obligation to make payments of its "net profits" on the Movie to Reed. (Pltfs' Brief at 7.) The language on which Plaintiffs seize is the following: "Pursuant to our agreement, upon the initial public exhibition of the Film, you will be paid an additional $2,500.00." The use of "our agreement" is hardly evidence that Cabin Fever was bound to make payments that were to be based on anyone's "net profits" from exploitation of the Movie. The expression could as easily refer to which party (Freebird or Cabin Fever) was making the fixed fee payment. Even if "our agreement" could be interpreted to refer to a binding contract between Cabin Fever and Reed, there is nothing in the letter that suggests Cabin Fever was obligated to do to anything beyond make the $2,500 payment.

#### 2. Plaintiffs' construction of the Reed-Freebird Agreement is incoherent because Cabin Fever's and Freebird's net profits from the Movie will not be the same.

Even if Reed's subjective understanding of the Reed-Freebird Agreement were relevant, his understanding is incoherent and meaningless. Reed declares:

> Based upon the [Reed-Freebird Agreement] and my discussions with Judy Van
> Zant Jenness and Jeff Waxman, I understood that Cabin Fever and Freebird Video

6

jointly agreed to pay me and would be jointly responsible for the promised payment to me of $5,000.00 (in two installments of $2,500.00) and 2.5% of **the net profits** of the documentary.

(Reed Decl. ¶ 18 (emphasis added).) First of all, the Movie did not have any "net profits." Cabin Fever and Freebird potentially did. Second, the Declaration contradicts the clear language of the Reed-Freebird Agreement that Reed will be entitled to 2.5% of Freebird's net profits: "we [Freebird] agree to pay to you 2.5% of our net profits . . ." from the Movie. Freebird and Cabin Fever [RHI] are separate and independent companies that have different expenses and that profit from exploitation of the Movie in different ways and amounts. Under the Freebird-Cabin Fever Agreement, Freebird is entitled, once Cabin Fever's initial and production advances are recouped, to a variable percentage of Cabin Fever's net proceeds or sales in connection with the Movie. (Freebird-Cabin Fever Agreement ¶¶ 4.2, 4.3, Ex. A.) The payment is dependent on numerous factors based on how the Movie is exploited. Freebird, in turn, has its own operating expenses, portions of which will be allocable to any return achieved on the exploitation of its intellectual property. Once those are deducted from Freebird's receipts, Reed is then entitled to 2.5% of Freebird's **net** profits. Cabin Fever's net profits from exploitation of the Movie and Freebird's net profits from exploitation of the Movie will always be different.[3]

### D. Plaintiffs Cannot Establish An Independent Contract For Royalties Between Cabin Fever And Reed.

To the extent that plaintiffs' are claiming that there is a separate agreement between Cabin Fever and Reed independent of the Reed-Freebird Agreement, this claim also fails.

---

[3] Almost all profits from the Movie have come from audio visual sales. Cabin Fever is to accrue for Freebird's benefit 50% of the net receipts from audio visual licenses to third parties. That amount, once costs are recouped, is paid to Freebird, which is to pay Reed 2.5% of Freebird's net profits. Cabin Fever meanwhile would calculate its "net profits" by deducting its allocable costs from the 50% of net receipts that it retained. Because Reed's claimed understanding of the Reed-Freebird Agreement is that he is owed 2.5% of the Movie's "net profits," of which there are none, and because the "net profit" numbers for Freebird and Cabin Fever will always be different, his construction is nonsensical and entitled to no weight.

7

Without resort to the "net profits" term of the Reed-Freebird Agreement, plaintiffs' cannot prove that Cabin Fever contracted to pay Reed "net profits" from the Movie.

### 1. There is no consideration for an independent net profits obligation on the part of Cabin Fever.

Nowhere do plaintiffs identify the consideration flowing from Reed to Cabin Fever that is necessary to make binding on Cabin Fever any supposed promise to pay a share of its net profits to Reed.[4] Reed already had agreed to license his film footage for what Freebird was paying him, and Cabin Fever had acquired from Freebird the rights to use the film footage. Without additional consideration—and plaintiffs have pointed to none—there can be no enforceable contract between Reed and Cabin Fever and, by extension, between Reed and RHI.

### 2. The Cabin Fever Letter does not promise to pay net profits to Reed.

As discussed above, the Cabin Fever Letter makes no mention of Cabin Fever paying a share of any net profits to Reed; rather, it refers only to the payment of the fixed fee, which the Freebird-Reed agreement contemplated might be paid through Cabin Fever. Thus, even if there were consideration flowing from Reed to Cabin Fever, the Cabin Fever Letter is insufficiently definite to constitute a contract regarding net profits to be paid by Cabin Fever to Reed.[5] Moreover, as noted *supra* at p. 8 n. 3, the Movie did not have "net profits" and there is an irreconcilable conflict between 2.5% of net profits of Cabin Fever and of Freebird.

---

[4] *See Carlisle v. T & R Excavating*, 704 N.E.2d 39, 43 (Ohio Ct. App 1997) ("Without consideration, there can be no contract. Under Ohio law, consideration consists of either a benefit to the promisor or a detriment to the promisee. To constitute consideration, the benefit or detriment must be 'bargained for.' Something is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." (citations omitted)).

[5] *See Preston v. First Bank of Marietta*, 473 N.E.2d 1210, 1214 (Ohio Ct. App. 1983) ("A contract price must be definite and certain. . . . If . . . price terms are so vague and indefinite that one party may charge what he will while the other party must guess at his obligation, the contract is illusory and unenforceable.")

### 3. Jeff Waxman is an independent film producer whose oral promises to Reed, if any, did not bind Cabin Fever.

To the extent that plaintiffs assert that a conversation between Reed and Jeff Waxman gave rise to an oral agreement regarding paying "net profits" independent of the Reed-Freebird Agreement, such discussions have not been set forth in sufficient detail to prove the existence of a binding contract. Furthermore, Jeff Waxman is an independent film producer (Waxman Decl. ¶ 1; Ex. A hereto), and plaintiffs have failed to produce any evidence that he had the authority to bind Cabin Fever to anything.

## III. SHOULD THE COURT CHOOSE TO ADDRESS PLAINTIFFS' UNPLED INTENDED BENEFICIARY CLAIM, RHI IS ENTITLED TO SUMMARY JUDGMENT ON THAT CLAIM ALSO.

### A. Plaintiffs Have Not Shown That Freebird Had Any Preexisting Obligation To Pay Reed; Therefore, Restatement Section 302(1)(A) Is Inapplicable.

As set forth more fully in the RHI Brief at 9, n.5, Restatement (Second) of Contracts § 302(1)(a) does not apply to this case because Freebird had no preexisting obligation to pay Reed at the time of the Freebird-Cabin Fever Agreement. Thus, Cabin Fever could not have promised in that agreement to pay any debt of Freebird to plaintiffs.

### B. There Is No Class Of Intended Beneficiaries Referred To And Identified In The Freebird-Cabin Fever Agreement, Let Alone Any Such Class Of Which Plaintiffs Are Members.

Plaintiffs maintain that an intended beneficiary need not be named in a contract if the beneficiary is nonetheless contemplated by the parties to the contract. (Pltfs' Brief at 9-10.) Plaintiffs, however, cannot show that the Freebird-Cabin Fever Agreement contemplates a class of unnamed but sufficiently identified members, which Freebird and Cabin Fever intended to benefit. *See Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 822 (9th Cir. 1985) ("Although the beneficiary need not be named in the contract, he must be a member of a class referred to and identified in it.") Plaintiffs point to no language in that agreement that manifests

an *intention* to benefit anyone other than the parties themselves. Without a class of unnamed but identified members who are intended beneficiaries, plaintiffs cannot establish that Reed is a member of any such class. Nor have plaintiffs ever explained how Freebird and Cabin Fever could have intended to benefit the plaintiffs when they signed an Agreement six months before Reed was even approached to use his film footage.

### C. Cabin Fever's Conduct Subsequent To The Freebird-Cabin Fever Agreement Does Not Prove Its Intent Upon Entering Into That Agreement.

The issue of intent to benefit third parties is measured as of the time of the contract. *See Zelber v. Lewoc*, 776 N.Y.S.2d 134, 136 (N.Y. App. Div. 2004) (finding that neither a title insurance company nor a lender could have intended to benefit plaintiff in a title insurance policy because neither party had notice of plaintiff's alleged continuing interest in the insured property); *Marino v. Dwyer-Berry Construction Corp.*, 597 N.Y.S.2d 466, 467 (N.Y. App. Div. 1993) ("[A]s a remote purchaser of the property, the plaintiff was not contemplated in the contractual arrangement between [defendant] and the original owner of the parcel, and the contract was not intended to benefit, nor was performance to be made directly to, the plaintiff.") Plaintiffs do not challenge this.

Cabin Fever's conduct subsequent to the Freebird-Cabin Fever agreement, which plaintiffs claim evidences that they are intended third party beneficiaries,[6] is not relevant to Cabin Fever's intent upon entering into that agreement. Only intent as of the time of contracting affects the third party beneficiary analysis.

---

[6] Plaintiffs claim that Cabin Fever knew that certain film footage being used in the Movie was Reed's, that Jeff Waxman said he knew the film footage being used in the Movie was Reed's, that Freebird signed a contract to pay Reed and the like. All of this happened (if it happened at all) many months after the Freebird-Cabin Fever contract was signed.

10

### D. *Septembertide* And The Other Cases Cited By Plaintiffs Are Inapposite.

The case of *Septembertide Publishing, B.V. v. Stein & Day, Inc.*, 884 F.2d 675 (2d Cir. 1989), on which plaintiffs rely heavily, is easily distinguishable and does not control the result herein. First, the court in *Septembertide* was faced with a licensor who sought relief from a sublicensee because the licensee was bankrupt and the licensor had no effective remedy. *Id.* at 677. Here, the licensee, Freebird, is a viable company fully capable of performing under the Reed-Freebird Agreement. Second, the court in *Septembertide* relied heavily on the fact the agreements were executed at essentially the same time. *Id.* at 679. Here, the Freebird-Cabin Fever Agreement preceded the Reed-Freebird Agreement by half a year. The timing here, instead of suggesting that the licensor was an intended beneficiary, makes clear that Cabin Fever and Freebird could not have contemplated a benefit for Reed. Finally, in *Septembertide*, the licensed rights at issue pertained to a single work by a single author, and the sublicense simply passed those rights along. *Id.* at 676. The Movie contains footage from several different sources, all licensed for the purpose of making the Movie. (Ringler Decl. ¶ 6, ECF 50-5) Any footage from an individual source played a minor role, undercutting any inference of intent to benefit a specific third-party licensor.[7]

---

[7] Plaintiffs' other cited cases are far afield. *ThorWorks Industries v. E.T. DuPont De Nemours and Co.*, No. 3:08CV948, 2008 WL 4966068 (N.D. Ohio 2008) found no support for the defendant licensing agent's (EMI's) attempt to invoke, under a third-party beneficiary theory, the forum selection and integration clauses in an agreement between its principal and a licensee, specifically rejecting the argument EMI was an intended beneficiary because it was named in the agreement and some clauses provided benefits to EMI. *Id.* at *4. *TRINOVA Corp. v. Pilkington Bros., P.L.C.*, 70 Ohio St. 3d 271, 277-78 (1994), also rejected a third party beneficiary claim, plainly stating "that there must be evidence, on the part of the promisee, that he intended to directly benefit a third party, and not simply that some incidental benefit was conferred on an unrelated party by the promisee's actions under the contract." *See also Karo*, 762 F.2d at 822 (finding no intent to benefit class of which plaintiff was a member). *Hines v. Amole*, 448 N.E.2d 473 (Ohio Ct. App. 1982), cited for the proposition that a third party beneficiary need not be named in contract, is similarly inapposite. In that case, which was brought by the purchasers of a home against a pest control company that inspected the home, "the parties to the contract to purchase [the home] clearly specified the termite inspection was for the benefit of the buyers." *Id.* at 479. Plaintiffs can point to no such expression of intent to benefit Reed in the Freebird-Cabin Fever Agreement.

## IV. EVEN IF THE COURT FINDS THAT PLAINTIFFS HAVE A VIABLE CONTRACT CLAIM, RHI IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PRODUCTION COSTS FOR THE MOVIE ARE STILL UNRECOUPED.

Plaintiffs make the almost absurd argument that Jeff Ringler's declaration about the status of the movie's "recoupment" should be disregarded because he was "not present when the payments were made" and that his "personal knowledge is limited to what RHI knows (which succeeded Hallmark in 2006)." (Pltfs' Brief at 15, 16.) First of all, plaintiffs are making an assumption that is simply incorrect. Mr. Ringler was employed at Hallmark at the time the Cabin Fever-Hallmark Asset Purchase Agreement was executed, and he remained with Hallmark and its successor RHI continuously thereafter. (Ringler 2d Decl. ¶ 1; Ex. B hereto.) In his position as senior vice president, Ringler has had continuous access to the business records of Hallmark and RHI, and is perfectly competent to testify with respect to information contained in those records.[8]

Furthermore, the attached Declaration of Jeff Waxman confirms the information in the original Declaration that the production costs for the Movie were approximately $1million. (Waxman Decl. ¶ 2, Ringler Decl. ¶ 10.) As the producer, Mr. Waxman had first hand knowledge of production costs. The unrecouped costs, which were scheduled by Cabin Fever as part of the closing of the Asset Purchase Agreement in 1998, were accepted as accurate by Hallmark, pursuant to the normal custom and practice in the industry. (Ringler 2d Decl. ¶ 3.) Recoupment numbers on an individual movie are of no significance to an overall deal, and RHI had no reason to doubt the accuracy of the information Cabin Fever provided. (*Id.*) In short,

---

[8] RHI has produced for plaintiffs all of its confidential records of license payments that Ringler relied on in his Declaration: the Cabin Fever report listing unrecouped advances as of the closing date (H/A 00182); the Lions Gate payment summaries (H/A 00183-876); the earlier Artisan payment summaries (H/A 00843-01379); the statement of the Japanese license (H/A 00181); and the various agreements among the parties.

pursuant to the custom and practice of the industry, Hallmark/RHI relied upon and worked from all of the recoupment information provided by Cabin Fever. Ringler has access to, and fully spelled out in his Declaration at ¶ 10, the royalties that have accrued to Freebird's account since Hallmark/RHI acquired the Cabin Fever library.[9]

Ringler's testimony as to the status of recoupment was based on the documents and agreements produced to plaintiffs in this case. (*See* n.8, *supra*.) The notion that Ringler had to be present when the payments were made, or had to view the cancelled checks, is baseless. *Dalton v. FDIC*, 987 F.2d 1216, 1223 (5th Cir. 1993) (accepting affidavit and rejecting plaintiffs "demand that each and every piece of paper that Wilson reviewed to determine the amount of the deficiency be attached to the affidavit" as being "without any legal basis whatsoever".) Furthermore, successor companies have the right to rely on the records of their predecessors in motions for summary judgment. *E.g., Resolution Trust Corp. v. Camp*, 965 F.2d 25, 29 (5th Cir. 1992) (RTC witness could rely on promissory note from institution it took over); *Dalton v. FDIC*, 987 F.2d at 1223 (5th Cir. 1993) (same); *FDIC v. Schreiner*, 892 F. Supp. 869, 878-879 (W.D. Tex. 1995) (explaining necessity of reliance on predecessor's records).

Plaintiffs also appear to argue that RHI's licensees have shortchanged RHI, and that RHI has therefore shortchanged Freebird, and that Freebird has therefore shortchanged plaintiffs. (Pltfs' Brief at 19) They jump from this claim to the conclusion that this undercuts RHI's contention that it has not recouped its production costs. Not so. Whether or not RHI's licensees have made errors in accounting to RHI, the issue herein is whether RHI has itself recouped the

---

[9] Plaintiffs also dispute the statement in the Ringler Declaration that there have been essentially no non-device proceeds generated by the Movie, arguing that that the Movie was shown in theaters. (Pltfs' Brief at 16, n. 7.) There is no inconsistency, as plaintiffs suggest. If the Movie was shown in theaters, it happened while Cabin Fever owned the rights, and accounting for any profits earned by virtue of its theatrical release would have been folded into the Cabin Fever statement of unrecouped amounts. As Mr. Ringler makes clear in his Second Declaration, the Movie was never licensed for theatrical release by Hallmark/RHI. (2d Ringler Decl. ¶ 2.)

costs of the Movie so as to owe any payments to Freebird. Ringler is perfectly competent to testify that RHI has not. If RHI has been shortchanged, that issue is between RHI and its licensees.[10]

Ringler's Declarations predicated on documents that were given to plaintiffs in discovery adequately establish that the Movie is unrecouped and that, even if Cabin Fever had an obligation to Reed, that obligation has yet to ripen.[11]

## CONCLUSION

For the foregoing reasons and the ones set forth in RHI's Brief, RHI asks that the Court enter summary judgment in its favor.

Respectfully submitted,

/s/Louis A. Colombo
Louis A. Colombo (0025711)
Brandt W. Gebhardt (0079823)
BAKER & HOSTETLER LLP
3200 National City Center
1900 East Ninth Street
Cleveland, Ohio 44114
(216) 621-0200 (telephone)
(216) 696-0740 (facsimile)
lcolombo@bakerlaw.com
bgebhardt@bakerlaw.com

*Attorneys for Defendant RHI Entertainment Distribution, LLC*

---

[10] RHI reviewed with Lions Gate the plaintiffs claim (Pltfs' Brief at 19) that Lions Gate did not properly allocate income from sales of the Movie. Plaintiffs are correct that an error occurred with respect to the movie "two-pack"; however, correcting for this error would result in an additional credit to Freebird of at most $11,000. The Movie would still be far from being recouped. When the precise adjustments are calculated, they will be included in the next Participation Statement to Freebird.

[11] Plaintiffs' lament that they need more time to take discovery on the issue of recoupment is a last ditch effort to keep this case alive a little longer, just as their evolving theories of liability have attempted to do. This case is easily disposed of based on the other arguments, and there is no reason to waste additional time with discovery from RHI's sublicensees when RHI and Freebird, which would also be getting shortchanged if the sublicensees were not accounting properly, are independent corporations both of which have an interest of their own to assure royalties are calculated properly. Furthermore, with respect to the issue of whether RHI has recouped its (Cabin Fever's) costs, plaintiffs have all of the documents that bear on that issue. (*See* n. 9, *supra*.)

14

## CERTIFICATE OF SERVICE

A copy of the foregoing was served upon counsel for plaintiffs and each of the defendants via the Court's electronic filing system this 6th day of March, 2009.

/s/Louis A. Colombo
*One of the Attorneys for Defendants*
*RHI Entertainment Distribution, LLC*

502299341.6