**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CRAIG REED, et al., | ) | |
| | ) | CASE NO. 1:08CV1761 |
| Plaintiffs, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| vs. | ) | |
| | ) | |
| FREEBIRD FILM PRODUCTIONS, INC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**</u>
<u>**OF LYNYRD SKYNYRD PRODUCTIONS, INC.**</u>

Defendant Lynyrd Skynyrd Productions, Inc. ("Lynyrd Skynyrd Productions"), through

its counsel, responds to the Complaint of Plaintiffs Craig Reed ("Reed") and Survivor Films, Inc.

("Survivor" and, together with Reed, "Plaintiffs"), as follows:

1.      Lynyrd Skynyrd Productions admits that Reed for a time worked as a production

and general assistant for the bands "Lynyrd Skynyrd," "The Rossington-Collins Band," and "The

Allen Collins Band."   Lynyrd Skynyrd Productions is without knowledge or information

sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 1 of

the Complaint and, on that basis, denies those allegations.

2.      Lynyrd Skynyrd Productions is without knowledge or information sufficient to

form a belief as to the truth of the allegations contained in paragraph 2 of the Complaint and, on

that basis, denies those allegations.  Lynyrd Skynyrd Productions further avers that Survivor

appears to be a Florida corporation and not a Tennessee corporation, as alleged in the Complaint.

Dockets.Justia.com

3.      Lynyrd Skynyrd Productions admits that: Freebird Film Productions, Inc. ("Freebird Film Productions") is organized under the laws of the State of Florida with its principal place of business in Orange Park, Florida; Defendant Rossington is the president and director of Freebird Film Productions; Defendant Jenness is the treasurer and statutory agent for Freebird Film Productions; and Freebird Film Productions was formerly known as Freebird Video Productions, Inc.  Lynyrd Skynyrd Productions admits that Freebird Film Productions produced a film entitled "Freebird the Movie."  Lynyrd Skynyrd Productions denies the remaining allegations contained in paragraph 3 of the Complaint.

4.      Lynyrd Skynyrd Productions admits the allegations contained in paragraph 4 of the Complaint.

5.      Lynyrd Skynyrd Productions admits that Defendant Cabin Fever Entertainment, Inc. has produced and/or distributed a Lynyrd Skynyrd-related film product.  Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 5 of the Complaint and, on that basis, denies those allegations.

6.      Lynyrd Skynyrd Productions admits that Vector Management, Inc. is a Tennessee corporation with its principal place of business in the Nashville, Tennessee metropolitan area.

7.      Lynyrd Skynyrd Productions admits that Defendant Jenness is the treasurer and statutory agent for Freebird Film Productions and was married to Ronnie Van Zant (Lynyrd Skynyrd's original lead singer).  Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 7 of the Complaint and, on that basis, denies those allegations.

8.      Lynyrd Skynyrd Productions denies that Defendant Rossington resides within the State of California, but admits the remaining allegations contained in paragraph 8 of the Complaint.

9.      Lynyrd Skynyrd Productions admits that Defendant Schilling is a Tennessee resident, is employed by Vector, and presently serves as part of the management team for the band Lynyrd Skynyrd.  Lynyrd Skynyrd Productions denies the remaining allegations contained in paragraph 9 of the Complaint.

10.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 10 of the Complaint and, on that basis, denies those allegations.

11.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 11 of the Complaint and, on that basis, denies those allegations.

12.     Lynyrd Skynyrd Productions admits the allegations contained in paragraph 12 of the Complaint.

13.     Lynyrd Skynyrd Productions admits that Plaintiffs purport to base jurisdiction on 28 U.S.C. §§ 1331, 1338(a) and (b), and 1367, avers that these allegations constitute legal conclusions that are not properly admitted nor denied, but for the purposes of answering only, denies the allegations made in paragraph 13 of the Complaint.

14.     Lynyrd Skynyrd Productions denies the allegations contained in paragraph 14 of the Complaint.

15.     Lynyrd Skynyrd Productions denies the allegations contained in paragraph 15 of the Complaint.

16.     Lynyrd Skynyrd Productions admits that Reed has worked as a production and general assistant for Lynyrd Skynyrd, The Rossington-Collins Band, and The Allen Collins Band, and also toured with those bands.  Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 16 of the Complaint and, on that basis, denies those allegations.

17.     Lynyrd Skynyrd Productions admits that Reed worked as a production and general assistant and in various capacities for Lynyrd Skynyrd commencing in or around 1974 through October 20, 1977, and commencing in or around 1987 until 2005.  Lynyrd Skynyrd Productions admits that Lynyrd Skynyrd performed in Cleveland, Ohio in April 2008.  Lynyrd Skynyrd Productions denies the remaining allegations contained in paragraph 17 of the Complaint, including that Reed rendered services for Lynyrd Skynyrd in April 2008 when the band performed in Cleveland, Ohio.

18.     Lynyrd Skynyrd Productions admits that Reed shot concert and "behind the scenes" film footage containing various members of Lynyrd Skynyrd and its crew, but denies that Reed did so "as a personal project and hobby."  Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 18 of the Complaint and, on that basis, denies those allegations.

19.     Lynyrd Skynyrd Productions admits that:  on October 20, 1977, while on tour with Lynyrd Skynyrd, Reed was a passenger on an airplane that crashed in Mississippi; the crash claimed the lives of the pilot, co-pilot, and four passengers (including Lynyrd Skynyrd's lead singer, Ronnie Van Zant); and the crash left the surviving passengers injured.  Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations contained in paragraph 19 of the Complaint and, on that basis, denies those allegations.

20.     Lynyrd Skynyrd Productions admits that Lynyrd Skynyrd temporarily disbanded after the October 20, 1977 plane crash.  Lynyrd Skynyrd Productions admits that Lynyrd Skynyrd re-formed in or around 1987 with Johnny Van Zant, the younger brother of the late Ronnie Van Zant, as lead singer.

21.     Lynyrd Skynyrd Productions admits the allegations contained in paragraph 21 of the Complaint.

22.     Lynyrd Skynyrd Productions admits that Reed worked for Lynyrd Skynyrd in various capacities after Lynyrd Skynyrd's reformation in 1987.  Lynyrd Skynyrd Productions admits that Reed was the longest-standing member of Lynyrd Skynyrd's crew, and was one of the few crew members to have worked with the original band's lineup, but denies that Reed still works for Lynyrd Skynyrd.

23.     Lynyrd Skynyrd Productions admits that Lynyrd Skynyrd is a popular musical group, but denies that Lynyrd Skynyrd sells upwards of one million records each year and generates in excess of $10 million in touring revenue each year from performances throughout the United States.  Lynyrd Skynyrd Productions admits that Lynyrd Skynyrd occasionally plays shows in Ohio.  Lynyrd Skynyrd Productions admits that, in 2006, Lynyrd Skynyrd was inducted into the Rock and Roll Hall of Fame.  Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 23 of the Complaint and, on that basis, denies those allegations.

24.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 24 of the Complaint and, on that basis, denies those allegations.

25.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 25 of the Complaint and, on that basis, denies those allegations.

26.     Lynyrd Skynyrd Productions denies the allegations contained in paragraph 26 of the Complaint.

27.     Lynyrd Skynyrd Productions denies the allegations contained in paragraph 27 of the Complaint.

28.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 28 of the Complaint and, on that basis, denies those allegations.

29.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 29 of the Complaint and, on that basis, denies those allegations.

30.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 30 of the Complaint and, on that basis, denies those allegations.

31.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 31 of the Complaint and, on that basis, denies those allegations.

32.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 32 of the Complaint and, on that basis, denies those allegations.

33.     Lynyrd Skynyrd Productions admits that, on or about July 31, 1995, Reed and Freebird Film Productions, formerly known as Freebird Video Productions, Inc., entered into a written agreement concerning Freebird Film Productions' possible use of Reed's film footage in a documentary film and certain other uses of the footage, avers that this written agreement speaks for itself, and denies the remaining allegations contained in paragraph 33 of the Complaint.

34.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34 of the Complaint and, on that basis, denies those allegations.

35.     Lynyrd Skynyrd Productions admits that a documentary film about the original Lynyrd Skynyrd band entitled "Freebird the Movie" was produced by Freebird Film Productions, formerly Freebird Video Productions, Inc., and Defendant Cabin Fever Entertainment, Inc.

36.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 36 of the Complaint and, on that basis, denies those allegations.

37.     Lynyrd Skynyrd Productions admits that Freebird Film Productions, formerly known as Freebird Video Productions, Inc., served as one of the production companies for the documentary film "Freebird the Movie."

38.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 38 of the Complaint and, on that basis, denies those allegations.

39.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 39 of the Complaint and, on that basis, denies those allegations.

40.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40 of the Complaint and, on that basis, denies those allegations.

41.     Lynyrd Skynyrd Productions admits that Defendant Rossington, inasmuch as he was a member of the original Lynyrd Skynyrd band, appeared in "Freebird the Movie," but denies that Mr. Rossington "was an actor" in the film.

42.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 42 of the Complaint and, on that basis, denies those allegations.

43.     Lynyrd Skynyrd Productions denies the allegations contained in paragraph 43 of the Complaint.

44.     Paragraph 44 of the Complaint attempts to interpret a written agreement or states a legal conclusion for which no response is required.  Lynyrd Skynyrd Productions avers, however, that the written agreement referred to in paragraph 44 of the Complaint speaks for itself.

45.     Lynyrd Skynyrd Productions denies that Freebird Film Productions failed to pay Reed under the Documentary Agreement (as that term is defined in paragraph 33 of the

Complaint).  Lynyrd Skynyrd Productions avers that it lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 45 of the Complaint and, on that basis, denies those allegations.

46.     Plaintiffs alleged in paragraph 34 of the Complaint that Reed provided a copy of Reel 1 to Defendant Cabin Fever Entertainment, Inc.—not to "Defendants" (as alleged in paragraph 46 of the Complaint).  Regardless, Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 46 of the Complaint and, on that basis, denies those allegations.

47.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 47 of the Complaint and, on that basis, denies those allegations.

48.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 48 of the Complaint and, on that basis, denies those allegations.

49.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 49 of the Complaint and, on that basis, denies those allegations.

50.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 50 of the Complaint and, on that basis, denies those allegations.

51.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 51 of the Complaint and, on that basis, denies those allegations.

52.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 52 of the Complaint and, on that basis, denies those allegations.

53.     Lynyrd Skynyrd Productions denies the allegations contained in paragraph 53 of the Complaint.

54.     Lynyrd Skynyrd Productions denies that it publicly performed or displayed the Film (as that term is defined in paragraph 24 of the Complaint).  Lynyrd Skynyrd Productions admits that portions of some film footage taken by Reed were displayed at live concert events where Lynyrd Skynyrd performed, but denies that the film footage was displayed without Reed's knowledge, consent, and agreement.  Lynyrd Skynyrd Productions denies the remaining allegations contained in paragraph 54 of the Complaint.

55.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 55 of the Complaint and, on that basis, denies those allegations.

56.     Lynyrd Skynyrd Productions denies the allegations contained in paragraph 56 of the Complaint.

57.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 57 of the Complaint and, on that basis, denies those allegations.

58.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 58 of the Complaint and, on that basis, denies those allegations.

59.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 59 of the Complaint and, on that basis, denies those allegations.

60.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 60 of the Complaint and, on that basis, denies those allegations.

61.     Lynyrd Skynyrd Productions admits that certain film footage of Lynyrd Skynyrd shot by Reed was used in the DVD entitled LYNYRD SKYNYRD LYVE – THE VICIOUS CYCLE TOUR.  Lynyrd Skynyrd Productions denies the remaining allegations contained in paragraph 61 of the Complaint.

62.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 62 of the Complaint and, on that basis, denies those allegations.

63.     Lynyrd Skynyrd Productions denies the allegations contained in paragraph 63 of the Complaint inasmuch as no DVD titled 2003 NASHVILLE LIVE exists.

64.     Lynyrd Skynyrd Productions admits that excerpts of film footage shot by Reed were used in a music video for the song SIMPLE MAN.  Lynyrd Skynyrd Productions denies the remaining allegations contained in paragraph 64 of the Complaint.

65.     Lynyrd Skynyrd Productions admits that excerpts of film footage shot by Reed were used in a music video for the song FREEBIRD.  Lynyrd Skynyrd Productions denies the remaining allegations contained in paragraph 65 of the Complaint.

66.     Lynyrd Skynyrd Productions denies the allegations contained in paragraph 66 of the Complaint.

67.     Lynyrd Skynyrd Productions avers that Freebird Film Productions exercised its rights under the Documentary Agreement (as that term is defined in paragraph 33 of the Complaint), and denies the remaining allegations contained in paragraph 67 of the Complaint.

68.     Lynyrd Skynyrd Productions admits that Fly On, Inc. was involved in Lynyrd Skynyrd's live concerts commencing in or around November 19, 2001, and denies the remaining allegations contained in paragraph 68 of the Complaint.

69.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 69 of the Complaint and, on that basis, denies those allegations.

70.     Lynyrd Skynyrd Productions denies that Vector Management, Inc. was involved in any Lynyrd Skynyrd project prior to 1999, including the LYNYRD SKYNYRD – LYVE FROM STEEL TOWN DVD.  Lynyrd Skynyrd Productions admits that Vector Management, Inc. managed the career of Lynyrd Skynyrd and certain of its members during the time period that one or more of the other video projects listed in paragraphs 59-66 of the Complaint were created, duplicated, distributed, marketed, and/or sold, but denies that Vector Management, Inc. directly created, duplicated, distributed, marketed, or sold any of these video projects.  Lynyrd Skynyrd Productions further avers that any use of any film footage shot by Reed and used in such projects was used with Reed's knowledge, consent, and agreement.   Lynyrd Skynyrd Productions denies the remaining allegations contained in paragraph 70 of the Complaint.

71.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 71 of the Complaint and, on that basis, denies those allegations.

72.     Lynyrd Skynyrd Productions admits that Defendant Rossington performed in Lynyrd Skynyrd's live shows and music videos, some of which are the subjects of paragraphs 59-66 of the Complaint.   Lynyrd Skynyrd Productions denies the remaining allegations of paragraph 72 of the Complaint.

73.     Lynyrd Skynyrd Productions avers that there is no defendant in this action defined as "Van Zant" and, on that basis, denies the allegations contained in paragraph 73 of the Complaint.

74.     Lynyrd Skynyrd Productions denies that Defendant Schilling was involved in any Lynyrd Skynyrd project prior to 1999, including the LYNYRD SKYNYRD – LYVE FROM STEEL TOWN DVD.   Lynyrd Skynyrd Productions admits that Defendant Schilling, as an employee of Vector Management, Inc., participated in the management of the career of Lynyrd Skynyrd and certain of its members during the time period that one or more of the other video projects listed in paragraphs 59-66 of the Complaint were created, duplicated, distributed, marketed, and/or sold, but denies that Defendant Schilling directly created, duplicated distributed, marketed, and/or sold any of these video projects.   Lynyrd Skynyrd Productions further avers that any use of any film footage shot by Reed and used in such projects was used with Reed's knowledge, consent, and agreement.   Lynyrd Skynyrd Productions denies the remaining allegations contained in paragraph 74 of the Complaint.

75.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 75 of the Complaint and, on that basis, denies those allegations.

76.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 76 of the Complaint and, on that basis, denies those allegations.

77.     Lynyrd Skynyrd Productions denies the allegations of paragraph 77 of the Complaint.

78.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 78 of the Complaint and, on that basis, denies those allegations.

79.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 79 of the Complaint and, on that basis, denies those allegations.

80.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 80 of the Complaint and, on that basis, denies those allegations.

81.     Lynyrd Skynyrd Productions denies that Vector Management, Inc. benefited financially from Lynyrd Skynyrd projects prior to 1999.  Lynyrd Skynyrd Productions admits that Vector Management, Inc. benefited financially from the career of Lynyrd Skynyrd during the time period that one or more of the video projects listed in paragraphs 59-66 of the Complaint were released, but denies the remaining allegations contained in paragraph 81 of the Complaint.

82.     Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 82 of the Complaint and, on that basis, denies those allegations.

83.    Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 83 of the Complaint and, on that basis, denies those allegations.

84.    Lynyrd Skynyrd Productions avers that there is no defendant in this action defined as "Van Zant" and, on that basis, denies the allegations contained in paragraph 84 of the Complaint.

85.    Lynyrd Skynyrd Productions denies the allegations contained in paragraph 85 of the Complaint.

86.    Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 86 of the Complaint and, on that basis, denies those allegations.

87.    Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 87 of the Complaint and, on that basis, denies those allegations.

88.    Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 88 of the Complaint and, on that basis, denies those allegations.

89.    Lynyrd Skynyrd Productions denies the allegations contained in paragraph 89 of the Complaint.

90.    Lynyrd Skynyrd Productions is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 90 of the Complaint and, on that basis, denies those allegations.

**Answer to Count I**

91.     Lynyrd Skynyrd Productions incorporates herein by reference all allegations, statements, denials and admissions contained in the previous paragraphs.

92.     Lynyrd Skynyrd Productions admits that, on or about July 31, 1995, Reed and Freebird Film Productions, formerly known as Freebird Video Productions, Inc., entered into a written agreement concerning Freebird Film Productions' possible use of Reed's film footage in a documentary film and certain other uses of the footage, avers that this written agreement speaks for itself, and denies the remaining allegations contained in paragraph 92 of the Complaint.

93.     Lynyrd Skynyrd Productions denies that all "Defendants" had obligations to Reed under the Documentary Agreement (as that term is defined in paragraph 33 of the Complaint) and answers that the Documentary Agreement speaks for itself.  Plaintiffs' allegations contained in paragraph 93 of the Complaint constitute an attempt to interpret that agreement or a legal conclusion for which no response is required.

94.     Lynyrd Skynyrd Productions denies that Freebird Film Productions, formerly known as Freebird Video Productions, Inc., failed to make any payments to Reed that were due under said Documentary Agreement (as that term is defined in paragraph 33 of the Complaint) or that Freebird Film Productions otherwise breached the Documentary Agreement.  Lynyrd Skynyrd Productions avers that Defendant Cabin Fever Entertainment, Inc. is not a party to the Documentary Agreement and, on that basis, denies the remaining allegations contained in paragraph 94 of the Complaint.

95.     Lynyrd Skynyrd Productions denies the allegations contained in paragraph 95 of the Complaint.

96.     Lynyrd Skynyrd Productions avers that it is not a party to the Documentary Agreement (as that term is defined in paragraph 33 of the Complaint) and, on that basis, denies the allegations contained in paragraph 96 of the Complaint.

## Answer to Count II

97.     Lynyrd Skynyrd Productions incorporates herein by reference all allegations, statements, denials, and admissions contained in the previous paragraphs.

98.     Lynyrd Skynyrd Productions denies the allegations contained in paragraph 98 of the Complaint.

99.     Lynyrd Skynyrd Productions denies the allegations contained in paragraph 99 of the Complaint.

100.    Lynyrd Skynyrd Productions denies the allegations contained in paragraph 100 of the Complaint, including, but not limited to, that a Certificate of Registration for Reel 1 was attached as Exhibit A to the Complaint.  Lynyrd Skynyrd Productions avers that there is no Exhibit A to the Complaint.  Lynyrd Skynyrd Productions further avers that any copyright registration Reed or Survivor filed and obtained for Reel 1 is invalid as a matter of law.

101.    Lynyrd Skynyrd Productions denies the allegations contained in paragraph 101 of the Complaint, including, but not limited to, that a Certificate of Registration for Reel 2 was attached as Exhibit B to the Complaint.  Lynyrd Skynyrd Productions avers that there is no Exhibit B to the Complaint.  Lynyrd Skynyrd Productions further avers that any copyright registration Reed or Survivor filed and obtained for Reel 2 is invalid as a matter of law.

102.    Lynyrd Skynyrd Productions denies the allegations of paragraph 102 of the Complaint.

103.    Lynyrd Skynyrd Productions denies the allegations of paragraph 103 of the Complaint.

104.    Lynyrd Skynyrd Productions denies the allegations of paragraph 104 of the Complaint.

105.    Lynyrd Skynyrd Productions denies the allegations of paragraph 105 of the Complaint.

106.    Lynyrd Skynyrd Productions denies the allegations of paragraph 106 of the Complaint.

107.    Lynyrd Skynyrd Productions denies the allegations of paragraph 107 of the Complaint.

108.    Lynyrd Skynyrd Productions denies the allegations of paragraph 108 of the Complaint.

109.    Lynyrd Skynyrd Productions denies that it infringed Plaintiffs' alleged copyrights in Reel 1 and/or Reel 2, and denies the remaining allegations contained in paragraph 109 of the Complaint.

110.    Lynyrd Skynyrd Productions denies the allegations contained in paragraph 110 of the Complaint, including, but not limited to, the assumption that Lynyrd Skynyrd Productions infringed Plaintiffs' alleged copyrights in Reel 1 and/or Reel 2.

## General Denial

111.    Lynyrd Skynyrd Productions denies each and every allegation not expressly admitted herein and denies that Reed or Survivor is entitled to any relief.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

112.    The claims asserted in the Complaint fail to state a claim upon which relief can be granted.

### SECOND DEFENSE

113.    The Court does not have subject matter jurisdiction over the claims asserted in the Complaint.

### THIRD DEFENSE

114.    The Court lacks personal jurisdiction over Lynyrd Skynyrd Productions.

### FOURTH DEFENSE

115.    Plaintiffs' recovery is barred by the doctrines of laches, estoppel, ratification, and/or waiver.

### FIFTH DEFENSE

116.    Plaintiffs' recovery is barred by the doctrine of fair use under the Copyright Act, 17 U.S.C. § 107.

### SIXTH DEFENSE

117.    Plaintiffs' recovery is barred because Reed had knowledge of and consented to, *i.e.*, licensed, the use of the works complained of herein.

### SEVENTH DEFENSE

118.    Plaintiffs' recovery is barred because the Documentary Agreement (as that term is defined in paragraph 33 of the Complaint) contemplates and permits the use of the works complained of herein.

## EIGHTH DEFENSE

119.     Plaintiffs' recovery is barred because Reed is not the author of the works complained of herein.

## NINTH DEFENSE

120.     Plaintiffs' claims are barred by applicable statutes of limitation and, in particular, the Copyright Act's statute of limitations set forth in 17 U.S.C. § 507(b).

## TENTH DEFENSE

121.     Plaintiffs' recovery is barred by the doctrine of unclean hands.

## ELEVENTH DEFENSE

122.     Plaintiffs are not entitled to receive attorneys' fees or statutory damages.

## TWELFTH DEFENSE

123.     Lynyrd Skynyrd Productions respectfully reserves the right to amend its Answer to the Complaint to add such additional defenses, cross-claims, counterclaims, and/or third-party complainants as may be disclosed during the discovery of this matter.

## COUNTERCLAIMS

Defendant/Counterclaim-Plaintiff Lynyrd Skynyrd Productions, by and through the undersigned counsel, asserts the following Counterclaims against Plaintiff/Counterclaim-Defendants Reed and Survivor (the "Counterclaim-Defendants"):

## Parties

124.     Lynyrd Skynyrd Productions incorporates by reference paragraphs 1-123 above as if rewritten herein.

125.    Lynyrd Skynyrd Productions is a corporation organized and existing under the laws of the State of Florida.   Lynyrd Skynyrd Productions maintains its principal place of business at 16830 Venture Boulevard, Encino, California 91436.   Therefore, Lynyrd Skynyrd Productions is a citizen of Florida and California pursuant to 28 U.S.C. § 1332(c).   Lynyrd Skynyrd Productions was formed to be the original production company of the musical group Lynyrd Skynyrd and to exploit certain Lynyrd Skynyrd intellectual property.

126.    On information and belief, Reed is an individual residing at 4217 South Arlington Road, Uniontown, Ohio 44685.   Therefore, Reed is a citizen of the State of Ohio pursuant to 28 U.S.C. § 1332(c).   On information and belief, Reed was a professional stage hand who worked for certain performing artists, including Lynyrd Skynyrd.

127.    On information and belief, Survivor is a Tennessee corporation with its principal place of business at 801 New Park Court, St. Augustine, Florida 32084.   Therefore, Survivor is a citizen of Tennessee and Florida.   On information and belief, Survivor is in the business of owning, producing, licensing, and distributing audiovisual works, films, and motion pictures as well as operating an Internet web site.   On information and belief, Reed is the sole owner of Survivor.

### Jurisdiction and Venue

128.    Lynyrd Skynyrd Productions incorporates by reference paragraphs 1-127 above as if rewritten herein.

129.    This Court has subject matter jurisdiction over the Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, and 28 U.S.C. § 1367.

130.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) as Reed resides in this district pursuant to 28 U.S.C. § 1391(c).

**Factual Background**

131.    Lynyrd Skynyrd Productions incorporates by reference paragraphs 1-130 above as if rewritten herein.

132.    Lynyrd Skynyrd is a world famous, hard-driving Southern rock band formed by Ronnie Van Zant, Gary Rossington, and Allen Collins.  The band's first album, released in 1973 and entitled "Pronounced Leh-Nerd Skin-Nerd" featured the classic rock anthem, "Free Bird," which is still regularly played on album-oriented and classic rock radio.  After opening for "The Who" on the 1973 *Quadrophenia* tour, Lynyrd Skynyrd released its second album, "Second Helping," also to great acclaim; that album included the group's biggest hit, "Sweet Home Alabama."  "Second Helping" reached number 12 on the album charts and went multi-platinum.

133.    Lynyrd Skynyrd Productions was formed in or around July 1975 to produce certain Lynyrd Skynyrd projects and exploit certain intellectual property, including trademarks and service marks associated with the band and the names and likenesses of the band.

134.    In or around 1976 and 1977, Reed, working full-time for Lynyrd Skynyrd as a roadie and in various other capacities, shot various film footage of the group and its members, including concert footage and behind-the-scenes footage (collectively, the "Footage"), on a Super 8 movie camera that recorded visual images and no audio.

135.    On October 17, 1977, Lynyrd Skynyrd released their sixth album, "Street Survivors."  Three days after its release, a privately chartered plane carrying the band between shows in Greenville, South Carolina and Baton Rouge, Louisiana crashed and killed singer, lyricist, and leader Ronnie Van Zant, guitarist Steve Gaines, and back-up vocalist Cassie Gaines.  Assistant road manager Dean Kilpatrick and the plane's pilot and co-pilot were also killed.

Other members of the band and crew were injured.  Lynyrd Skynyrd subsequently disbanded for approximately ten years.

136.    Crash survivors Gary Rossington, Bill Powell, Leon Wilkeson, and Artimus Pyle re-formed Lynyrd Skynyrd in 1987, joined by Ronnie Van Zant's young brother, Johnny Van Zant, on lead vocals.  Since re-forming, the band has toured consistently, performing new material as well as the classic Skynyrd songs such as "Free Bird," "Sweet Home Alabama," "Simple Man," and "Saturday Night Special."  On March 13, 2006, Lynyrd Skynyrd was inducted into the Rock and Roll Hall of Fame.  Lynyrd Skynyrd has, in the aggregate, sold millions of recordings and is regarded throughout the world as an iconic and legendary musical group.

137.    On or about January 15, 1995, Freebird Video Productions, Inc. (now known as Freebird Film Productions, Inc.) ("Freebird Film Productions") entered into an agreement with Cabin Fever Entertainment, Inc. ("Cabin Fever") (the "Cabin Fever Agreement") concerning the production of a documentary film about Lynyrd Skynyrd (the "Documentary Project") that would eventually be called "Freebird . . . the Movie."

138.    Reed was contacted by Freebird Film Productions and was asked whether he still had the Footage and, if so, whether he would make it available for the Documentary Project; Reed communicated that he had the Footage and would provide it.

139.    On July 31, 1995, Reed and Freebird Film Productions entered into an agreement (the "Documentary Agreement") concerning Cabin Fever's use of the Footage in "Freebird . . . the Movie."  The Documentary Agreement provided Freebird Film Productions and its assignees with the right to exploit the Footage in any manner or media throughout the universe in perpetuity without restriction and without obligation, financial or otherwise to Reed and, in

return, Freebird Film Productions agreed to pay Reed 2.5% of Freebird Film Productions' net profits derived from exploitation of the "Freebird . . . the Movie" video product itself (plus a cash advance).  On information and belief, Cabin Fever paid for the film's significant production costs (approximately $1 million), and charged Freebird Film Productions' royalty account accordingly. Eventually, Hallmark Entertainment Dist., LLC, predecessor to RHI Entertainment, LLC ("RHI"), acquired the assets of Cabin Fever, including the rights to "Freebird . . . the Movie." No royalties have ever been paid to Freebird Film Productions by Cabin Fever, RHI, or any other party for "Freebird . . . the Movie" because, on information and belief, the film's significant production costs were never recouped from sales.  Accordingly, Freebird Film Productions never earned any royalties, *i.e.*, profits, from "Freebird . . . the Movie" and nothing is owed to Reed.

140.    Inasmuch as Freebird Film Productions and its licensees and assignees had the right to exploit the Footage in any manner or media throughout the universe in perpetuity without restriction and without obligation, financial or otherwise to Reed, on July 15, 1997, small excerpts of the Footage were displayed on a screen behind the band as it performed live at a concert in Burgettstown, Pennsylvania.  The concert was filmed, including those portions of the show during which the Footage happened to be displayed.  Reed was working with the band backstage and onstage during that show.  The film was eventually released as a video product called "LYNYRD SKYNYRD LYVE FROM STEEL TOWN."

141.    Unbeknownst to Freebird Film Productions, Reed had additional Super 8 footage that he shot back in 1976 or 1977, or both, that he did not turn over to Freebird Film Productions upon entering into the Documentary Agreement.  In or around 2002, Reed turned over this additional footage to Ross Schilling ("Schilling") of Vector Management, Inc., Lynyrd

Skynyrd's management company.  Counterclaim-Defendants call this hold-back footage "Reel 2" in the Complaint they filed in this action.

142.    In or around August 2003, Lynyrd Skynyrd's touring company, Fly On, Inc. ("Fly On"), through Schilling, entered into a clarifying agreement with Reed concerning uses of his film footage at live performances:  Reed would get $75 for every Lynyrd Skynyrd live performance that Reed's film footage was displayed at, and this amount was eventually increased to $100 per show.  Fly On paid Reed thousands of dollars in fees over the years for these uses; Reed cashed the checks.

143.    In celebration of Lynyrd Skynyrd's 30th anniversary, VC Partners, another Lynyrd Skynyrd-related entity, produced a DVD product that came to be called "LYNYRD SKYNYRD LYVE – THE VICIOUS CYCLE TOUR" and was produced from a live concert filmed in Nashville, Tennessee that incorporated brief excerpts of Reed's film footage.

144.    Reed was working with Lynyrd Skynyrd backstage and onstage the night that the concert was filmed for the "LYNYRD SKYNYRD LYVE – THE VICIOUS CYCLE TOUR" video product.

145.    In or around August 2003, VC Partners and Reed orally agreed that VC Partners would pay Reed $2,500 to incorporate Reed's film footage in the "LYNYRD SKYNYRD LYVE – THE VICIOUS CYCLE TOUR" video product.  Reed was also listed as an Assistant Production Manager in the DVD's packaging materials.

146.    On September 30, 2003, VC Partners indeed paid Reed the $2,500 by check, and Reed cashed it.

147.    Lynyrd Skynyrd Productions is the owner of U.S. Service Mark Registration No. 2,271,355 (the "Skynyrd Live Performance Registration") for LYNYRD SKYNYRD for use in

connection with "entertainment in the nature of live performances by a musical group" in International Class 41. The Skynyrd Live Performance Registration validly issued to Lynyrd Skynyrd Productions on August 24, 1999, and is based on a first use in interstate commerce in 1973. A true and correct copy of the Skynyrd Live Performance Registration is attached hereto as EXHIBIT A. The LYNYRD SKYNYRD service mark has been used for approximately 35 years in connection with the group's live performances and is now incontestable under 15 U.S.C. 1065(b), *i.e.*, it is conclusive evidence of Lynyrd Skynyrd Productions' ownership of the service mark, the validity of the service mark registration, and of Lynyrd Skynyrd Productions' *exclusive* right to use the service mark in commerce on or in connection with live performances under 15 U.S.C. § 1115(b). A true and correct copy of the United States Patent and Trademark Office's record of the LYNYRD SKYNYRD service mark for this registration showing its incontestable status is attached hereto as EXHIBIT B.

148. Lynyrd Skynyrd Productions is also the owner of U.S. Trademark Registration No. 2,240,157 (the "Skynyrd Sound Recording Registration") for LYNYRD SKYNYRD for use in connection with "pre-recorded compact discs, audio cassettes, video cassettes, albums, and sound recordings featuring musical performances" in International Class 9. The Skynyrd Sound Recording Registration validly issued to Lynyrd Skynyrd Productions on April 20, 1999, and is based on a first use in interstate commerce in 1968. A true and correct copy of the Skynyrd Sound Recording Registration is attached hereto as EXHIBIT C. The LYNYRD SKYNYRD trademark has been used for approximately 40 years in connection with the group's sound recordings as permitted by Lynyrd Skynyrd Productions and is now incontestable under 15 U.S.C. 1065(b), *i.e.*, it is conclusive evidence of Lynyrd Skynyrd Productions' ownership of the trademark, the validity of the trademark registration, and of Lynyrd Skynyrd Productions'

*exclusive* right to use the trademark in commerce on or in connection with musical sound recordings under 15 U.S.C. § 1115(b).  A true and correct copy of the United States Patent and Trademark Office's record of the LYNYRD SKYNYRD trademark for this registration showing its incontestable status is attached hereto as EXHIBIT D.

149.    Further, Lynyrd Skynyrd Productions is the owner of U.S. Trademark Registration No. 2,268,065 (the "Skynyrd Apparel Registration") for LYNYRD SKYNYRD for use in connection with "clothing, namely, T-shirts, sweatshirts, hats and bandannas" in International Class 25.  The Skynyrd Apparel Registration validly issued to Lynyrd Skynyrd Productions on August 10, 1999, and is based on a first use in interstate commerce in 1973.  A true and correct copy of the Skynyrd Apparel Registration is attached hereto as EXHIBIT E. The LYNYRD SKYNYRD trademark has been used for approximately 35 years in connection with the group's apparel as permitted by Lynyrd Skynyrd Productions and is now incontestable under 15 U.S.C. 1065(b), *i.e.*, it is conclusive evidence of Lynyrd Skynyrd Productions' ownership of the trademark, the validity of the trademark registration, and of Lynyrd Skynyrd Productions' *exclusive* right to use the trademark in commerce on or in connection with apparel under 15 U.S.C. § 1115(b).  A true and correct copy of the United States Patent and Trademark Office's record of the LYNYRD SKYNYRD trademark for this registration showing its incontestable status is attached hereto as EXHIBIT F.

150.    Lynyrd Skynyrd Productions has established significant goodwill in the mark LYNYRD SKYNYRD, which has become famous in the entertainment field, and is strongly associated with a single source, namely, Lynyrd Skynyrd.

151.    Fans and critics alike refer to the band simply as "Skynyrd."  A true and correct copy of a printout of the first page of a Google search for "Skynyrd" is attached hereto as

EXHIBIT G.  In fact, the mark SKYNYRD itself is a valid common law mark, which mark has become famous in the entertainment field, and is strongly associated with a single source, namely, Lynyrd Skynyrd.

152.    On June 22, 2000, an organization known as "anulook," on information and belief Counterclaim-Defendants' agent and at Counterclaim-Defendants' direction, registered a domain name, <skynyrdsurvivor.com> (the "Skynyrd Domain Name"), and Counterclaim-Defendants began using the Skynyrd Domain Name.  On information and belief, anulook, Reed, and/or Survivor, never used the Skynyrd Domain Name in connection with a *bona fide* offering of goods or services, but rather used the Skynyrd Domain Name only in connection with a distasteful web site for commercial gain that tarnished the Lynyrd Skynyrd organization's reputation because, among other reasons, Lynyrd Skynyrd Productions did not control the web site's content, which was contrary to Lynyrd Skynyrd Productions' and the Lynyrd Skynyrd organization's creative intent and standards of quality.

153.    Specifically, the Skynyrd Domain Name resolved to a web site that charged unwitting consumers to view certain Lynyrd Skynyrd memorabilia, photographs, collectables, and films embodying the likenesses of the Lynyrd Skynyrd band and its members without permission.

154.    On information and belief, Counterclaim-Defendants, or their designees, developed the web site at the Skynyrd Domain Name for the purpose of selling CD-ROMs, photographs, memorabilia, collectables, and films embodying the likenesses of, or belonging to, members of the Lynyrd Skynyrd organization without authorization or permission.  Through this web site, Counterclaim-Defendants utilized individual band members' (both living and dead)

names and likenesses, infringed Lynyrd Skynyrd Productions' trademarks and service marks, infringed third party copyrights, and earned financial remuneration thereby.

155.    Since its inception, Lynyrd Skynyrd Productions repeatedly asked, and then demanded, that Reed cease and desist from operating the web site at the Skynyrd Domain Name, but those demands were all ignored.  By way of illustration, attached hereto as EXHIBIT H is a true and correct copy of a December 21, 2000 letter to Reed from Lynyrd Skynyrd Productions' attorneys.

156.    Reed's employment with Fly On and the Lynyrd Skynyrd organization in general was terminated in 2005 for cause.

157.    Counterclaim-Defendants' activities escalated; they began to market guitars as Lynyrd Skynyrd-endorsed guitars through the web site at the Skynyrd Domain Name and through www.eBay.com.   Moreover, prior to and during the pendency of this lawsuit, Counterclaim-Defendants charged up to $99.95 to Lynyrd Skynyrd fans or unwitting consumers to "join" the web site at the Skynyrd Domain Name, a crass practice that injured the goodwill and trust that Lynyrd Skynyrd Productions and Lynyrd Skynyrd have worked for approximately 40 years to build with Skynyrd fans.  In addition, representations on the web site at the Skynyrd Domain Name intimated that genuine "Lynyrd Skynyrd merchandise" was available to consumers through the web site, which was false and/or misleading.  True and correct copies of five sample pages from the web site at the Skynyrd Domain Name are attached hereto as EXHIBIT I.

158.    Further, Counterclaim-Defendants began improperly using the LYNYRD SKYNYRD mark in "metatags" in the programming code of the web site at the Skynyrd Domain Name.  By doing so, they nefariously attempted to attract Lynyrd Skynyrd fans and potential

customers.  A "metatag" is a list of words hidden in a web site acting as an index or reference source identifying the content of the web site for search engines.  A true and correct copy of the programming code for the web site at the Skynyrd Domain Name containing the LYNYRD SKYNYRD mark is attached hereto as EXHIBIT J.  This "hidden-from-public-eye" usage evidences a bad intent and improper trading on the goodwill of the LYNYRD SKYNYRD mark and, on information and belief, has caused actual confusion and/or initial-interest confusion to Lynyrd Skynyrd fans, potential fans, and the relevant purchasing public.

159.    On or about December 12, 2008, Lynyrd Skynyrd Productions submitted a complaint to the World Intellectual Property Organization Arbitration and Mediation Center, in accordance with the Uniform Domain Name Dispute Resolution Policy, to recover the Skynyrd Domain Name from anulook.

160.    Within days, anulook surrendered the Skynyrd Domain Name to the Skynyrd Domain Name's registrar—Melbourne IT, Ltd., d/b/a Internet Names.

161.    Though the web site associated with the Skynyrd Domain Name no longer existed, Counterclaim-Defendants continued to charge "subscribers" monthly fees on their credit cards to view the absent content, to the detriment of Lynyrd Skynyrd fans and the goodwill that the LYNYRD SKYNYRD mark had earned over approximately 35 years.

162.    On January 29, 2009, Survivor then registered a new <syrvyvyrfilms.com> domain name (the "Successor Domain Name").

163.    Though by that time this action had already commenced, Counterclaim-Defendants then boldly caused the Successor Domain Name to point to the same web site content to which the Skynyrd Domain Name had once resolved, including, without limitation,

the web site content specifically described in paragraphs 153, 154, and 157 above; the Successor Domain Name continues to resolve to such content, to Lynyrd Skynyrd Productions' detriment.

164.    Moreover, on information and belief, Counterclaim-Defendants have resumed all of the activities described above through the Successor Domain Name, and they continue to do so, to Lynyrd Skynyrd Productions' detriment.

165.    True and correct copies of sample pages from the <syrvyvyrfilms.com> web site are attached hereto as EXHIBIT K.

166.    Further, Counterclaim-Defendants improperly use the LYNYRD SKYNYRD mark in "metatags" in the programming code of the <syrvyvyrfilms.com> web site, evidencing a bad intent and improper trading on the goodwill of the LYNYRD SKYNYRD mark and, on information and belief, causing actual confusion and/or initial-interest confusion to Lynyrd Skynyrd fans, potential fans, and the relevant purchasing public.  A true and correct copy of the programming code for the web site at the Successor Domain Name containing the LYNYRD SKYNYRD mark is attached hereto as EXHIBIT L.

## Count I

## Federal Trademark Infringement

167.    Lynyrd Skynyrd Productions incorporates by reference paragraphs 1-166 above as if rewritten herein.

168.    Counterclaim-Defendants' use of the LYNYRD SKYNYRD trademarks and service marks in interstate commerce in connection with the aforesaid acts, including, without limitation, in the metatags of the programming code of the <skynyrdsuvivor.com> web site and of the <syrvyvyrfilms.com> web site, has resulted in actual confusion or initial-interest

confusion, and constitutes infringement of the LYNYRD SKYNYRD trademarks and service marks, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

169.   On information and belief, Counterclaim-Defendants' acts of infringement are and have been deliberate, intentional, and willful and have been committed with full knowledge of Lynyrd Skynyrd Productions' rights in the LYNYRD SKYNYRD trademarks and service marks for musical recordings, live performances, and various apparel.

170.   Lynyrd Skynyrd Productions has been and will continue to be injured as a result of the foregoing acts, either by direct diversion of business from genuine LYNYRD SKYNYRD-branded products and services or by lessening of the goodwill that the LYNYRD SKYNYRD trademarks and service marks enjoys with the buying public, including, without limitation, Lynyrd Skynyrd fans.

171.   Counterclaim-Defendants, by their aforesaid acts, have damaged Lynyrd Skynyrd Productions and unlawfully derived profits and gains.

172.   By reason of the aforesaid unlawful acts of infringement, Counterclaim-Defendants have caused and will continue to cause substantial and irreparable harm to Lynyrd Skynyrd Productions and to the public, for which there is no adequate remedy at law. Counterclaim-Defendants have unjustifiably benefited from said unlawful acts and will continue to carry out such unlawful conduct and be unjustly enriched unless enjoined by this Court.

## Count II

## Federal Trademark Dilution

173.   Lynyrd Skynyrd Productions incorporates by reference paragraphs 1-172 above as if rewritten herein.

174. The LYNYRD SKYNYRD mark is inherently distinctive and/or has acquired distinctiveness through approximately 40 years of continued use.

175. The LYNYRD SKYNYRD mark is also famous.

176. Counterclaim-Defendants' commercial use of the famous LYNYRD SKYNYRD mark in interstate commerce in connection with the aforesaid acts, including, without limitation, on the <skynyrdsurvivor.com> web site and on the <syrvyvyrfilms.com> web site, in connection with selling various items, in connection with marketing guitars, in connection with offering "Lynyrd Skynyrd merchandise," and in connection with selling memberships to users, has caused dilution by tarnishment of the famous LYNYRD SKYNYRD mark, or is likely to dilute it, in violation of Section 43(c) of the Lanham Act, 15 U.S.C. 1125(c).

177. On information and belief, Counterclaim-Defendants' use of the LYNYRD SKYNYRD mark in connection with the aforesaid activities has been willful.

178. Counterclaim-Defendants, by their aforesaid acts, have damaged Lynyrd Skynyrd Productions and unlawfully derived profits and gains therefrom.

179. By reason of the aforesaid unlawful acts, Counterclaim-Defendants have caused and will continue to cause substantial and irreparable harm to Lynyrd Skynyrd Productions and to the public for which there is no adequate remedy at law. Counterclaim-Defendants have unjustifiably benefitted from said unlawful acts and will continue to carry out such unlawful conduct and be unjustly enriched unless enjoined by this Court.

## Count III

## Violation of the Anti-Cybersquatting Consumer Protection Act

180. Lynyrd Skynyrd Productions incorporates by reference paragraphs 1-179 above as if rewritten herein.

181.    The LYNYRD SKYNYRD and SKYNYRD service marks are inherently distinctive and/or have acquired secondary meaning, and are also famous.  The public associates the LYNYRD SKYNYRD and SKYNYRD marks exclusively with the musical group "Lynyrd Skynyrd."  This is a result of the LYNYRD SKYNYRD and SKYNYRD marks' inherent distinctiveness and of distinctiveness and fame acquired through longstanding and extensive use in commerce by Lynyrd Skynyrd Productions in connection with the provision of SKYNYRD-branded products and services throughout the State of Ohio and in interstate commerce.

182.    The LYNYRD SKYNYRD and SKYNYRD service marks were distinctive and famous on June 22, 2000, when Counterclaim-Defendants began using the <skynyrdsurvivor.com> domain name for their illicit purposes.

183.    On information and belief, commencing on June 22, 2000, Counterclaim-Defendants, with a bad faith intent to profit within the meaning of 15 U.S.C. § 1125(d)(1)(B), began using, and continued to use until December 2008, the <skynyrdsurvivor.com> domain name, a domain name that is confusingly similar to Lynyrd Skynyrd Productions' LYNYRD SKYNYRD mark, in violation of 15 U.S.C. § 1125(d)(1)(A).

184.    Lynyrd Skynyrd Productions has been injured as a result of Counterclaim-Defendants' unlawful use of the Skynyrd Domain Name.

185.    As a result of Counterclaim-Defendants' acts, Counterclaim-Defendants have damaged Lynyrd Skynyrd Productions and unlawfully derived profits and gains from their unlawful use of the Skynyrd Domain name.

## Count IV

## Federal Unfair Competition

186.    Lynyrd Skynyrd Productions incorporates by reference paragraphs 1-185 above as if rewritten herein.

187.    Counterclaim-Defendants' liberal use of the LYNYRD SKYNYRD mark in interstate commerce in connection with the aforesaid acts, including, without limitation, on the <skynyrdsurvivor.com> web site and on the <syrvyvyrfilms.com> web site, in connection with selling various items, in the metatags of the web site's programming code, in connection with marketing guitars, in connection with offering "Lynyrd Skynyrd merchandise," and in connection with selling memberships to users, were and are intended to create confusion, mistake, and deception as to the affiliation, connection, or association of Counterclaim-Defendants with Lynyrd Skynyrd Productions, and intimate that Counterclaim-Defendants' goods and services originate with, are sponsored by, or are approved of by Lynyrd Skynyrd Productions.

188.    Counterclaim-Defendants' advertisement on the <skynyrdsurvivor.com> web site that they were offering "Lynyrd Skynyrd merchandise" in interstate commerce also constituted a false or misleading description of fact falsely describing and advertising such goods, in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. 1125(a)(1)(B).

189.    On information and belief, Counterclaim-Defendants' use of the LYNYRD SKYNYRD mark in connection with the aforesaid activities has been willful and either has deceived or is likely to deceive a substantial portion of the intended audience for genuine Lynyrd Skynyrd merchandise.

190.    Counterclaim-Defendants' deception is material in that it is likely to influence purchasing decisions.

191.    Counterclaim-Defendants' activities have resulted in actual harm to Lynyrd Skynyrd Productions by lessening of the goodwill that the LYNYRD SKYNYRD brand enjoys with the buying public.

192.    Counterclaim-Defendants, by their aforesaid acts, have damaged Lynyrd Skynyrd Productions and unlawfully derived profits and gains therefrom.

193.    By reason of the aforesaid unlawful acts and the aforesaid false or misleading statements, Counterclaim-Defendants have caused and will continue to cause substantial and irreparable harm to Lynyrd Skynyrd Productions and to the public for which there is no adequate remedy at law.  Counterclaim-Defendants have unjustifiably benefitted from said unlawful acts and will continue to carry out such unlawful conduct and be unjustly enriched unless enjoined by this Court.

## Count V

## Violation of the Ohio Deceptive Trade Practices Act

194.    Lynyrd Skynyrd Productions incorporates by reference paragraphs 1-193 above as if rewritten herein.

195.    Counterclaim-Defendants' activities constitute unfair or deceptive trade practices or acts within the meaning of the Ohio Deceptive Trade Practices Act, codified at Ohio Revised Code § 4165.02.

196.    Lynyrd Skynyrd Productions has been injured as a result of Counterclaim-Defendants' unlawful and unauthorized deceptive trade practices by lessening of the goodwill that Lynyrd Skynyrd Productions' products and services have with the buying public.

197. As a result of Counterclaim-Defendants' unlawful and unauthorized deceptive trade practices, Counterclaim-Defendants have caused and will continue to cause substantial and irreparable harm to Lynyrd Skynyrd Productions and to the public for which there is no adequate remedy at law. Counterclaim-Defendants have unjustifiably benefited from said unlawful acts and will continue to carry out such unlawful conduct and be unjustly enriched unless enjoined by this Court.

## Count VI

## Unfair Competition Under Ohio Law

198. Lynyrd Skynyrd Productions incorporates by reference paragraphs 1-197 above as if rewritten herein.

199. The aforesaid conduct of Counterclaim-Defendants constitutes unfair competition under the common law of the State of Ohio.

200. On information and belief, Counterclaim-Defendants' acts of unfair competition have been willful.

201. Lynyrd Skynyrd Productions has been injured as a result of the foregoing acts by lessening of the goodwill that Lynyrd Skynyrd Productions and Lynyrd Skynyrd products and services enjoy with the buying public.

202. As a result of Counterclaim-Defendants' acts of unfair competition, Counterclaim-Defendants have caused and will continue to cause substantial and irreparable harm to Lynyrd Skynyrd Productions and to the public for which there is no adequate remedy at law. Counterclaim-Defendants have unjustifiably benefited from said unlawful acts and will continue to carry out such unlawful conduct and be unjustly enriched unless enjoined by this Court.

## PRAYER FOR RELIEF

**WHEREFORE**, Lynyrd Skynyrd Productions prays that this Court enter judgment in its favor as follows:

(A)    That Counterclaim-Defendants be adjudged to have infringed Lynyrd Skynyrd Productions' federal trademark and service mark rights in LYNYRD SKYNYRD conveyed by U.S. Trademark Registration Nos. 2,271,355, 2,240,157, and 2,268,065, in violation of Lanham Act Section 32(1), 15 U.S.C. § 1114(1);

(B)    That Counterclaim-Defendants be adjudged to have willfully infringed the LYNYRD SKYNYRD trademarks and service marks, with full knowledge of Lynyrd Skynyrd Productions' prior use of and rights in the LYNYRD SKYNYRD trademarks and service marks;

(C)    That Counterclaim-Defendants be adjudged to have diluted the LYNYRD SKYNYRD trademarks and service marks by tarnishment or, alternatively, that their activities be adjudged likely to dilute the LYNYRD SKYNYRD trademarks and service marks, in violation of Lanham Act Section 43(c), 15 U.S.C. § 1125(c);

(D)    That Counterclaim-Defendants be adjudged to have, with bad faith, used a domain name that is confusingly similar to Lynyrd Skynyrd Productions' LYNYRD SKYNYRD service mark, in violation of Lanham Act Section 43(d)(1), 15 U.S.C. § 1125(d)(1);

(E)    That Counterclaim-Defendants be adjudged to have used a false designation of origin, in violation of Lanham Act Section 43(a), 15 U.S.C. § 1125(a)(1)(A), and caused a false or misleading statement of fact to enter into interstate commerce, in violation of Lanham Act Section 43(a), 15 U.S.C. § 1125(a)(1)(B);

(F)    That Counterclaim-Defendants be adjudged to have committed deceptive trade practices under Ohio Rev. Code Ann. § 4165.02 and to have committed these deceptive trade practices willfully and with knowledge that they would be deceptive;

(G)    That Counterclaim-Defendants be adjudged to have engaged in unfair competition under Ohio law;

(H)    That, pursuant to 15 U.S.C. § 1116 and Ohio Rev. Code Ann. § 5165.03(A)(1), the Court preliminary and permanently enjoin Counterclaim-Defendants, their agents, employees, attorneys, and all persons in active concert or participation with them, from directly or indirectly using the LYNYRD SKYNYRD trademarks and service marks or any other mark, trade name, word, or name similar to the LYNYRD SKYNYRD trademarks and service marks, including, without limitation, SKYNYRD, in a manner that is likely to cause confusion, mistake, or to deceive, including, without limitation, by selling products as "Lynyrd Skynyrd merchandise" through a web site, by publishing false or misleading statements in connection with such products, and/or by creating a false impression that the genuine Lynyrd Skynyrd organization sponsors or endorses any activity;

(I)    That Counterclaim-Defendants be required, pursuant to 15 U.S.C. § 1117(a), to pay Lynyrd Skynyrd Productions the actual damages it has suffered as a result of Counterclaim-Defendants' trademark infringement, trademark dilution, and deceptive practices and disgorge any profits therefrom, and that Counterclaim-Defendants be required, pursuant to 15 U.S.C. § 1117(b), to pay Lynyrd Skynyrd Productions three times the amount of actual damages or profits suffered by them by virtue of the willful nature of Counterclaim-Defendants' illegal acts;

(J)    That Counterclaim-Defendants be required, pursuant to 15 U.S.C. § 1117(a), to pay Lynyrd Skynyrd Productions all damages sustained by it by reason of Counterclaim-Defendants' illegal use of the Skynyrd Domain Name in violation of Lanham Act

Section 43(d)(1), 15 U.S.C. § 1125(d)(1); alternatively, pursuant to 15 U.S.C. § 1117(d), for maximum statutory damages in the amount of $100,000;

(K)     That, pursuant to Ohio Rev. Code Ann. § 4165.03(B), the Court award Lynyrd Skynyrd Productions its attorneys' fees by virtue of Counterclaim-Defendants' willful engagement in a deceptive trade practice listed in Ohio Rev. Code Ann. § 4165.03(A) knowing it to be deceptive, or alternatively, pursuant to 15 U.S.C. § 1117(a), that the Court declare this an exceptional case and awarding Lynyrd Skynyrd Productions its reasonable attorneys' fees;

(L)     That, pursuant to 15 U.S.C. § 1117(a), the Court award the full costs of this action and interest to Lynyrd Skynyrd Productions; and

(M)     That the Court grant such other and further relief as is just and proper.


Respectfully submitted,

DATED:  February 19, 2010

*/s/ Mark E. Avsec*
Mark E. Avsec (0064472)
mavsec@beneschlaw.com
Bryan A. Schwartz (0078527)
bschwartz@beneschlaw.com
Angela R. Gott (0082198)
agott@beneschlaw.com
**BENESCH, FRIEDLANDER,**
  **COPLAN & ARONOFF LLP**
200 Public Square, Suite 2300
Cleveland, Ohio  44114-2378
Telephone:  (216) 363-4500
Facsimile:   (216) 363-4588

*Attorneys for Defendant*
*Lynyrd Skynyrd Productions, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 19, 2010, a true and correct copy of the foregoing **FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS OF LYNYRD SKYNYRD PRODUCTIONS, INC.** was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Mark E. Avsec*
One of the Attorneys for Defendant